# BEFORE THE ALABAMA DEPARTMENT
# OF REHABILITATION SERVICES

## IN RE:  THE MATTER OF CALVIN SCOTT

### A Full and Evidentiary Hearing Pursuant to the Randolph-

### Sheppard Vending Act 20 U.S.C. 107, et seq.

# VOLUME I

# [Pages 1 to 75]

# FREEDOM COURT REPORTING

1

BEFORE THE ALABAMA DEPARTMENT

OF REHABILITATION SERVICES

ORIGINAL

IN RE:  THE MATTER OF CALVIN SCOTT

A FULL EVIDENTIARY HEARING PURSUANT TO THE

RANDOLPH-SHEPPARD VENDING ACT 20 U.S.C.

107, et seq.

* * * * * * * * * * *

TESTIMONY AND PROCEEDINGS, taken
before the Honorable Frank S. James, III,
as Hearing Officer, and reported by
Virginia Denese Barrett, Court Reporter
and Commissioner for the State of Alabama
at Large, at 2129 East South Boulevard,
Montgomery, Alabama, on the 6th day of
October, 2005, commencing at approximately
10:00 a.m.

* * * * * * * * * * *



# FREEDOM COURT REPORTING

2

1          EXAMINATION INDEX

2    GLADYS SCOTT

3    Testimony of Gladys Scott .......... 59

4    Cross-Examination by Mr. Simpson ... 115

5    Cross-Examination by Ms. Fleming ... 118

6    Recross-Examination by Ms. Fleming . 222

7    **CALVIN SCOTT**

8    Testimony of Calvin Scott .......... 76

9    Cross-Examination by Mr. Simpson ... 90

10   Cross-Examination by Ms. Fleming ... 96

11   Recross-Examination by Mr. Simpson . 109

12   **RAY DENNIS**

13   Direct Examination by Mr. Simpson .. 119

14   **KEN GREEN**

15   Direct Examination by Mr. Simpson .. 137

16   Cross-Examination by Mr. Scott ..... 153

17   Redirect Examination by Mr. Simpson. 157

18   Recross-Examination by Ms. Scott ... 159

19   Redirect Cont'd. by Mr. Simpson .... 170

20   Cross-Examination by Ms. Fleming ... 171

21   **PERRY HOPPER**

22   Direct Examination by Mr. Simpson .. 175

23   Cross-Examination by Ms. Fleming ... 190

# FREEDOM COURT REPORTING

3

1          EXAMINATION INDEX CONTINUED

2    **PERRY HOPPER**

3    Cross-Examination by Mr. Scott ..... 194

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

4

1           BEFORE THE ALABAMA DEPARTMENT

2             OF REHABILITATION SERVICES

3

4     IN RE:  THE MATTER OF CALVIN SCOTT

5

6     A FULL EVIDENTIARY HEARING PURSUANT TO THE

7     RANDOLPH-SHEPPARD VENDING ACT 20 U.S.C.

8     107, et seq.

9

10

11    BEFORE:

12        VIRGINIA DENESE BARRETT, Commissioner

13    APPEARANCES:

14              BAKER, DONELSON, BEARMAN,

15    CALDWELL & BERKOWITZ, P.C., by Mr. Frank

16    S. James, III, SouthTrust Tower, 420

17    Twentieth Street North, Suite 1600,

18    Birmingham, Alabama  35203, appearing as

19    the Hearing Officer.

20              DEPARTMENT OF REHABILITATION

21    SERVICES, by Mr. Stephen K. Simpson, 2129

22    East South Boulevard, Montgomery, Alabama

23    36111, appearing on behalf of the Alabama

# FREEDOM COURT REPORTING

5

1   Department of Rehabilitation Services.

2           OFFICE OF THE ATTORNEY GENERAL,

3   by Ms. Margaret Fleming, 11 South Union

4   Street, Montgomery, Alabama  36130,

5   appearing on behalf of James "Buddy"

6   Swearengin.

7   ALSO PRESENT:

8           Mr. Calvin Scott, Pro Se

9           Ms. Gladys Scott

10          Mr. Ray Dennis

# FREEDOM COURT REPORTING

6

1    HEARING OFFICER:  We are here to

2    conduct a full evidentiary hearing in

3    the matter of Calvin Scott pursuant

4    to the Court order in the

5    consolidated cases of Calvin Scott

6    versus Ray Dennis, Perry Hopper, Ken

7    Green, State of Alabama Department of

8    Rehabilitation Services Business

9    Enterprise Program.  That's Civil

10   Action Number 2:05cv-652-F.  Calvin

11   Scott versus James Buddy Swearengin,

12   Jr., Civil Action Number

13   2:05cv-651-T.  That's in the United

14   States District Court for the Middle

15   District of Alabama.

16            I am Frank James, and

17   I've been appointed as the hearing

18   officer to conduct a full evidentiary

19   hearing to consider Mr. Calvin

20   Scott's complaints against the

21   Alabama Department of Rehabilitation

22   Services that contend that the State

23   licensing agency has violated the

# FREEDOM COURT REPORTING

7

1    Randolph-Sheppard Act.

2            Are there any preliminary

3    matters?

4        MR. SIMPSON:  Well, we have had

5    some discussions about exhibits

6    preliminarily.  And the Department

7    prepared and presented to the Scotts

8    as well as Ms. Margaret Fleming who

9    represents Mr. Swearengin a notebook

10   containing fifteen exhibits.  And

11   correct me if I'm wrong anybody, but

12   I believe that we've agreed that in

13   that notebook Exhibits 1 through 12

14   and Exhibit 15 are all things that

15   all of the parties would want to

16   present to the Hearing Officer.

17   There's some question as to whether

18   13 and 14 should be received into

19   evidence.

20       HEARING OFFICER:  That's 1

21   through 12 and 15?

22       MR. SIMPSON:  Yes.

23       HEARING OFFICER:  Is that

# FREEDOM COURT REPORTING

8

1    correct?

2         MS. SCOTT:  Yes.

3         MR. SIMPSON:  And the Scotts

4    very graciously presented me with or

5    aloud me to examine a number of

6    pieces of correspondence that are not

7    included in this notebook.  They're

8    correspondence between the Scotts and

9    the United States Department of

10   Education.  And I don't -- the

11   Department doesn't have any

12   objections at all to those pieces of

13   correspondence being presented.

14        HEARING OFFICER:  And where are

15   they?

16        MR. SIMPSON:  Ms. Scott has it.

17        MS. SCOTT:  I have them.

18        HEARING OFFICER:  Okay.  Do you

19   want to give me those?  And I assume

20   that you two already have them,

21   Ms. Fleming and --

22        MR. SIMPSON:  Yes.

23        HEARING OFFICER:   -- and

# FREEDOM COURT REPORTING

9

1    Mr. Simpson.

2        MR. SIMPSON:  Yes.

3        MS. FLEMING:  I don't have them,

4    but I can get them from Mr. Simpson.

5        MR. SIMPSON:  The ones that I

6    was shown this morning were things

7    that we already had in our file.

8        HEARING OFFICER:  Okay.  All

9    right.  This is Ms. Scott?

10        MS. SCOTT:  Yes.  I'm his

11    assistant.

12        HEARING OFFICER:  All right.

13        MS. SCOTT:  My husband's

14    assistant.

15        HEARING OFFICER:  Why don't we

16    identify for the record who else

17    we've got present here today.

18        MR. SIMPSON:  Sure.  I'm Stephen

19    Simpson, and I represent the Alabama

20    Department of Rehabilitation

21    Services.

22        MS. FLEMING:  Margaret Fleming.

23    I represent James Swearengin.

# FREEDOM COURT REPORTING

10

1    MR. DENNIS:  Ray Dennis.  I'm

2    program director for the Business

3    Enterprise Program for the Blind.

4    HEARING OFFICER:  Okay.  And,

5    Ms. Scott, would you justify

6    yourself?

7    MS. SCOTT:  I'm Gladys Scott.

8    I'm Calvin Scott's wife and his

9    assistant.

10    MR. SCOTT:  I'm Calvin Scott.

11    And I'm the blind vendor at the

12    Gordon Persons office building.

13    HEARING OFFICER:  And our court

14    reporter is --

15    COURT REPORTER:  Denese Barrett.

16    HEARING OFFICER:  Denese

17    Barrett.  Very good.  Now, I have

18    just been presented by Ms. Scott a

19    March 18, 2005 memorandum to Deborah

20    Steadman of OCR from Calvin Scott,

21    Jr.

22    MS. SCOTT:  Calvin Scott, Sr.

23    HEARING OFFICER:  Calvin Scott,

# FREEDOM COURT REPORTING

11

1   Sr.  Excuse me.  This looks like a

2   statement dated February 3rd, 2005

3   from Calvin Scott, Sr., to the United

4   States Department of Education Office

5   for Civil Rights and a June 22nd,

6   2005 letter from the U. S. Department

7   of Education Office for Civil Rights

8   addressed to Calvin Scott, Sr.

9   Subject complaint Number 05-05-3004.

10   Now, are there any objections to my

11   receiving these --

12        MR. SIMPSON:  No.

13        HEARING OFFICER:  -- documents

14   as exhibits, which we will mark

15   Exhibits 16, 17 and 18 I guess?

16        Those of us who are not lawyers

17   maybe have never participated in a

18   hearing before.  But typically when

19   we have hearings, we give the parties

20   the opportunity to make opening

21   statements.  And opening statements

22   are designed to -- to help the finder

23   of fact find out what the case is all

# FREEDOM COURT REPORTING

12

1    about.  And in this case, I am the

2    finder of fact.  We typically let the

3    claimant make an opening statement

4    first, and then we let the responding

5    party make an opening statement

6    second.  Now, an opening statement is

7    certainly not required.  It's up to

8    the parties.  Either of the parties

9    may waive their right to make an

10   opening statement, but it's entirely

11   up to you-all.

12        Mr. Scott, I'll ask you if you

13   would like to make an opening

14   statement.

15        MR. SCOTT:  Yes, I would.

16        HEARING OFFICER:  All right.

17   Then we will hear from you.

18        MR. SCOTT:  First of all, we are

19   here because the judge ordered us to

20   go through these hearings.  And this

21   is what we are here for today.  And

22   the next thing is is that we did no

23   wrong for us to really be here.  And

# FREEDOM COURT REPORTING

13

1    had things -- had -- had -- well,

2    I've got to go back to James

3    Swearengin, first of all.  He's the

4    cause of the problem, telling lies on

5    us.

6        HEARING OFFICER:  Now, who is

7    James Swearengin?

8        MR. SCOTT:  He was the building

9    manager at the Gordon Persons office

10   building.

11       HEARING OFFICER:  Go ahead.  I'm

12   sorry.  I didn't mean to interrupt

13   you.

14       MR. SCOTT:  Anyway, he told lies

15   on myself and my wife and plus the

16   fact stating that we threatened to

17   bring a gun in that building to shoot

18   personnel.

19       HEARING OFFICER:  Excuse me.

20   Can we just hold off on the

21   paperwork, shuffling the papers until

22   we get through this.

23       MS. SCOTT:  Okay.

# FREEDOM COURT REPORTING

14

1        HEARING OFFICER:  Go ahead.

2        MR. SCOTT:  Now, he wrote Ken

3   Green a letter stating that he wanted

4   us out of that building and that he

5   was not -- claiming not to put up

6   with our wrongdoing in that building,

7   which we did no wrong at all.  And

8   all he did was tell lies, which this

9   agency went along with his lies

10  because they -- one day we were

11  coming in to work on the 31st of

12  January when we had gotten a swipe

13  key through my representative, Ken

14  Green.

15       MS. SCOTT:  You got that in

16  2004.

17       MR. SCOTT:  We got that in 2004.

18  But on the 31st of January, that --

19  no.  27th of January, that key was

20  keyed out from the room up there on 4

21  Monroe and Ripley Street.  And my

22  wife went to him on the 31st of

23  January and told him about the key.

# FREEDOM COURT REPORTING

15

1    He said, Well, who gave you this key.

2         HEARING OFFICER:  Are we

3    referring to Mr. Swearengin?

4         MR. SCOTT:  Mr. James Buddy

5    Swearengin.

6         HEARING OFFICER:  Okay.

7         MR. SCOTT:  She said you did.

8    Then he asked her again.  Said, Who

9    gave you this key.  Did Carol give

10   you this key?  She said, No, you did.

11   He said, Well, I changed my mind.

12   And he did not commence to even give

13   us any kind of consideration about

14   the key.  And his only thing was for

15   us to get out of that building off of

16   his lies saying that -- and even in

17   that letter, he was stating to Ken

18   Green that when -- one day my wife

19   was -- and I was coming in with stock

20   and there was a security guard there

21   by the name of Fred Morris.  He acted

22   real snobbish about it.  And when my

23   wife did not park the way he wanted

# FREEDOM COURT REPORTING

16

1    her to park, because she was not

2    going to try to cause no accident

3    between that car and the truck, he

4    jumped up on -- up on the porch and

5    started cursing at her.

6            HEARING OFFICER:  Who did this?

7            MR. SCOTT:  Fred Morris, the

8    security guard.  And so I told him, I

9    said, Now, I'm going to have you done

10   in about your job, I said, because

11   I'm going to see that you -- that you

12   get fired.  I did not threaten him

13   with no bodily harm.  And so we went

14   to talk to James Swearengin about it,

15   and he got all up in the air.  Well,

16   you're privileged to work in this

17   building.  You -- you -- see, he --

18   he did not give us any kind of

19   consideration that we -- that the --

20   about Fred Morris at all.  And so he

21   said -- and he told -- told us, said,

22   Well, now, if we -- if we give you

23   privilege to park in here, we'll be

# FREEDOM COURT REPORTING

17

1    having respect of persons.  And so,

2    well, anyway, my wife explained to

3    him about respect of persons.  He

4    said, Well, you have to do like

5    Jesus.  You have to not say nothing.

6    So she wrote him a letter and

7    explained to him in that letter --

8    and she could read that letter to

9    you, if you want her to.

10        HEARING OFFICER:  Would this be

11   Exhibit 2?

12        MR. SIMPSON:  No.

13        HEARING OFFICER:  Do we have

14   this exhibit?  Is it an exhibit?

15        MR. SIMPSON:  No.  I think he's

16   referring to correspondence that

17   would be approximately nine years old

18   from some time ago.

19        MS. SCOTT:  May I speak, sir?

20        HEARING OFFICER:  Yes.

21        MS. SCOTT:  Calvin, are you

22   finished?

23        MR. SCOTT:  Go ahead.

# FREEDOM COURT REPORTING

18

1       MS. SCOTT: Okay. Back in the

2   year 2004 when we had the Gordon

3   Persons Building, my husband's

4   facility, one of the areas had been

5   locked and we could not get in on 4

6   Monroe and Ripley. We name it by the

7   street. It covers four blocks down

8   there. So my husband called Ken

9   Green, his representative, and told

10  him that we couldn't get in 4 Monroe

11  and Ripley, that the door coming out

12  from the elevator had been locked and

13  we couldn't get in. And so Ken said,

14  All right. I'll call you back. So

15  later he called back and said that we

16  have to go to Swearengin to get a

17  key. So we tell Ken, Ken, listen.

18  We shouldn't have to go to Swearengin

19  to get a key. Calvin is a permanent

20  vendor here and he should have a

21  swipe key like the other employees.

22      HEARING OFFICER: When you say

23  other employees, are you saying that

# FREEDOM COURT REPORTING

19

1          Mr. --

2              MS. SCOTT:  We're talking about

3      State employees.  We're talking about

4      the janitors that's not State

5      employees, even though my husband is

6      told that he's self-employed, that

7      he's not a State employee.  But

8      janitorial is not State employees

9      either and they all have swipe keys.

10     We shouldn't have to run in and out

11     of his office every time to pick a

12     key up, a swipe key.  But Ken said

13     he'd work on it.  So a few days later

14     Ken called us back and said, I got it

15     worked out.  And he said, But you

16     have to go to Swearengin to pick up

17     the key.  So my husband and I, we

18     went to Swearengin's office and told

19     them that Ken had sent us there, that

20     they had a swipe key for us.  So he

21     gave us a swipe key, Swearengin did.

22     And he said, Keep up with it.  Don't

23     lose it because it cost.  Now, he

# FREEDOM COURT REPORTING

20

1    didn't tell us to pick this key up

2    and bring it back when you get ready.

3    And Ken done told us that he had it

4    worked out so we could have a

5    permanent swipe key.  So we said okay

6    and went on about our business,

7    finished doing our work in the

8    building.  All right.  On January the

9    27th -- we had the key for several

10    months.  January the 27th the key

11    would not unlock the door, which was

12    on a Thursday.  I didn't bother on it

13    that Friday because I knew we was

14    going to take that Friday off.  So

15    that Monday, I happened to see James

16    Swearengin out on the road.  And I

17    told him that his key would no longer

18    open up the door on 4 Monroe and

19    Ripley.  So he said, Who gave you

20    this key.  And I said, You did.  Did

21    Carol give you this key?  I said, You

22    did and you told us to keep up with

23    it and not lose it because it cost.

# FREEDOM COURT REPORTING

21

1    Well, I don't recall giving you a

2    key.  I changed my mind.  You're not

3    a State employee.  I said, No, I'm

4    not a State employee.  I said, But my

5    husband is through the State

6    Rehabilitation Business Enterprise

7    Program for the Blind.  And I quoted

8    again to him, You gave us this key

9    and told us not to lose it, to keep

10   up with it.  Well, I changed my mind.

11   So he took the key.  So I go on back

12   down to the office, my husband's

13   stock room and told him what

14   happened.  So we left and came out on

15   January 31st and had a conference

16   with Ray Dennis, Calvin's

17   representative, Ken Green, and told

18   them what had happened.  We put in

19   three requests.  Ray asked what did

20   you want.  I put in -- we put in

21   three requests.  We want a swipe key,

22   a permanent swipe key.  We want the

23   snack machine moved out of the

# FREEDOM COURT REPORTING

22

1        restaurant that's back in a corner

2        out of the eye of the people.  We

3        want it moved into the hallway.  And

4        we want a parking place in the

5        loading dock.  I said, We're not

6        having any problems right now.  But

7        down through the years, Ray, you know

8        we have had terrible problems parking

9        in the loading dock.  And it's been

10       times we had to go back home because

11       we couldn't get a parking place.  And

12       I said every time Ken goes to

13       Swearengin for a request for us,

14       Swearengin tells him to tell us to

15       move.  And Ken spoke up and said,

16       Well, take this request or they might

17       tell you to move again.  I said,

18       About the swipe key, about this

19       request here.  I said, Y'all are

20       going to sit by and let that happen.

21       You're not supposed to let that

22       happen.  He tells us every time

23       Calvin have a request to make his

# FREEDOM COURT REPORTING

23

1    work better and enjoyable, that's

2    under ADA law.  We're not -- he's

3    supposed to be accommodating, and it

4    doesn't cost him unless it's undue

5    hardship.  But they stood by and

6    allowed it to happen.

7         So we went on back to work that

8    day.  That's the reason I had the

9    conference with Ray Dennis and Ken

10   Green.  Well, when we got back down

11   there, Swearengin didn't -- well, I

12   didn't document where I -- what

13   happened to the key.  He didn't say,

14   Here, here's the key back.  Instead,

15   he writes Ken Green a letter.  You

16   have it.

17        MR. SIMPSON:  It's Number 2.

18        HEARING OFFICER:  All right.

19        MS. SCOTT:  Have you got it?  Do

20   you want me to read it?

21        HEARING OFFICER:  Yes.

22        MS. SCOTT:  It says Mr.  --

23        HEARING OFFICER:  This is an

# FREEDOM COURT REPORTING

24

1        undated letter.  You don't need to

2        read it.  It has a received February

3        7th, 2005 stamp on it.

4               MS. SCOTT:  Uh-huh.  Yes.

5        That's where I guess Ken received it.

6        It's undated.

7               HEARING OFFICER:  Let me just

8        take a moment to read it here.

9               MS. SCOTT:  Okay.  All right.

10               HEARING OFFICER:  All right.  Go

11        ahead.

12               MS. SCOTT:  Okay.  So you read

13        the letter.  But these letters in

14        here, the slander and liable,

15        defamations of character, slander and

16        liable.  Now, he said we don't pay

17        pay-outs.  Calvin had a good

18        relationship.  These are payouts for

19        2004.  If the customer's name be put

20        on the machine, we call them and we

21        pay them.  We had no reason not to

22        pay anybody because God is good.  We

23        take these off income tax.

# FREEDOM COURT REPORTING

25

1    HEARING OFFICER:  Do you want to

2    offer these as exhibits, too?

3        MS. SCOTT:  2004 I can because I

4    have already filed on income tax, and

5    I've got a copy at home.  I keep -- I

6    sent copies of these with this income

7    tax so they won't be calling me down

8    there talking about some audits or

9    something.  So I sent them everything

10   that we claimed.  So you can keep

11   this 2004 if you want to.

12       HEARING OFFICER:  Well, that's

13   up to you-all.  I'm asking if you

14   want to offer that as an exhibit.

15       MS. SCOTT:  You know, whatever

16   is best for this case.  I've got

17   copies of them.  These are 2004.

18       HEARING OFFICER:  Well, I assume

19   you want to offer those as an

20   exhibit?

21       MR. SCOTT:  Yes.

22       HEARING OFFICER:  Any objection?

23       MR. SIMPSON:  No.

# FREEDOM COURT REPORTING

26

1        MS. SCOTT:  And I've got copies

2    of 2003.  I've got copies of these

3    where I sent one with the State when

4    you file State income tax and one

5    where you file federal income tax.

6        HEARING OFFICER:  All right.  We

7    will just mark this as Exhibit Number

8    19.

9        MS. SCOTT:  Down the years we've

10   been filing.

11       HEARING OFFICER:  They will be

12   received.

13       MS. SCOTT:  Then here's 2003.

14       HEARING OFFICER:  Do you want to

15   mark that as an exhibit, too?

16       MS. SCOTT:  If you want to.  If

17   you want to.

18       HEARING OFFICER:  All right.

19   That will be -- any objections?

20       MR. SIMPSON:  None.

21       HEARING OFFICER:  That will be

22   Number 20.

23       MS. SCOTT:  Okay.  Now, the ones

# FREEDOM COURT REPORTING

27

1    for 2005, I haven't ran copies of

2    them.  I always run copies of them

3    off, you know, and I keep the

4    originals and send the income tax

5    people those.  And I've got more than

6    that.  I didn't bring them all.

7    These are refunds we paid out for the

8    year 2005.  So we'll keep them, but

9    I'm showing they were here that we

10   have those.

11        HEARING OFFICER:  I understand.

12        MS. SCOTT:  Now, to prove

13   another point saying that we don't

14   pay -- don't pay -- don't pay --

15        MR. SCOTT:  Payouts.

16        MS. SCOTT:  -- payouts, I

17   brought my cell phone bills.  On this

18   one month I made thirty-seven calls.

19   I've got the numbers on there, the

20   242 numbers and the 353 numbers.

21   I've got them all checked in red.

22   Those are Gordon Persons personnel

23   people that have left notes on the

# FREEDOM COURT REPORTING

28

1    machine.  I've got all of these to

2    prove that we do pay payouts and we

3    call these people.

4         Now, we don't go to people's

5    office so they won't fall out with

6    the supervisors or either with us, a

7    complaint that we in there holding

8    people up from their work.  So I call

9    them, and they come up to the snack

10   machine when we get there.  So those

11   are lies.  I've got proof that we do

12   pay payouts.  He's talking about he's

13   got witnesses.  What witness he got?

14   Telling him we bring a gun and shoot

15   personnel.  Everybody down there has

16   been so nice.  The whites and the

17   blacks.  Everybody has been so nice.

18   I don't know what's James

19   Swearengin's problem.  It's just that

20   he doesn't like us, and it's no law

21   against not liking nobody.  But it's

22   a way for him of retaliation.

23        HEARING OFFICER:  Let me say

# FREEDOM COURT REPORTING

29

1    that the purpose of a full

2    evidentiary hearing under Section

3    795-7-12-.04 of the applicable

4    regulations is to receive evidence

5    consistent with the blind evidence --

6    the blind vendor's dissatisfaction

7    with a decision of the commissioner.

8    Okay.  And so I would like to ask

9    during your opening statement what

10   decision of the commissioner is being

11   challenged here.

12       MS. SCOTT:  Well, we never heard

13   anything from the commissioner.

14       MR. SCOTT:  We never heard

15   anything from the commissioner.

16       MS. SCOTT:  He wasn't given a

17   chance to.  He wasn't given a chance

18   to hear it.  We didn't get a letter

19   or anything from the commissioner.

20   And anyway, they -- I'm glad you read

21   the letter.  But all these things in

22   this letter is not true.  We have not

23   went in no secured area.  We've been

# FREEDOM COURT REPORTING

30

1    down there ten years.  We haven't

2    been in no secured area.  Now, when

3    Calvin first got inventoried in there

4    March of 1995, Perry Hopper was his

5    representative at the time before he

6    got promoted to assistant director.

7    And the temporary vendor that was

8    there, when they inventoried Calvin

9    in, they carried us all through those

10   secured areas and didn't knock at the

11   door.  Swearengin had no complaint.

12   And for the -- that building is three

13   acres wide and long.  And at the

14   time, we only had three floors.  So

15   that means I'm walking three acres

16   times three.  Nine acres a day.  I

17   prayed so hard that God showed me a

18   diagram on the wall and said you are

19   here.  So I told my husband, I said,

20   I believe -- because we didn't know

21   the building.  And I said, I believe

22   all those vending -- the break rooms

23   are up on each elevator.  I said,

# FREEDOM COURT REPORTING

31

1    Let's get on the elevator and just go

2    and ride and see.  So we done that

3    and we saw that it was.  We'd go down

4    another long hall to the other

5    elevator and saw that it was.  So I

6    no longer had to knock at the

7    security doors in 1995.  During the

8    second week God showed me a way

9    through that building that we no

10   longer had to knock at those doors.

11   But when we were in there, we was

12   taught the way to go.  But God showed

13   me another way that I didn't have to

14   go and knock at no door.

15       It's just that January the 27th,

16   2005, up on 4 Monroe and Ripley, that

17   area has already been secured.  Down

18   the hallway doors, you would have to

19   knock to get in there if you didn't

20   have a key.  But the door coming off

21   the elevator that would take you to

22   the break room and to the hallway

23   hadn't been locked all the time.  It

# FREEDOM COURT REPORTING

32

1    had recently got locked and keyed us

2    out that we couldn't get in with the

3    key.  Now, I'm going to tell you my

4    feelings about what happened, the

5    reason why we got keyed out.

6         Back in 2004 one night at the

7    dog track James Swearengin, III,

8    Swearengin's son, he was at the dog

9    track.  He saw me coming to the

10   mutuel teller window with some money

11   in my hand.  He said, Did you just

12   win that race, and I said, Yes.  I

13   said, Did you -- have you won a race

14   yet, and he said, No.  So I gave him

15   six dollars and said, Here.  Go see

16   can you catch you a dog, and I went

17   on to my seat.  So he saw where I

18   sit, and he came over.  And he told

19   me, he said, Loan me -- he said,

20   asked me, said, Loan me twenty

21   dollars.  And I said, You want to

22   borrow twenty dollars from me.  He

23   said, Yes.  So I loaned him twenty

# FREEDOM COURT REPORTING

33

1    dollars.  Several weeks after that

2    back in 2004 we was at the track

3    because we usually be up there.  And

4    if he see me, he'll come and sit by

5    me because we'll just quote scripture

6    every time we see each other because

7    he claimed that God had called him to

8    preach.  So we always quoted

9    scripture when we'd see each other.

10   And so that night he won a quinella

11   that paid him forty-two dollars.  I

12   wasn't expecting him to pay me twenty

13   dollars out of forty-two dollars.

14   And after that he won another race

15   that paid him eighty-eight dollars

16   and some odd cents.  So he went and

17   cashed his tickets in.  He come back

18   and sat down.  He didn't say nothing

19   about the twenty dollars he owed me.

20   I didn't care if he didn't give me

21   two dollars and say, Here.  Catch you

22   a dog, because I gave him the six

23   dollars.  And so I asked him, I said,

# FREEDOM COURT REPORTING

34

1      Aren't you going to pay me my twenty

2      dollars.  Oh, no.  You don't pay

3      people when you're gambling.  I said,

4      Listen here, you was gambling when

5      you borrowed it and I didn't harass

6      you about it.  I didn't aggravate you

7      when you asked to borrow twenty

8      dollars.  Get out from around me.

9      You're unclean.  I don't care to

10     associate with you.  Stay out of my

11     company.  So there was another fellow

12     sitting down I haven't never seen

13     before.  What I noticed about him, he

14     knew all the trainers.  He could

15     about tell you who was going to win

16     the race.  But I wasn't listening to

17     him.  He's sitting down beside

18     Swearengin.  I didn't know whether he

19     was with him or knew him or not.  So

20     this fellow, whoever he was, he

21     didn't like the way Swearengin, III,

22     had responded to me about that twenty

23     dollars.  So when I went to put my

# FREEDOM COURT REPORTING

35

1    wagers in, I noticed Swearengin had

2    got up and walked down about a half a

3    block near the bar.  And when on my

4    way back to the seat, I noticed that

5    that fellow, he was standing up down

6    there talking to Swearengin.  And he

7    come back up there and told me --

8         HEARING OFFICER:  I think, you

9    know, right now you are getting more

10   into evidence rather than opening

11   statements trying to tell me what the

12   hearing is all about.

13        MS. SCOTT:  I want to tell you

14   the reason why I feel that we got

15   keyed out.

16        HEARING OFFICER:  Well, I mean,

17   I can let you testify to that if it's

18   relevant.

19        MS. SCOTT:  Okay.  I would like

20   to -- I would like to finish telling

21   you that, if I may.

22        HEARING OFFICER:  Well, how much

23   longer do you think it will be?

# FREEDOM COURT REPORTING

36

1      MS. SCOTT:  It's not long.  It's

2      not long.  I'm near the end of it.

3      HEARING OFFICER:  All right.  Go

4      ahead.

5      MS. SCOTT:  Whoever this fellow

6      was, he came back and told me that he

7      cursed him out and called him MF.  I

8      don't like the way you treated her

9      about the GD money.  And I said,

10     Listen, Mister.  I don't come to the

11     dog track for that.  I said God is

12     going to punish him I don't know how

13     many fold for that twenty dollars.

14     And I don't come up here for that.

15     He said, You listen to me.  I have

16     respect for what you said.  He said,

17     But every time you see that MF, you

18     ask him for your GD twenty dollars.

19     Follow him all in the parking lot

20     until he pay you.  I said, Mister, I

21     don't come up here for that.  He can

22     have the twenty dollars.  I'm not

23     studying the twenty dollars.  He can

# FREEDOM COURT REPORTING

37

1   have it, and I went on back to my

2   seat.

3           He stayed away from me for

4   several months until January 2005.

5   One night I come back to my seat and

6   he was sitting there in the chair

7   next to where I -- he saw where I was

8   sitting.  And he says, Hey.  I didn't

9   say anything.  How have you been?  I

10  didn't have no response.  I just

11  prayed in my heart that God would

12  have him to get up because he's

13  unclean and I didn't like how he

14  treated me about that twenty dollars.

15  And I didn't care to keep no company

16  with him.  So he finally got up.  But

17  shortly after that in January 2005,

18  our key got keyed out, and I believe

19  this is why.  I don't know what his

20  son went and told him.  He should

21  have told him all the truth.  I

22  believe and feel that this is why our

23  key got keyed out because he seemed

# FREEDOM COURT REPORTING

38

1    to have been very upset on January

2    31st when I mentioned to him about

3    that key.  He seemed angry,

4    Swearengin did.  And I was wondering

5    what was the matter with him.  And

6    then to come back to me about the

7    relationship with him and his son

8    that same month and like a week or so

9    after that I'm keyed out.  And when I

10   came out and had the conference with

11   Ray and Ken Green, they asked me,

12   said, Have anything happened recently

13   that he might have changed his mind.

14   And that's what I told them, what I

15   just got through saying.  I can't

16   prove that.  But we'd had that key

17   several months and wasn't having no

18   problem with it.  And he seemed upset

19   and mad about something, and I didn't

20   know what was the matter with him.

21   We had done nothing to him.

22        Anyway, every time we have

23   problems with him, he don't like us

# FREEDOM COURT REPORTING

39

1    because we're black.  First, they had

2    two white vendors in that building.

3    And every time Ken Green go and ask

4    for a request for Calvin -- we asked

5    for a request back in January.  I

6    wrote it up in -- we asked for one

7    back in January.  Well, it might have

8    been the 26th.  January 23rd when we

9    went in his office and Fred Morris

10   was giving us such a hard time about

11   the loading dock or parking.  I can

12   park that van at the loading dock to

13   go in and get the cart while my blind

14   husband sit there while I come back

15   for him to put the products up on the

16   loading dock for me to put on the

17   cart.  I come back, and Fred Morris

18   had got in that van, had driven

19   Calvin down to the trash can like

20   fifty feet away.  I had to load up

21   down at the trash can and put the

22   cart up the ramp.  So he done it

23   several times.  So we went in to find

# FREEDOM COURT REPORTING

40

1    out who the building manager was,

2    because Perry Hopper or nobody never

3    introduced us to the building

4    manager.  So we told him how he was

5    doing us.  He was saying that it's a

6    privileged parking loading dock.  I

7    said, Yeah, but that's not what I'm

8    in here for.  That's not the issue.

9    I said, Your security guard is giving

10   us a hard time out there, and I went

11   on telling what he had done and all.

12   I just said with him moving the car,

13   me coming in and coming out to get

14   the car.

15        HEARING OFFICER:  I think we

16   need to swear you in if you want to

17   continue to recite evidence.

18        MS. SCOTT:  Okay.

19        HEARING OFFICER:  This is the

20   place for opening statements.  You

21   will have the opportunity to offer

22   relevant evidence.

23        MS. SCOTT:  Okay.  All right,

# FREEDOM COURT REPORTING

41

1    then.  All right, then.

2           HEARING OFFICER:  But I still

3    don't understand from your point of

4    view what this -- what decision of

5    the commissioner you-all are

6    dissatisfied with.  I mean, because

7    as I understand it, I can only review

8    a commissioner's decision.

9           MR. SCOTT:  We have not --

10   excuse me.  We have not talked with a

11   commissioner, nor heard from a

12   commissioner.

13          HEARING OFFICER:  I see.

14          MR. SCOTT:  No, sir.

15          HEARING OFFICER:  All right.

16          MS. SCOTT:  But after Ray

17   inventoried Calvin out --

18          HEARING OFFICER:  Again, you're

19   getting into evidence now.

20          MS. SCOTT:  Okay.

21          HEARING OFFICER:  Again, do you

22   have anything else you want to say

23   about the reason why I'm here?

# FREEDOM COURT REPORTING

42

1        MS. SCOTT:  Well, we was told by

2    Judge Coody --

3        HEARING OFFICER:  You're here

4    just because the judge told you to be

5    here.

6        MS. SCOTT:  Because we had to go

7    through these remedies, all these

8    procedures before we could enter this

9    lawsuit which has been filed.

10        HEARING OFFICER:  Maybe the

11    judge should have told you to start

12    with the administrative review and

13    then go to the commissioner, as I

14    read this.  But not everyone is

15    familiar with these regulations.

16        I will hear from Mr. Simpson on

17    behalf of the commissioner.

18        MR. SIMPSON:  The -- this is a

19    unique full evidently hearing,

20    Mr. James.  The Department's

21    Administrative Code rules provide for

22    a blind vendor who is dissatisfied

23    with any decision made by the

# FREEDOM COURT REPORTING

43

1    Department to initiate due process

2    proceedings, the first step being

3    informally discussing the decision

4    with the Blind Vendor Enterprise

5    Program representative. If the blind

6    vendors is dissatisfied with whatever

7    the outcome of that discussion is,

8    they have a right to request an

9    administrative review, which is an

10   informal meeting between employees of

11   the Department who have not been

12   involved with the decision that the

13   blind vendor is dissatisfied with to

14   try to reach some resolution of that

15   grievance.

16        The facts regarding Mr. Scott's

17   participation in the program at the

18   Gordon Persons Building in late

19   January and early February of 2005

20   led him to write a letter requesting

21   an administrative review. And the

22   Department set up two employees that

23   had no prior involvement with any of

# FREEDOM COURT REPORTING

44

1    the decisions made or any of the

2    actions taken by the Department to

3    meet with Mr. Scott.  It was supposed

4    to -- it was scheduled to take place

5    on March 10th.

6        We have evidence that we intend

7    to present about Mr. Scott's request,

8    and the scheduling of that

9    administrative review and his

10   subsequent writing correspondence to

11   us cancelling it, telling us he would

12   not attend.

13       The Department was then later,

14   much later served with a federal

15   court lawsuit naming three

16   departmental employees and the

17   Department as defendants making

18   allegations that are set forth in one

19   of our exhibits which we've presented

20   to you, the claim itself.  And the

21   Department filed a motion to dismiss

22   with the federal court indicating

23   that the -- a number of reasons why

# FREEDOM COURT REPORTING

45

1       we felt the Court should dismiss it.

2       But one of them was that Mr. Scott

3       had failed to go through the process

4       of a -- the Administrative Code Rules

5       to seek administrative remedies

6       through due process proceedings that

7       were available to him, failing to

8       exhaust the administrative remedies.

9               The judge issued an order

10      ordering the Department to grant to

11      Mr. Scott a full evidentiary hearing.

12      The issues would appear to me to be

13      those things that are -- that are

14      factual allegations that are raised

15      by the federal district court

16      complaint.  In normal circumstances,

17      we would have correspondence from the

18      blind vendor to the Department

19      setting forth what he was complaining

20      about.  We didn't receive that except

21      through the process of being served

22      with the complaint filed in federal

23      court.  The judge didn't order us to

# FREEDOM COURT REPORTING

46

1      conduct an administrative review,

2      which is normally a preliminary to

3      the full evidentiary hearing.  He

4      didn't order us to conduct a

5      commissioner's conference which is

6      also normally a preliminary step to

7      the full evidentiary hearing.  He

8      ordered us to conduct a full

9      evidentiary hearing, and that's why

10     there's not a commissioner's decision

11     to be evaluated by a hearing officer

12     in this case.  I think in order to

13     comply with Magistrate Judge Coody's

14     order, we have to conduct a hearing

15     and report to him its outcome within

16     five days, according to his order.

17     The court order doesn't really give

18     us any clear indication of what issue

19     you're supposed to decide but the

20     only thing that I can perceive as the

21     issue is what was raised in the

22     federal district court complaint.

23     And we're prepared to present

# FREEDOM COURT REPORTING

47

1    information and exhibits and

2    testimony with regards to all of the

3    allegations in that complaint today.

4         HEARING OFFICER:  Ms. Fleming,

5    do you wish to be heard?

6         MS. FLEMING:  We waive our right

7    to opening statement, Your Honor.

8         HEARING OFFICER:  Well, let me

9    hear from you-all on this

10   proposition.  It seems to me that

11   there are a number of ways to look at

12   this.  Typically as a hearing

13   officer, I will have a commissioner's

14   decision and I am supposed to try and

15   determine whether there's any error

16   associated with this commissioner's

17   decision.  I'd just like to hear your

18   comments on what -- how you would

19   feel about my kicking this to the

20   commissioner for a commissioner's

21   hearing and the commissioner would

22   then have the right to refer this

23   back down for an administrative

# FREEDOM COURT REPORTING

48

1    hearing with the idea that before

2    this goes any further -- I mean, not

3    an administrative hearing -- with the

4    idea that before anything can happen,

5    there has to be an administrative

6    review and there has to be a

7    commissioner's conference before

8    there's any kind of evidentiary

9    hearing.  Now, the other side of

10   that, one other way to look at it --

11   and I'm sure that there are others

12   who would look at it this way -- is

13   that, number one, there was an

14   administrative review scheduled.  It

15   was -- Mr. Scott declined to appear

16   for that administrative review, and,

17   therefore, he has waived his right to

18   an administrative review and he's

19   waived his right to a commissioner's

20   conference and he's waived his right

21   to an administrative hearing.  Those

22   are two ways to look at all of this.

23   I'd like to hear from you any

# FREEDOM COURT REPORTING

49

1    thoughts that you-all have on it.

2         MS. SCOTT:  I would like to

3    speak on behalf of Calvin.

4         HEARING OFFICER:  Go ahead.

5         MS. SCOTT:  Now, the reason why

6    we didn't go to the administrative

7    hearing, Ray had inventoried Calvin

8    out.  Before we heard anything from

9    Ray and them, we got a call saying

10   that I could no longer work with

11   Calvin, which I have the letters

12   here.  And I wrote all the

13   government, a lot of government

14   people.  I sent it to Congressman

15   Rogers, President Bush, Office of

16   Civil Rights and Representative Thad

17   McClammy.  I had written Swearengin's

18   boss man, Jim Maine, finance

19   director, and told them of this

20   defamation of character and what was

21   going on and that they had got

22   together and collaborated and come up

23   with a plan to push us out of this

# FREEDOM COURT REPORTING

50

1    program because of three simple

2    requests.

3         HEARING OFFICER:  Let me just

4    say that that's not really

5    responsive.  Nothing that you have

6    said so far is responsive to the

7    questions that I threw out.

8         MS. SCOTT:  The reason why we

9    didn't go to the administrative

10   hearing --

11        MR. SCOTT:  Let me answer that.

12        MS. SCOTT:  -- because I wrote

13   all those letters and the people --

14   contacted the people and we got back

15   to work.  We had gone back to work.

16   The administrative hearing was

17   scheduled March the 10th.  We went

18   back to work.

19        HEARING OFFICER:  You went back

20   to work?

21        MS. SCOTT:  Uh-huh.

22        HEARING OFFICER:  So you did not

23   feel that it was necessary for you to

# FREEDOM COURT REPORTING

51

1      have it?

2           MR. SCOTT:  Exactly.

3           MS. SCOTT:  I've got proof of

4      that.

5           HEARING OFFICER:  So I take it

6      something happened after that?

7           MS. SCOTT:  Did something happen

8      after that?

9           HEARING OFFICER:  What happened

10     after that?

11          MS. SCOTT:  After we got back to

12     work, quite naturally, all the

13     machines was empty.

14          HEARING OFFICER:  Are you

15     working now?

16          MS. SCOTT:  Uh-huh.

17          MR. SCOTT:  Yeah.  We're working

18     now.

19          HEARING OFFICER:  In the Gordon

20     Persons Building?

21          MR. SCOTT:  Yes, we are.

22          MS. SCOTT:  We went back on

23     March the 2nd.  We got letters after

# FREEDOM COURT REPORTING

52

1    all these people that I had contacted

2    in Washington.

3         HEARING OFFICER:  Do you have a

4    swipe card?

5         MS. SCOTT:  We've got a swipe

6    card.  He gave it to Ken Green and

7    then he assigned it over to us.

8         HEARING OFFICER:  Do you have a

9    parking place?

10        MR. SCOTT:  Let me answer this.

11   Excuse me.  Now, the parking place

12   that James Buddy Swearengin gave us,

13   on the left side I'm on the right

14   side of the steps going up to the

15   porch of the dock, which would

16   basically cause us to have problems,

17   because, see, that place over

18   there --

19        MS. SCOTT:  He asked you did you

20   have a parking place.  That's all.

21        MR. SCOTT:  We have a parking

22   place.  Yeah.

23        MS. SCOTT:  Don't worry about

# FREEDOM COURT REPORTING

53

1       that.

2               MR. SCOTT:  Okay.

3               MS. SCOTT:  But that's why I

4       said it wasn't necessary for the

5       administrative review because we got

6       letters stating that we could go back

7       to work.  Now, what Swearengin's

8       supervisor done, he -- what you call

9       it -- rescinded his letter after he

10      -- all these people contacted him and

11      got all those calls.  We never heard

12      anything from the different -- the

13      lawyer out here with all the

14      violations they had done.  And the

15      more letters that we wrote Ray to

16      tell him about the violations he

17      done, the more letters he sent of

18      harassment by Fed Ex and intimidation

19      to try to push Calvin out of this

20      program.

21              HEARING OFFICER:  Okay.  Now,

22      January 31st, I take it that was the

23      date that you lost your swipe card?

# FREEDOM COURT REPORTING

54

1          MS. SCOTT:  That's the day he

2     took the swipe card.

3          HEARING OFFICER:  All right.

4     Now, you say -- in your complaint in

5     the federal court, you say that you

6     identify four dates that your civil

7     rights were violated?

8          MS. SCOTT:  Uh-huh.

9          HEARING OFFICER:  And I take it

10    you're telling me that on January

11    31st, Mr. Scott's civil rights were

12    violated when the swipe card was

13    taken?

14         MR. SCOTT:  Uh-huh.

15         MS. SCOTT:  Uh-huh.

16         HEARING OFFICER:  Now, what

17    event occurred on February 9?

18         MS. SCOTT:  February 9 was when

19    we got a call from Ken Green,

20    Calvin's representative, and Perry

21    Hopper, and we received some letters

22    I think around about the 12th from

23    Fed Ex telling -- do I need to

# FREEDOM COURT REPORTING

55

1     present this?

2          HEARING OFFICER:  Yeah.  You

3     need to show me what you're referring

4     to.

5          MS. SCOTT:  Okay.  I appreciate

6     it.

7          MS. FLEMING:  I believe it's

8     Exhibit 4, Your Honor.

9          HEARING OFFICER:  Exhibit 4.

10          MS. FLEMING:  Or it may be

11     Exhibit 3.

12          MR. SIMPSON:  It's 3.  3,

13     actually.

14          HEARING OFFICER:  All right.

15     Exhibit 3.  Let me just double check

16     here.  Exhibit 3.  All right.

17          MS. SCOTT:  It was February the

18     9th.

19          HEARING OFFICER:  February 9th,

20     that's Exhibit 3.

21          MS. SCOTT:  Uh-huh.

22          HEARING OFFICER:  So you're

23     saying that Exhibit 3 violated your

# FREEDOM COURT REPORTING

56

1    constitutional rights?

2         MS. SCOTT:  They wrote --

3         HEARING OFFICER:  Violated

4    Mr. Scott's constitutional rights?

5         MS. SCOTT:  Uh-huh.  They wrote

6    James Swearengin and told him that

7    Gladys Scott, your current employee,

8    is no longer approved by our agency

9    as an assistant/driver for the blind

10   vendor.  Mr. Scott will retain a new

11   assistant/driver approved by our

12   agency.  Mr. Scott and his employee

13   will cooperate with building

14   management to comply with all

15   security --

16        HEARING OFFICER:  You don't need

17   to read for me.  I can read.

18        MS. SCOTT:  All right.

19        HEARING OFFICER:  We're

20   saying -- you're saying that this

21   letter violated Mr. Scott's --

22        MS. SCOTT:  Uh-huh.  It did.

23        HEARING OFFICER:  All right.

# FREEDOM COURT REPORTING

57

1    Now, let's go to February the 14th.

2    I believe that's the next date that's

3    referenced in the complaint.  What

4    happened on that date?

5         MR. SIMPSON:  It's Exhibit 6.

6         MS. FLEMING:  It's Exhibit 5.

7         HEARING OFFICER:  It will be

8    Exhibit 5.

9         MR. SIMPSON:  I think it is 5.

10    I'm sorry.

11         HEARING OFFICER:  Which is it?

12    6.

13         MR. SIMPSON:  You're right.

14    It's 6.

15         HEARING OFFICER:  And the claim

16    is that Exhibit 6 violated

17    Mr. Scott's constitutional right?

18         MS. SCOTT:  Yes.  Uh-huh.

19         MR. SCOTT:  Uh-huh.  Yeah.

20         HEARING OFFICER:  Now let's go

21    back to February the 22nd.

22         MS. SCOTT:  Yes.

23         HEARING OFFICER:  What occurred

# FREEDOM COURT REPORTING

58

1      on that date?

2           MS. SCOTT:  This is where he

3      inventoried him out.  We hadn't been

4      gone but two weeks.

5           MR. SIMPSON:  Exhibit 8.

6           MS. FLEMING:  Exhibit 8.

7           HEARING OFFICER:  Exhibit 8.

8           MS. FLEMING:  Uh-huh.

9           HEARING OFFICER:  That's 7,

10     Exhibit 7.  All right.  I think I

11     understand.

12          MS. SCOTT:  You know, where the

13     agency got together and was partaking

14     with the building manager to push us

15     out and come up with a plan to first

16     get rid of me and they knew that

17     they'd get rid of my husband.  We

18     haven't done nothing but work hard

19     down there.  Haven't never violated

20     no -- no laws and no rules of that

21     building.  Got along with the

22     personnel.  The customers were very

23     nice.  And I said I don't know what

# FREEDOM COURT REPORTING

59

1        James Swearengin's problem is.

2            HEARING OFFICER:  Well, we need

3        to swear you in at this time, if you

4        don't mind.

5                GLADYS SCOTT

6            The witness, having been first

7    duly sworn or affirmed to speak the truth,

8    the whole truth, and nothing but the

9    truth, testified as follows:

10           MS. SCOTT:  But this is where

11       Ray Dennis, the director, wrote

12       Calvin a letter and told him he was

13       going to throw him out on the 24th,

14       but instead he throwed him out on the

15       23rd of February.  And he'd only been

16       gone two weeks.  And they caused all

17       the problems by getting together with

18       Swearengin.  They violated the State

19       Code laws.  They are not supposed to

20       oppress him and can't tell him who

21       can work with him.  They don't

22       furnish the car.  Neither do they pay

23       the driver.  That's unfair.  But they

# FREEDOM COURT REPORTING

60

1   tell him he's self-employed.  And I'm

2   guilty of working hard and assisting

3   my husband all these years and having

4   good conduct down in that building.

5   Why I was told I couldn't come to the

6   building?  But he violated him then,

7   and then he -- he burdened him.  Then

8   he violated the 21-9-1.

9        HEARING OFFICER:  Of what?

10       MS. SCOTT:  Of the Alabama State

11   Code of Rehabilitation which reads

12   that they're to keep these people

13   working and they're not to burden

14   them or their family.

15       Now, when they told Calvin that

16   I couldn't work with him back here in

17   this letter of February the 9th, when

18   they told him I couldn't work with

19   him, that put a burden on him.  They

20   only gave him three days to find

21   somebody.

22       MR. SIMPSON:  This is what she's

23   referring to.

# FREEDOM COURT REPORTING

61

1          HEARING OFFICER:  Okay.

2          MR. SIMPSON:  I did not provide

3     you a copy of this.

4          HEARING OFFICER:  I understand.

5          MS. SCOTT:  But they went on and

6     inventoried him out anyway.

7     Rehabilitation did not support

8     Calvin.  If you read the letter that

9     I wrote Office of Civil Rights, he

10    didn't give him support.  But all

11    these other letters proved the fact

12    that they wasn't giving Calvin the

13    support that they should give him.

14    So the only thing I told them in

15    there, I said Nothing they could do

16    about this agency.  I told them what

17    had happened between Swearengin and

18    us, you know, about the swipe key and

19    all.  And I told them that the agency

20    was not giving Calvin the support

21    that they should be giving him and

22    that he paid eleven percent of his

23    income every month to them plus an

# FREEDOM COURT REPORTING

62

1    escrow.  I didn't say nothing

2    negative about it.  They should have

3    came through with those requests like

4    we asked them to.  I told them to go

5    to the utmost part.  It didn't cost

6    no money and to the bring those

7    requests back to Calvin and that we

8    not have no problems.  And James

9    Swearengin said we've got to move.

10   So we didn't get no support.  Yeah.

11   They violated him.  They broke about

12   every rule in that State Code book.

13   They broke every one of them.  And

14   here's another one they broke.  Here

15   it is.  795-7-2-04.  Have y'all got

16   that in there?  Is that in that book?

17       MR. SIMPSON:  Yes.

18       MS. SCOTT:  It's 795-7-2-4.  The

19   removal from a BEP facility,

20   suspension and termination of a

21   license.  The first paragraph there

22   in that showed that they violated

23   that, that the vendor -- said

# FREEDOM COURT REPORTING

63

1    termination of a vendor shall occur

2    only after affording the vendor an

3    opportunity for a full evidentiary

4    hearing.  They never told us nothing

5    about it.  They inventoried him out

6    and they gave him no hearing.  They

7    had a meeting on the 9th out of his

8    presence and got together and

9    collaborated with Swearengin to push

10    us out.

11        HEARING OFFICER:  Well, let me

12    ask you this.  When you left the --

13    when you were removed from the Gordon

14    Persons Building, was Mr. Scott's

15    license terminated or suspended?

16        MS. SCOTT:  No.  They didn't

17    terminate his license.

18        MR. SCOTT:  No.  He didn't do

19    that.

20        MS. SCOTT:  They didn't

21    terminate his license, but he was

22    removed.  He was inventoried out.

23    And they said he had to be -- it

# FREEDOM COURT REPORTING

64

1      would occur only after affording the

2      vendor an opportunity.

3          HEARING OFFICER:  Well, what it

4      says is that a suspension or

5      termination of a license shall occur

6      only after affording the vendor a

7      full evidentiary hearing.

8          MS. SCOTT:  Okay.  You know, it

9      reads like removal.  And he was

10     removed, and that's the part I'm

11     looking at.  Removal from a BEP

12     facility, and he was removed from the

13     BEP facility.

14         MR. SCOTT:  Now --

15         MS. SCOTT:  But that's what it

16     is, 795-7-2-04, the removal of a BEP

17     facility.

18         MR. SIMPSON:  Could I address

19     the question with regards to sending

20     it back for the proceeding?

21         HEARING OFFICER:  Yes.

22         MR. SIMPSON:  This is an

23     administrative hearing.  The relief

# FREEDOM COURT REPORTING

65

1    that the Scotts seek is a million

2    dollars and imprisonment of three of

3    the Department's employees.  The --

4    it's futile to conduct the due

5    process proceedings with the relief

6    that they seek because --

7         HEARING OFFICER:  Well, isn't it

8    also futile to conduct this

9    evidentiary hearing with the relief

10   that they are seeking?  I have no

11   power to order -- as I understand it,

12   I have no power to order anyone to

13   pay damages and I have no power to

14   imprison anyone in the county jail or

15   sentence anyone to hard labor, not

16   even for a minute or a day.  I don't

17   have that kind of power.

18        MS. FLEMING:  Your Honor, also

19   with respect to the three things on

20   the list that Ms. Scott has

21   previously identified, the card key

22   and the parking place and the moving

23   of the machine, it's my understanding

# FREEDOM COURT REPORTING

66

1    that those are the things that she

2    was seeking before and those things

3    have all been granted by the

4    Department --

5        HEARING OFFICER:  When were they

6    granted?

7        MS. FLEMING:  -- at this point.

8        HEARING OFFICER:  When were they

9    granted?

10       MS. FLEMING:  Ms. Scott could

11   speak to that.

12       MS. SCOTT:  After all the

13   letters we've written.

14       HEARING OFFICER:  No.  Just

15   answer that question, please.  When

16   were these granted?

17       MS. SCOTT:  We went back in

18   March -- March the 2nd and they had

19   moved the machines.  They had marked

20   off a parking place and had written

21   no parking on it.  And on March the

22   2nd, Ken Green gave me a swipe key

23   that Swearengin had given him.

# FREEDOM COURT REPORTING

67

1    HEARING OFFICER:  Okay.  So the

2  answer to my question is March the

3  2nd?

4    MS. SCOTT:  March the 2nd.

5    HEARING OFFICER:  Okay.

6    MS. SCOTT:  That was my

7  knowledge of it, you know.

8    HEARING OFFICER:  What evidence

9  do I need to hear here today?

10    MR. SIMPSON:  Well, there is --

11  the Department would present

12  information that Mr. Scott was

13  actually never removed from his

14  facility.  He chose not to go and

15  work in the building where his

16  business resides because a condition

17  was placed on him that he have

18  someone else other than his wife

19  accompany him and assist him.  He was

20  sent correspondence indicating that

21  he was going to be removed from his

22  facility.  But before an actual

23  inventory could take place, the

# FREEDOM COURT REPORTING

68

1    owners of that building where the

2    business operates changed their mind

3    and indicated that his wife could

4    accompany him.  And he went back and

5    has ever since March the 2nd

6    performed his job there.

7         I say this with regards to your

8    question of what would the Department

9    present.  I think the Scotts would

10   disagree as to my characterization of

11   what happened because of what I've

12   heard this morning about their

13   contentions that he was removed from

14   his facility.  It would be our

15   contention that he never was.

16        MS. SCOTT:  Well, here's a

17   letter saying that it could take

18   place whether you're there or not.

19   And I'm going to find the

20   inventory --

21        HEARING OFFICER:  Let me ask you

22   this.  Let me ask you this,

23   Mr. Scott.  What do you want from me

# FREEDOM COURT REPORTING

69

1    other than one million dollars,

2    imprisonment of the defendants in the

3    county jail or sentence them to hard

4    labor and that the defendants resign

5    from their appointed offices?

6         MS. SCOTT:  That was for

7    Swearengin.

8         HEARING OFFICER:  No.  I want

9    you to answer my question.

10        MR. SCOTT:  I'm going to answer

11   it.  I'm going to answer it.  For

12   you-all -- for the Business

13   Enterprise Program for the blind, I'm

14   asking for a million dollars for Ray

15   Dennis, a million dollars for Perry

16   Hopper, a million dollars for Ken

17   Green for their action behind James

18   Swearengin.  Yes, sir.

19        HEARING OFFICER:  What else do

20   you want from me?

21        MR. SCOTT:  Plus, to be sure

22   even though -- let me go back to

23   another thing.  What is your name?

# FREEDOM COURT REPORTING

70

1          HEARING OFFICER:  My name is

2    Frank James.

3          MR. SCOTT:  Frank James.  Now,

4    see, the reason that we are back

5    working at the Gordon Persons office

6    building, it was not voluntarily from

7    them, because Ray Dennis kept sending

8    me Fed Ex letters threatening me

9    that -- to not bring my wife down to

10   that building, that she couldn't

11   drive my car, that she couldn't help

12   me nowhere in my business.  And she

13   has been with me for forty years.

14   And I'm going to get rid of her for

15   no reason whatsoever?  No, sir, I

16   cannot do it.

17         MS. SCOTT:  And may I say this?

18         HEARING OFFICER:  No.  Wait just

19   a minute, now.

20         Your wife is your assistant

21   right now?

22         MR. SCOTT:  Yes, sir.

23         HEARING OFFICER:  Is there any

# FREEDOM COURT REPORTING

71

1    threatening that she cannot be your

2    assistant, any current threat that

3    she cannot be your assistant?

4         MR. SCOTT:  There is not now.

5    But, you see, the whole deal, people,

6    they are always planning things to

7    wreck against you if they can.  And

8    I'll be honest with you.  I do not

9    appreciate -- Lord knows I don't -- I

10   do not appreciate their actions

11   toward us and my wife.  My wife works

12   hard with me in this program.  See,

13   we never violate no laws.  We never

14   violate with any part of the business

15   that we're supposed to take care of

16   in this program.  But yet, she,

17   according to James Swearengin's lies,

18   was not allowed into that Gordon

19   Persons office building.  And these

20   people went right along with them to

21   terminate -- to stop her from working

22   with me because of James Swearengin's

23   lies.  And I do not appreciate that.

# FREEDOM COURT REPORTING

72

1    HEARING OFFICER:  Is there

2    anything else you want from me

3    besides a million dollars from each

4    defendant?

5        MS. SCOTT:  And Ray Dennis -- if

6    I may speak.

7        HEARING OFFICER:  No.  I'm

8    asking about relief.

9        MS. SCOTT:  Oh, okay.  All

10   right.

11       HEARING OFFICER:  Okay.

12       MS. SCOTT:  Okay.

13       HEARING OFFICER:  At the end of

14   this hearing, is there anything else

15   you want from me other than to order

16   the defendants to pay you one million

17   dollars each?

18       MR. SCOTT:  Plus I want the cost

19   of court.

20       HEARING OFFICER:  Anything else?

21       MR. SCOTT:  Well, basically the

22   other thing I want them to do, we

23   have not caused any problems in this

# FREEDOM COURT REPORTING

73

1    job program.  Until we do, leave us

2    alone.  Now, we -- we don't violate

3    no laws, no building laws or no laws.

4    Sure don't.

5        HEARING OFFICER:  All right.

6    Now, I think I understand.  Do you

7    wish to offer any evidence at this

8    time?

9        MS. SCOTT:  Well, the letters

10    here that --

11        HEARING OFFICER:  All right.

12    Let me just say that -- that -- let

13    me make sure I get this right here.

14    I have before me Exhibits 1 through

15    12 and 15 plus Exhibits 16 through

16    19, I believe, or maybe 20.  16

17    through 20.  Is there any other

18    evidence that you want to -- any

19    other documents that you want to --

20        MS. SCOTT:  Yes.

21        HEARING OFFICER:  Which ones are

22    those?

23        MS. SCOTT:  These are the

# FREEDOM COURT REPORTING

74

1    letters that we wrote Ray Dennis.

2    And every time we wrote him and told

3    him about the laws he broke, the more

4    letters kept coming.  The more

5    letters kept coming.

6         HEARING OFFICER:  I believe that

7    Mr. Simpson has --

8         MR. SIMPSON:  I think those

9    might be included in this notebook.

10        HEARING OFFICER:  Okay.  Which

11   ones are you referring to?  Give me

12   the dates on your letters.

13        MS. SCOTT:  February the 14th

14   that we wrote Ray.

15        HEARING OFFICER:  Is that a

16   letter from Calvin Scott to Ray

17   Dennis?

18        MS. SCOTT:  Uh-huh.

19        HEARING OFFICER:  I have that.

20        MS. SCOTT:  February 15.

21        HEARING OFFICER:  Is that a

22   letter from Calvin Scott to Ray

23   Dennis?

# FREEDOM COURT REPORTING

75

1        MS. SCOTT:  Uh-huh.

2        HEARING OFFICER:  I have that.

3   That's Exhibit 7.

4        MS. SCOTT:  February the 22nd

5   here.

6        HEARING OFFICER:  I've got a

7   February 22nd letter from Ray Dennis

8   to Calvin Scott, Exhibit 8.  Is that

9   it?

10       MS. SCOTT:  Uh-huh.  And you've

11  got the letters that Ray wrote Calvin

12  on February the 9th.  Is that in the

13  exhibits?

14       HEARING OFFICER:  A February 9,

15  2005 letter from Ray Dennis to James

16  Buddy Swearengin, that's Exhibit 4.

17  A February 9, 2005 letter from Ray

18  Dennis to Calvin Scott is Exhibit 3.

19  Have I got them all?

20       MS. SCOTT:  Have you got the

21  February 22nd letter?

22       HEARING OFFICER:  February 22nd

23  letter from Ray Dennis to Calvin