# BEFORE THE ALABAMA DEPARTMENT
# OF REHABILITATION SERVICES

## IN RE: THE MATTER OF CALVIN SCOTT

### A Full and Evidentiary Hearing Pursuant to the Randolph-

### Sheppard Vending Act 20 U.S.C. 107, et seq.

# VOLUME II

## [Pages 76 to 150]

# FREEDOM COURT REPORTING

76

1          Scott is Exhibit 8.

2              MS. SCOTT:  Okay.  Okay.

3              HEARING OFFICER:  Have I got

4      them all?

5              MS. SCOTT:  Yeah.

6              HEARING OFFICER:  All right.

7      Now, Mr. Scott, do you wish to offer

8      any other evidence?

9              MR. SCOTT:  I wish to offer a

10      statement.

11              HEARING OFFICER:  Okay.  Let's

12      swear Mr. Scott in.

13                  CALVIN SCOTT

14          The witness, having been first

15  duly sworn or affirmed to speak the truth,

16  the whole truth, and nothing but the

17  truth, testified as follows:

18              HEARING OFFICER:  All right.

19      Now, Mr. Scott, normally we ask

20      witnesses to -- to testify in the

21      form of a question and answer.  But

22      you are -- you are without a lawyer.

23      By the way, did you-all try to get a

# FREEDOM COURT REPORTING

77

1    lawyer to --

2         MS. SCOTT:  This is why it took

3    us so long to file this lawsuit.

4    Nobody seemed to want to go to fight

5    against the State.  A lot of them say

6    they don't take discrimination cases.

7    This is why it had taken us so long

8    to file the lawsuit.

9         HEARING OFFICER:  All right.

10   Now, I'm addressing Mr. Scott now.

11        Mr. Scott, we're going to let

12   you testify in the form of a

13   narrative.  Do you understand that

14   you're under oath?

15        MR. SCOTT:  Oh, yes, I do.

16        HEARING OFFICER:  All right.  Go

17   right ahead with your narrative

18   testimony.

19        MR. SCOTT:  See, first of all,

20   too -- now, they're saying that my

21   wife is not to help me in any aspects

22   of -- of my work.  Now, see, when

23   they wrote all of these letters to me

# FREEDOM COURT REPORTING

78

1     whether they were Fed Ex'd or not, I

2     was supposed to have gotten a Braille

3     copy of everything that they wrote.

4     Okay.

5         HEARING OFFICER:  Why do you say

6     that?

7         MR. SCOTT:  Because I'm the

8     vendor and everything that they sent

9     to me is supposed to be sent to me in

10    Braille.  That has been a request

11    from long back.  Yes, sir.

12        HEARING OFFICER:  Okay.

13        MR. SCOTT:  And these people do

14    not furnish my car, no gas, don't

15    furnish my payment to whoever I have

16    to help which is my wife.  Because

17    she -- let me say this, also.  Number

18    one, my wife has worked with me ever

19    since I've been in this job program.

20    And down through the years that we've

21    been in this program, this is the

22    first time that we really had an

23    unnecessary run-in because of three

# FREEDOM COURT REPORTING

79

1    requests.  The removal of that

2    machine from the little back room

3    from the restaurant out in the hall

4    where the people could see it to use

5    it, a swipe key to get into that

6    machine on the fourth floor on Monroe

7    and Ripley and a place to park,

8    because they have many -- there have

9    been many days that we came down

10   there with stock that we could not

11   get to that porch to put out our

12   stock, plus had nowhere to park.  We

13   would sit down there for almost hours

14   at a time driving around the block

15   waiting to get back into the building

16   and we couldn't do it.

17        MS. SCOTT:  Calvin, do you want

18   to give him this letter?

19        HEARING OFFICER:  Let's let him

20   finish testifying first.

21        MR. SCOTT:  And, see, these

22   people instead of being my advocates

23   have been my adversaries along with

# FREEDOM COURT REPORTING

80

1    James Swearengin.  And that's a fact.

2    And, see, when we -- from way back in

3    this program, they never tried to

4    work things right in my favor but

5    instead with James Swearengin.  And,

6    see, they know that if my wife don't

7    work with me, which is a fact, you

8    know, I'm not going to work in this

9    program because I'm not going to work

10    without her.

11        Number one, my wife sees to it

12    that my job goes right every day that

13    we work.  My wife quit her job to

14    work with me in order for my business

15    to go right because the monies that I

16    would make would not be able to pay

17    nobody to work with me all day long

18    and bring monies home.  The people

19    ain't going to work with you for

20    nothing.  Now, that's just it.

21        HEARING OFFICER:  Anything

22    further, Mr. Scott?

23        MS. SCOTT:  Do you want to give

# FREEDOM COURT REPORTING

81

1    him that letter?

2         MR. SCOTT:  Give him that.

3         MS. SCOTT:  He wants to present

4    this letter from a problem we had

5    when we asked James Swearengin for a

6    parking place and he asked for us to

7    move because I wrote him a letter

8    when we brought God into it.

9         HEARING OFFICER:  All right.

10   What I have been presented is a

11   memorandum dated February 2nd, 1996

12   from James Swearengin, Jr., to Ken

13   Green.  Subject, parking problem.

14        MR. SIMPSON:  I'm familiar with

15   the content of the letter, Your

16   Honor, and we'd object to the

17   relevance to Mr. Scott's complaints

18   at that time.  The correspondence

19   arose nearly ten years ago.

20        MS. SCOTT:  Well, that's not the

21   first time he asked us to move.

22   That's why I brought it in.  It shows

23   that every time we have a request, we

# FREEDOM COURT REPORTING

82

1    can't go to him.  It doesn't cost him

2    anything, and he's always rude and

3    evil to us.  That's why I presented

4    the letter because it had been times

5    that we --

6        HEARING OFFICER:  I'm going to

7    admit the letter.

8        MS. SCOTT:  Thank you.

9        MR. SCOTT:  Thank you.  Thank

10   you so much.

11       HEARING OFFICER:  Noting that

12   there is attached to it a letter from

13   Ms. Gladys Scott to Mr. James

14   Swearengin dated January 28th,

15   1997 -- '96.  So I'll admit this as

16   Exhibit 21.

17       Anything further, Mr. Scott?

18       MS. SCOTT:  Yes.  These letters

19   are where we wrote people in order to

20   get back to work.  The agency done

21   nothing but no more than keep trying

22   to push us out.  We would like to --

23       HEARING OFFICER:  Let's see what

# FREEDOM COURT REPORTING

83

1       you have there.

2             MS. SCOTT:  It's evidence.

3             HEARING OFFICER:  All right.

4       What we have here is a -- let me --

5       what we have here is an undated

6       letter to President George Bush from

7       Calvin Scott, Sr.  We have a February

8       10th, 2005 letter to Governor Bob

9       Riley from Calvin Scott, Sr.  We have

10      a February 10, 2005 letter to Senator

11      Mike Rogers from Calvin Scott, Sr.

12      There is a February 3rd, 2005 letter

13      to the U. S. Department of Education

14      Office for Civil Rights from Calvin

15      Scott, Sr.  It looks like another

16      undated letter to President George

17      Bush from Calvin Scott, Sr., and a

18      fax, a two page fax correspondence

19      dated 10/2/2005 from Calvin Scott,

20      Sr., to Thad McClammy.

21            MS. SCOTT:  And we also have

22      correspondence and a letter where we

23      wrote the government, some letters

# FREEDOM COURT REPORTING

84

1    that they -- some response from them.

2        HEARING OFFICER:  And we also

3    have a March 1, 2005 letter from --

4    to Mr. Calvin Scott from Cecilia

5    Boyer, special assistant to the Vice

6    President for correspondence.  And we

7    have a February 11, 2005 letter to

8    Mr. Calvin Scott, Sr., from Heide

9    Barkez, special assistant to the

10    President and director of

11    Presidential Correspondence.  And we

12    have a March 29, 2005 letter from

13    Mr. Harold M. Bush, the director of

14    the Division of Program Operations,

15    U. S. Department of Labor Employment

16    Standards Administration, Office of

17    Federal Contract Compliance Program

18    to Mr. Calvin Scott, Sr.

19        MS. SCOTT:  I've also got a

20    letter here that I wrote Jim Maine,

21    the director of finance asking for

22    his --

23        HEARING OFFICER:  Do you want to

# FREEDOM COURT REPORTING

85

1    add that to that collective exhibit?

2        MS. SCOTT:  Yeah. I'm going to

3    see can I find it.  It's supposed to

4    be in this envelope with this stuff.

5    I don't see it.  I know I've got it

6    here somewhere.

7        HEARING OFFICER:  Do you want

8    this to be a collective Exhibit 22?

9        MS. SCOTT:  Yeah.  Whatever.

10   You know, I'm not a lawyer, but it's

11   evidence.  It proves how we got back

12   to work and all.  Jim Maine gave us a

13   response to it from Hornsby.

14       HEARING OFFICER:  Is there any

15   objection?

16       MR. SIMPSON:  No.

17       HEARING OFFICER:  These will be

18   admitted as Exhibit 22.  And when you

19   find the other letter, we'll attach

20   that to the exhibit, too.

21       MS. SCOTT:  Let me see if it's

22   in here.

23       HEARING OFFICER:  You can look

# FREEDOM COURT REPORTING

86

1       for it during a break, but let's just

2       move on right now.

3               MS. SCOTT:  All right.  All

4       right.

5               HEARING OFFICER:  Now, is there

6       any other evidence to come from

7       Mr. Scott?

8               MR. SCOTT:  No other evidence

9       right now.

10              HEARING OFFICER:  All right.  I

11      take it that you want to rest and

12      require the Alabama Department of

13      Rehabilitation Services to present

14      their evidence?

15              MR. SCOTT:  Go ahead.

16              HEARING OFFICER:  All right.

17      Mr. Simpson.

18              MR. SIMPSON:  First I'd call

19      Mr. Scott.  You were -- throughout

20      the preliminary presentation of the

21      information, the Department had not

22      invoked the rule knowing that

23      Mr. Scott might need the assistance

# FREEDOM COURT REPORTING

87

1    of his wife.  But there's some

2    evidence that we think credibility of

3    the witnesses would be best served if

4    Ms. Scott was excluded while we

5    examined -- cross-examined Mr. Scott.

6         HEARING OFFICER:  Yeah.

7    Actually, we don't want to rest you

8    yet.  You want to give -- you want to

9    have the opportunity to cross-examine

10   him and then he will have the

11   opportunity to come back with his

12   redirect evidence.  So we'll withdraw

13   that.

14        MS. SCOTT:  May I say something

15   else?

16        HEARING OFFICER:  Well,

17   Mr. Scott is -- you know, it's

18   Mr. Scott here that we're having the

19   evidentiary hearing for.

20        MS. SCOTT:  Yeah.

21        HEARING OFFICER:  And I

22   recognize who you are, Ms. Scott.

23        MR. SCOTT:  She has power of

# FREEDOM COURT REPORTING

88

1    attorney.

2        HEARING OFFICER:  What do you

3    want to say, Ms. Scott?

4        MS. SCOTT:  I would like to say

5    the reason why Swearengin want me out

6    of the building, it used to be in the

7    rule book that nobody come in that

8    building selling anything that is

9    vendible.  The restaurant not sell

10   candy, chips, pastry, anything that's

11   vendible.  And when I see this going

12   on, I tell Calvin.  Calvin get on the

13   phone and call his representative,

14   Ken Green.  Then Ken in turn called

15   the building manager, Swearengin.

16   Then he's got to get up and go and

17   see about getting these people out of

18   the building.  There's nothing else I

19   ever done around there that he

20   wouldn't want me around and not like

21   me.  We ain't done nothing but good

22   work and gave him respect.  Never had

23   no run-in problem, no arguments with

# FREEDOM COURT REPORTING

89

1    him.  But that's one of the reasons I

2    feel that he want me out of the

3    building because I tell Calvin about

4    the laws being broken.

5         HEARING OFFICER:  All right.

6    Now, we'd like to just ask you to be

7    excused for a little while from this

8    session.  We'll call you back a

9    little bit later.  And if you would

10   like, you can take the documents that

11   you have with you and search for the

12   other documents that you want to

13   attach as Exhibit 22.

14        MS. SCOTT:  Okay.  Are you

15   allowed to -- you got this letter?

16   Yeah.  You got it.  All right.  Okay.

17   I'll get everything together.

18        HEARING OFFICER:  We'll call you

19   back in when we're ready for you to

20   come back.

21        MS. SCOTT:  Okay.

22             (Ms. Gladys Scott left the

23             conference room.)

# FREEDOM COURT REPORTING

90

1                    CALVIN SCOTT

2           having been previously sworn,

3    testified as follows:

4                 CROSS-EXAMINATION

5    BY MR. SIMPSON:

6           Q.    Mr. Scott --

7           A.    Uh-huh.

8           Q.    -- how much money do you make

9    in a year's time by operating the Gordon

10   Persons Building facility?

11          A.    It varies.

12          Q.    Last year?

13          A.    Really I can't remember

14   because my wife keeps all my records.

15   That's why I don't see why y'all let her

16   go out.  She handles all the records, all

17   the money.  But first of all, for us

18   stating what you did about my income, my

19   net income has never been fifty thousand

20   dollars.

21          Q.    What has it been?

22          A.    Oh, it wasn't that much.  My

23   wife keep all -- keeps all of my records.

# FREEDOM COURT REPORTING

91

1    HEARING OFFICER:  Do you know

2    what it's been?  Can you give us a

3    range?

4    THE WITNESS:  Oh, we -- we

5    have -- I have made up -- maybe after

6    all deductions, there were times that

7    actually I made no more than ten

8    thousand dollars.  There were several

9    times that I made maybe somewhere

10    near twenty something thousand

11    dollars.  In other words, really I --

12    actually as far as what I made, I --

13    my wife can answer you that better --

14    HEARING OFFICER:  Okay.

15    THE WITNESS:  -- than I can.

16    I'm going to be honest with you about

17    it.

18    Q.    The only way, Mr. Scott --

19    and tell me if I'm wrong -- the only way

20    that you know how much your business

21    brings in in income is through your wife?

22    A.    She handles all of my

23    business.

# FREEDOM COURT REPORTING

92

1          Q.     You don't have any other

2    person assisting you?

3          A.     No, sir.  And will not.

4          Q.     And do you recall at the

5    motion to dismiss hearing in federal court

6    having a long visit with Ms. Margaret

7    Fleming and myself?

8          A.     Yes, I do.

9          Q.     And do you remember me asking

10   you about your income at that meeting

11   about three weeks ago?  Do you remember

12   telling me that you had never made more

13   than twenty-five thousand dollars in any

14   one year from the Gordon Persons Building

15   facility?  Do you remember saying that to

16   me?

17         A.     Twenty-five thousand dollars?

18         Q.     Yes, sir.

19         A.     Well, anyway, it hasn't -- if

20   I have, it hasn't been that -- if it was,

21   it wasn't that much over.

22         Q.     Wasn't that much over.  So

23   it's your belief based on --

# FREEDOM COURT REPORTING

93

1          A.      My net income, yes.

2          Q.      It's your belief based on

3    what your wife has told you that you --

4          A.      No.  It's on record.  It

5    ain't what she told me either.  It's on

6    record.

7          Q.      Okay.

8          A.      It's on paper.

9          Q.      And so --

10         A.      See, she -- hold up.  Let me

11   say this.

12         Q.      You say --

13         A.      She do not lie about my --

14   about my -- my records.

15         Q.      Okay.

16         A.      We do not lie about our

17   records.  You can check everything that we

18   have according to my records.

19              HEARING OFFICER:  Nobody is

20        accusing anyone of lying.  No one is

21        accusing anyone of lying.

22              THE WITNESS:  Well, I just had

23        to get that clear.

# FREEDOM COURT REPORTING

94

1      HEARING OFFICER:  Well, we need

2      you to be responsive to the

3      questions.  If you're not being

4      responsive, we might be here several

5      days longer than we need to be.

6           Q.     Your visual impairment

7    doesn't allow you to see documents; am I

8    correct?

9           A.     No.  I'm totally blind.

10          Q.     Totally blind.  So the

11   documents that have to be filed with the

12   Business Enterprise Program reflecting

13   what your monthly sales and monthly income

14   are, you can't see the numbers that are

15   put on those documents?

16          A.     No.  Naturally I couldn't.

17          Q.     All right.  So someone has to

18   tell you what those numbers are before you

19   have any knowledge of them; am I right?

20          A.     Sure.

21          Q.     And that's always been your

22   wife?

23          A.     Sure it has.  Will always be.

# FREEDOM COURT REPORTING

95

1          Q.     And it's your belief that

2    you've never earned more than twenty-five

3    thousand dollars in any one year at the

4    Gordon Persons Building; is that correct?

5          A.     Not much more over.  We just

6    gave kind of an average.  I don't know.

7    You know, but it has never been no fifty

8    thousand dollars.

9          Q.     All right.  Did anyone else,

10   any other blind vendor go into your

11   machines, the machines provided for you by

12   the Business Enterprise Program at the

13   Gordon Persons Building, and sell things

14   out of them during February or March of

15   this year?

16         A.     Unh-unh.  No.

17         Q.     Nobody else took over your

18   facility?

19         A.     No, they didn't.

20         Q.     Everything that was sold

21   through those machines was through your

22   business?

23         A.     To say.

# FREEDOM COURT REPORTING

96

1          Q.      Am I correct?

2          A.      To say, yes.

3          Q.      Everything that was sold

4    through those machines was through your

5    business.  No one else made money through

6    those machines but you; is that correct?

7          A.      Sure.

8          Q.      Okay.

9          A.      You said that to say what?

10              HEARING OFFICER:  Well, this is

11         the time for him to ask questions and

12         you to answer questions.

13              THE WITNESS:  Okay.  All right.

14         Excuse me, sir.

15              HEARING OFFICER:  That's all

16         right.

17              MR. SIMPSON:  Ms. Fleming may

18         have a number of questions for you,

19         Mr. Scott.  That's all I have right

20         now.

21              THE WITNESS:  Okay.

22              CROSS-EXAMINATION

23    BY MS. FLEMING:

# FREEDOM COURT REPORTING

97

1          Q.      Mr. Scott, you remember me.

2     I'm Margaret Fleming.

3          A.      Oh, I remember.

4          Q.      We visited for a while a few

5     weeks ago after the hearing in federal

6     court.  And you'll recall that I

7     represent --

8          A.      James Swearengin.

9          Q.      -- Mr. James Buddy

10    Swearengin.  Let me ask you, Mr. Scott --

11         A.      Uh-huh.

12         Q.      -- do you have any evidence

13    of any kind?  Do you know of any witnesses

14    or do you have any -- know of any

15    documents that would indicate that James

16    Buddy Swearengin has a problem with you or

17    has treated you differently because of

18    your race?

19         A.      Do I have any documents?

20         Q.      Yes, sir.

21         A.      No, I don't have any

22    documents, per se, except the letters that

23    was given to you-all that he wrote Ken

# FREEDOM COURT REPORTING

98

1    Green, blah, blah, blah.

2         Q.    Right.   In those letters he

3    doesn't mention your race; is that

4    correct?

5         A.    No.   He did not mention my

6    race.

7         Q.    All right.   Do you know of

8    any witnesses who have told you that

9    Mr. -- has anyone ever told you that

10   Mr. Swearengin has a prejudice or has

11   discriminated against you because of your

12   race?

13        A.    No, I haven't.

14        Q.    To your knowledge, has

15   Mr. Swearengin ever mentioned your race to

16   anyone?

17        A.    No.   I don't know.

18        Q.    Is it your understanding that

19   the -- and I think your wife talked

20   earlier.   I'm not sure if it was under

21   oath.   But she mentioned an incident that

22   occurred at the racetrack having to do

23   with Mr. Swearengin's son, James

# FREEDOM COURT REPORTING

99

1   Swearengin, III.  Do you recall that

2   testimony or that conversation that your

3   wife just had with us here?

4        A.    Yes.  She told me about it

5   when she came home from the track that

6   Saturday night.

7        Q.    Is it your belief that the

8   problems that arose with Mr. Swearengin

9   had to do with the incident at the dog

10  track between your wife and

11  Mr. Swearengin's son, James Swearengin,

12  III?

13       A.    Well, I can't say

14  specifically, but something did.  That's

15  all I can say.

16       Q.    Other than that incident, do

17  you know of anything that would have

18  caused Mr. James Swearengin to change his

19  behavior towards you in February of 2005?

20       A.    Well, he -- first of all, let

21  me say this.  I'm going to answer your

22  question.  But now, first of all, when we

23  started working in that building, I didn't

# FREEDOM COURT REPORTING

100

1    know James Swearengin until January of

2    1996 when we had trouble out of Fred

3    Morris.  Now, as far as --

4            Q.    But --

5            A.    Go ahead.

6            Q.    And I'm sorry.  I'm trying to

7    make this as short as I can.  So I'm going

8    to ask you some fairly direct questions,

9    and I need you to try to respond as best

10   you can to those.  And you may not know.

11   And if you don't know, please tell me you

12   don't know.  But your wife apparently is

13   of the opinion that the treatment that you

14   received in February 2005, the card key

15   being changed and some other things were

16   as a result of an incident that occurred

17   at the dog track between your wife and

18   James Swearengin's son, James Swearengin,

19   III.  Your wife has said that's her

20   opinion.  Do you share that opinion, or do

21   you know?

22           A.    Yes, I do.

23           Q.    You do share her opinion?

# FREEDOM COURT REPORTING

101

1      A.    I do share her opinion.  Yes,

2  I do.

3      Q.    Now, other than the dog track

4  incident, do you know of any other thing

5  that has happened that would cause James

6  Swearengin to treat you any differently?

7      A.    Other than he -- see, other

8  than that letter, he got mad when my wife

9  had to straighten him out about having

10  respect of person when she wrote him that

11  letter that you already have there in your

12  stuff.

13      Q.    The 1996 letter?

14      A.    Yes.

15      Q.    Okay.  Other than the 1996

16  letter and the incident at the dog track

17  in January 2005, do you know of anything

18  that would have caused James Swearengin to

19  change his behavior towards you?

20      A.    No, I don't.

21      Q.    And you don't have the -- you

22  have no evidence.  You have not been told

23  anything else about Mr. Swearengin?

# FREEDOM COURT REPORTING

102

1     A.    No.   Nobody told me nothing

2   about Mr. Swearengin.

3     Q.    Okay.

4     A.    Told her either.  We don't

5   discuss him with anybody.  We get up there

6   and do our work, and that's it.

7         HEARING OFFICER:  Okay.  We just

8       need you to be responsive to the

9       question.

10    Q.    There was -- you mentioned

11  Fred Morris, the security guard.  And in

12  your opening statement you made a

13  statement that you had not threatened him

14  with bodily harm; is that correct?

15    A.    That's correct.

16    Q.    Has Fred Morris said to

17  someone that you threatened him with

18  bodily harm?

19    A.    He must have said something

20  to James Swearengin.

21    Q.    Okay.

22    A.    Because I haven't said

23  nothing to him about threatening him with

# FREEDOM COURT REPORTING

103

1    no bodily harm.  I just told him I was

2    going to get him fired.

3          Q.    You told Fred Morris --

4          A.    Fred Morris, yes.

5          Q.    -- that you would get him

6    fired?

7          A.    Yes, I did.

8          Q.    Why did you tell him that?

9          A.    Because of the way he

10    responded to my wife.

11          Q.    And tell me about that.

12          A.    When my wife -- when we got

13    in that dock, my wife -- he -- he was

14    trying to direct my wife in an area.  She

15    can tell you more about it than I can,

16    because I don't see it.  But --

17          Q.    Excuse me.

18          A.    Let me finish.

19          Q.    Excuse me.  Let me just

20    provide some background.  This has to do

21    with the loading dock there --

22          A.    Yes.

23          Q.    -- at the Gordon Persons

# FREEDOM COURT REPORTING

104

1  Building?

2      A.    That's correct.

3      Q.    And when did this take place?

4      A.    I can't -- I can't give you

5  the exact date of it now.

6      Q.    What year?

7      A.    Huh?

8      Q.    What year?

9      A.    Back in '96.

10     Q.    Okay.  Tell me about it.

11     A.    Well, anyway, when we came in

12  there, he -- Fred Morris got all rowed up

13  about my wife parking and he told her to

14  park one way and she was not going to take

15  that chance to try to cause an accident

16  between the car and the truck.  And he

17  jumped up on that porch and started

18  cursing at her and telling her, When I

19  tell you to do this stuff, blah, blah,

20  blah, blah, blah.  See, number one, I did

21  not appreciate him -- see, let me put it

22  this way.  This is sort of the whole deal.

23  I guarantee you if I had been able to see,

# FREEDOM COURT REPORTING

105

1    that man would not have done that.  No.

2    No.  No.  No.  No.  See, he thought he had

3    the advantage of me doing this.  And, see,

4    that has happened to me with a lot of

5    people.  That's just it.  And I'm not --

6    you see, and from what I said to him, had

7    that been Buddy Swearengin, that man

8    wouldn't have had a job nowhere, at no

9    bank or nowhere else being a security

10   guard.  No.  And I only spoke up right in

11   behalf of my wife and how he treated her.

12   And I would do that not only with him but

13   with anybody.

14          Q.    Yes, sir.  Now --

15          A.    Yes, ma'am.

16          Q.    Now, let me ask you.  This

17   1996 incident that you had with the

18   security guard, Fred Morris, is that the

19   only confrontation you have ever had with

20   Fred Morris, or have you had similar

21   confrontations?

22          A.    Well, that -- see, after that

23   -- after that, however he left, he left

# FREEDOM COURT REPORTING

106

1  and never came back.  Never came back.

2      Q.    Okay.  So since 1996, Fred

3  Morris has not been at the building?

4      A.    No.  No.

5      Q.    Okay.  In the letter that

6  James Swearengin wrote to Kenneth Green,

7  there is a statement in the letter that

8  says there have been incidents when the

9  Scotts have threatened to bring a gun and

10 shoot personnel?

11     A.    Uh-huh.  Yeah.  He --

12     Q.    Has there ever been a chance

13 when you or your wife had threatened to

14 shoot anyone?

15     A.    No way.  No way, Ms. Fleming.

16 No way.  That's a lie.

17     Q.    At least not that you were a

18 party to?

19     A.    Neither one of us.

20     Q.    Okay.  But you can't --

21     A.    No, ma'am.

22     Q.    But you can't testify about

23 what your wife did when you weren't

# FREEDOM COURT REPORTING

107

1    present with her?

2         A.    No.  But, now, see, I know

3    one thing.  I do know this.  She ain't

4    going to come up and tell me no lie.  I

5    have that much confidence in her.  Not

6    about something like that.  No, ma'am.

7         Q.    But you were never present

8    when your wife threatened to bring a gun?

9         A.    She ain't never threatened to

10   bring a gun in no building.  I ain't going

11   to let you hang that on me.  No, sir.  No,

12   ma'am.  No, ma'am.  And he's a lie to his

13   grave.

14        Q.    Has your wife ever owned a

15   gun?

16        A.    Yeah.  We've got a gun.

17        Q.    Has she ever fired a gun?

18        A.    I don't know whether she's

19   fired it, per se, other than checking it

20   to see if it worked.

21        Q.    To your knowledge --

22        A.    But there had been no gun in

23   that building for her -- for them to tell

# FREEDOM COURT REPORTING

108

1    a lie about.  No.

2         Q.    To your knowledge, has your

3    wife ever fired at anyone with a gun?

4         A.    No.  Hell no.  Excuse me.

5         MS. FLEMING:  Okay.  That's all

6    I have.

7         MR. SIMPSON:  I have one other

8    question, Your Honor.

9         HEARING OFFICER:  Well, let's go

10   back to Mr. Scott at this time and

11   see if he has anything that he wants

12   to testify to in the way of a

13   narrative.

14        THE WITNESS:  Well, I basically

15   put forth all of my saying.  It's

16   just the fact that, you know, we need

17   to come to some kind of a conclusion.

18   Because I'll be honest with you, you

19   know, I'm going through these

20   hearings as I was told to do by the

21   lawyer before we go to court.

22        HEARING OFFICER:  I understand.

23   All right.  Now, Mr. Simpson.

# FREEDOM COURT REPORTING

109

RECROSS-EXAMINATION

BY MR. SIMPSON:

Q.    Mr. Scott --

A.    Uh-huh.

Q.    -- with regard to the documents being sent to you from the Business Enterprise Program that were not in Braille, you received the documents and someone read them to you, I assume; is that correct?

A.    You know that's correct. Well, yes.  I won't -- yes.  I won't be that stupid.  Yes, it was.

Q.    Did you ever make a request to -- let me --

A.    Let me explain to you.  I know what you're trying to ask me.

HEARING OFFICER:  Wait.  Wait. Wait.  No.  No.  Just answer his question, if you can.

THE WITNESS:  Okay.

Q.    And let me state it real clear.  You're not saying here today that

# FREEDOM COURT REPORTING

110

1    you didn't receive correspondence from the

2    Alabama Department of Rehabilitation

3    Services or that we hid things from you on

4    purpose; is that -- is that correct?

5            A.    I am saying this.  Do you

6    want me to answer it?

7            Q.    Sure.

8            A.    Okay.  I am saying this.

9    From way back years ago, I requested that

10   everything that was sent to me from the

11   Business Enterprise Program for the blind

12   regardless to what it may have been was to

13   be sent to me in Braille so that I could

14   put my hands on it and read it for myself.

15           Q.    And not all the

16   correspondence has been sent to you,

17   correct?

18           A.    No.  No.  No.

19           Q.    Did you -- you said years

20   ago?

21           A.    Yeah.

22           Q.    Did you request that any of

23   these particular letters that you received

# FREEDOM COURT REPORTING

111

1    be Brailled for you?

2        A.    I didn't tell them, per se,

3    but they had it on record that I wanted

4    everything that they sent me to be sent to

5    me in Braille.  That's it.

6            MR. SIMPSON:  You've answered my

7        questions, Mr. Scott.  Thank you.

8            THE WITNESS:  Uh-huh.

9            HEARING OFFICER:  Ms. Fleming,

10       do you have anything further?

11           MS. FLEMING:  No.

12           HEARING OFFICER:  Mr. Scott, do

13       you have anything further?

14           MR. SCOTT:  I'm all right.  I'm

15       fine.

16           HEARING OFFICER:  All right.

17       Are we ready to have Ms. Scott come

18       back in?

19           MR. SIMPSON:  Sure.

20               (Ms. Gladys Scott

21               re-entered the conference

22               room.)

23           HEARING OFFICER:  Next witness?

# FREEDOM COURT REPORTING

112

1    MR. SIMPSON:  I think we rested

2    them and unrested them.

3    HEARING OFFICER:  Oh, they have.

4    That's right.  Now, let me ask you.

5    Do you have any further testimony,

6    any further evidence, any exhibits,

7    Mr. Scott?

8    MR. SCOTT:  We don't have

9    anything else.

10    MS. SCOTT:  Yes.  He told me I

11    could find it when I went out.

12    HEARING OFFICER:  Do you want to

13    give me that other letter that you

14    want to attach to Exhibit 22,

15    Ms. Scott?

16    MS. SCOTT:  Uh-huh.  This is the

17    letter that we wrote to --

18    HEARING OFFICER:  Why don't you

19    give it to me and I'll identify it

20    for the record.

21    MS. SCOTT:  Okay.  Let me make

22    sure I've got that.  Okay.

23    HEARING OFFICER:  All right.

# FREEDOM COURT REPORTING

113

1    This is a February 17, 2005 letter to

2    Mr. James Alan Maine, Director of

3    Finance and Internal Affairs of the

4    State of Alabama, I assume.  And this

5    is from Mr. Calvin Scott, Sr.  And

6    this is a copy of a February 18, 2005

7    letter from Mr. -- to Mr. Calvin

8    Scott, Sr., from Annie Hornsby,

9    assistant finance director.  Is there

10   any objection to including these two

11   letters as part of Exhibit 22?

12        MR. SIMPSON:  No.

13        HEARING OFFICER:  Then they'll

14   be received.  I also have a

15   February -- do you want to give it to

16   me all at once?

17        MS. SCOTT:  Yes.  Uh-huh.

18   That's it.  That's it.  That's it.  I

19   think that's it.

20        HEARING OFFICER:  February 25,

21   2005 letter to Mr. or Ms. -- I can't

22   tell -- Searcy Rushing from Calvin

23   Scott, Sr.  February 28, 2005 to

# FREEDOM COURT REPORTING

114

1    Searcy Rushing from Calvin Scott,

2    Sr., and a February 25, 2005 letter

3    to Calvin Scott from Searcy Rushing.

4            MR. SIMPSON:  I don't have any

5    objection.

6            HEARING OFFICER:  These will be

7    received as part of the Exhibit 22.

8    Mr. Scott, do you have any further

9    evidence, any testimony, any

10    exhibits?

11            MR. SCOTT:  I don't have

12    anything else.

13            HEARING OFFICER:  All right.

14    Now we will go to the Alabama

15    Department of Rehabilitation

16    Services.

17            MR. SIMPSON:  Would you mind if

18    we took just a moment for a bathroom

19    break?

20            HEARING OFFICER:  We have been

21    at it for a while.  Why don't we take

22    a momentary break at this time, a

23    five minute bathroom break.

# FREEDOM COURT REPORTING

115

1              (Brief recess)

2              HEARING OFFICER:  Why we won't

3        break for lunch at this time and then

4        we will resume at a quarter to one.

5                   We're adjourned until

6        twelve forty-five.

7              (Lunch recess)

8              HEARING OFFICER:  Okay.

9        Mr. Simpson, are you ready to

10       proceed?

11             MR. SIMPSON:  Yes.  In the

12       cross-examination of Ms. Scott or

13       call her as a witness would be our

14       first.  And I believe she's already

15       been sworn.

16             HEARING OFFICER:  And you're

17       still under oath, Ms. Scott.  He

18       wants to ask you some questions.

19                   GLADYS SCOTT

20          having been previously sworn,

21    testified as follows:

22                 CROSS-EXAMINATION

23   BY MR. SIMPSON:

# FREEDOM COURT REPORTING

116

1      Q.    Ms. Scott, in complying with

2   the rules of the Business Enterprise

3   Program, there's a form called a BEP-1E.

4   Are you familiar with that monthly sales

5   report form?

6      A.    Yes.

7      Q.    Are you the person that fills

8   out that form --

9      A.    Yes.

10     Q.    -- in connection with the

11  facility at the Gordon Persons Building?

12     A.    Yes.

13     Q.    And on that form do you

14  accurately report the sales and the net

15  profits for the vendor, for your husband's

16  business?

17     A.    See, what's on that report is

18  vending, total vending sales.  We report

19  that.  And we report what it costs him

20  to -- the cost is reported on there.  And

21  that's how it comes on down to an amount,

22  eleven percent of what he pays on what his

23  income is.  So that's at the very

# FREEDOM COURT REPORTING

117

1    beginning on the form.  I don't have a

2    form here with me.

3         Q.    But my question is -- my

4    question is when you fill those forms out,

5    they're accurate?

6         A.    Yes.  I try.

7         Q.    They are correct?

8         A.    Uh-huh.  Yes.  That's right.

9    When all this -- we do a report every

10   week.

11        HEARING OFFICER:  I think you've

12        answered his question.

13        THE WITNESS:  Okay.

14        MR. SIMPSON:  That's all I have

15        of this witness.  My next witness is

16        Mr. Ken Green.  And I'll have to just

17        step outside and get him.

18        HEARING OFFICER:  Well, let me

19        just see if Mr. Scott has any.

20        MR. SCOTT:  No.

21        HEARING OFFICER:  Ms. Fleming,

22        do you have some questions?

23        MS. FLEMING:  Simply to avoid

# FREEDOM COURT REPORTING

118

1      repetition, I would ask Ms. Scott

2      some.

3           CROSS-EXAMINATION

4  BY MS. FLEMING:

5      Q.    Earlier during this

6  proceeding you made a rather lengthy

7  opening statement and then at some point

8  the hearing officer swore you in.  The

9  statements that you made earlier on were

10 not sworn to, but I would just simply ask

11 you to affirm for us now, has everything

12 that you have said here today been the

13 truth?

14      A.    Yes.

15      MS. FLEMING:  Thank you.

16      HEARING OFFICER:  Now,

17    Mr. Scott, do you have any questions

18    for your wife?

19      MR. SCOTT:  Any questions for

20    her?

21      HEARING OFFICER:  Correct.

22    That's my question to you.

23      MR. SCOTT:  No, I don't.

# FREEDOM COURT REPORTING

119

1    HEARING OFFICER:  All right.

2  Next witness.

3    MR. SIMPSON:  Yes.  I'll be

4  right back.

5        (Brief recess)

6    MR. SIMPSON:  This is Ray

7  Dennis.

8    HEARING OFFICER:  Ray Dennis is

9  the next one.  And you can stay where

10  you are, Mr. Dennis.  If you'll just

11  raise your right hand to be sworn.

12        RAY DENNIS

13    The witness, having been first

14  duly sworn or affirmed to speak the truth,

15  the whole truth, and nothing but the

16  truth, testified as follows:

17        DIRECT EXAMINATION

18  BY MR. SIMPSON:

19    Q.    Tell us your name, please.

20    A.    Ray Dennis.

21    Q.    And what do you do for a

22  living, Mr. Dennis?

23    A.    I'm the program director for

# FREEDOM COURT REPORTING

120

1  the Business Enterprise Program for the

2  Blind, Department of Rehabilitation

3  Services.

4       Q.    And how long have you been

5  the program director?

6       A.    June '97.

7       Q.    And what does the program

8  director of the Business Enterprise

9  Program do?

10       A.    The ultimate responsibility

11  for the proper administration of the

12  program, the provision of services to the

13  consumers, e.g., the blind vendors is my

14  responsibility.

15       Q.    In early February of 2005,

16  you were serving as director of the

17  Business Enterprise Program?

18       A.    Yes, sir.

19       Q.    Did a problem with the

20  operation of the facility that Mr. Scott

21  is assigned to, the Gordon Persons

22  Building, arise early in February?

23       A.    Yes.

# FREEDOM COURT REPORTING

121

1     Q.     What problem?

2     A.     The problem as described to

3   me by Mr. and Ms. Scott and the program

4   representative Ken Green was -- was

5   centered around customer relationships,

6   difficulties with refunds, access to

7   secured areas that the building manager

8   had said that State statute had provided

9   him to secure certain areas of the

10   building.  I think Department of Revenue

11   has been mentioned earlier.  And he -- he

12   said, I want another vendor.  I want the

13   Scotts out of here.

14     Q.     Who is that he?

15     A.     James Swearengin.

16     Q.     Had you had dealings with

17   Mr. Swearengin before that letter was

18   written on February 7th?

19     A.     Sporadic.  Sporadically.

20     Q.     When -- and you -- you saw a

21   copy of the letter Mr. Swearengin had

22   written to Ken Green, Exhibit Number 2?

23     A.     Yes.

# FREEDOM COURT REPORTING

122

1        Q.      When you saw that letter,

2    what did you do?

3        A.      I -- I arranged an

4    appointment with Mr. Swearengin as soon as

5    possible with the intention of doing

6    everything I could to preserve Mr. Scott

7    in his business operation in the Gordon

8    Persons Building.

9        Q.      And when did that meeting

10   with Mr. Swearengin take place?

11       A.      It took place on February

12   9th, 2005.

13       Q.      So you got a letter on

14   February 7th that asked for the Scotts to

15   be removed, and as soon as possible you

16   set up a meeting with Mr. Swearengin?

17       A.      Yes.  Mr. Swearengin was

18   returning from the death of his father.

19   And upon his first day back at work, as I

20   understood it, February 9th, we did have

21   this meeting conference with

22   Mr. Swearengin.

23       Q.      And what happened at that

# FREEDOM COURT REPORTING

123

1    meeting?

2         A.    Well, at that meeting

3    Mr. Swearengin reiterated what is said in

4    the letter in the exhibit.  He said that

5    he had discussed this with his supervisor

6    and that he wanted the Scotts removed from

7    the building.  He wanted to know could

8    they be relocated.  And I said that

9    that's -- that's not possible.  In the

10   system, there is -- this is the top of the

11   hill.  This is the ultimate location on

12   State property.  Relocation is highly

13   unlikely for the Scotts.

14        Q.    And did you say things to

15   Mr. Swearengin about the situation at that

16   meeting?

17        A.    Well, yes.

18        Q.    And what did you tell him?

19        A.    Well, I said to him that it

20   would be devastating to the blind vendor

21   if the blind vendor were not allowed to

22   continue his business operation.  And the

23   growth that's derived from that building

# FREEDOM COURT REPORTING

124

1  and is on State property and it's one of

2  the best, if not the best in the state.

3  And Mr. Scott had had a long, successful

4  career with the program.  And I was

5  generally speaking, exploring -- exploring

6  avenues in order to be able to maintain

7  Mr. Scott's business presence at the

8  building.

9        Q.    Avenues in order for him to

10  maintain his business operation there.

11  What was talked about when you say avenues

12  in order to maintain his business

13  operation there?

14        A.    Well, what was talked about

15  was in some detail the issue of the -- the

16  card, the swipe card I think it has been

17  called.  And we -- we said and believed

18  that we could -- whatever was perceived to

19  be not going well with customer refunds,

20  we proposed that we could improve that in

21  cooperation with Mr. Scott.  And we also

22  -- we talked about the relocation of a

23  machine.  I had had some experience there

# FREEDOM COURT REPORTING

125

1   in the late '80's and the early '90's at

2   the building as a program representative,

3   and so I'm familiar with the layout of the

4   building.  And we had some discussion

5   about the movement of a machine that I

6   quite frankly was never able to get moved

7   from the specific spot, the cafeteria that

8   was spoken about this morning.  I was not

9   able to convince management to move that

10  machine in behalf of my blind vendor, my

11  consumer pre Mr. Scott.

12      Q.    So you talked about the

13  movement of the snack machine from the

14  cafeteria area to another area.  You

15  talked about the swipe card.  What was

16  said at that meeting about the swipe card

17  access?

18      A.    Mr. Swearengin said to us --

19  actually Perry Hopper and myself were

20  there in Mr. Swearengin's office -- was

21  that he was required by State statute to

22  secure certain records for the Department

23  of Revenue and that he was going to do

# FREEDOM COURT REPORTING

126

1    that and that -- he said the Scotts had

2    been asked to sign a card out as all other

3    contractors are asked to check the card

4    out while they're servicing the building

5    and check it back in.  He said he was --

6    he could not issue a permanent card to

7    Mr. Scott.

8          Q.     Did y'all come to a

9    conclusion or a proposal about changing

10   Mr. Swearengin's mind to get him off this

11   request that Mr. Scott not be allowed back

12   in the Gordon Persons Building?

13         A.     Well, yes, we did.

14         Q.     How did that come about?

15         A.     It came about in that as we

16   went through the options, that we were

17   best able to manifest and the testimony of

18   Mr. Swearengin was that the -- the main

19   dissatisfaction, for lack of a better way

20   of saying it, was Ms. Scott and her

21   relationship with business personnel and

22   customers.  As we -- we said at the end,

23   Can Mr. Scott maintain his business

# FREEDOM COURT REPORTING

127

1    operation here.  We said, Can he continue

2    with a different employee.

3         Q.    And what was the outcome of

4    that discussion?

5         A.    Mr. Swearengin accepted --

6    accepted our suggestion, our -- our effort

7    to maintain the operation for the blind

8    vendor.

9         Q.    All right.  Subsequent to

10   that meeting, correspondence was prepared

11   to inform Mr. Scott about the conditions

12   that would be allowing him to continue his

13   business operation?

14        A.    Yes.

15        Q.    Sent to Mr. Scott and to

16   Mr. Swearengin.  I believe they're Exhibit

17   3 and 4 in the exhibit notebook.

18   Basically the same letter, one to

19   Swearengin and one to Mr. Scott setting

20   forth the outcome of that meeting?

21        A.    Yes.  Yes, sir.

22        Q.    At that point in time, if

23   Mr. Scott had complied with the conditions

# FREEDOM COURT REPORTING

128

1    of that letter, he would have been allowed

2    to continue to operate his business at the

3    Gordon Persons Building; is that correct?

4         A.    Yes.

5         Q.    Did he?  Did he comply with

6    the conditions outlined in Exhibits --

7         A.    No.

8         Q.    -- Exhibit Number 3 that was

9    sent to him?

10        A.    No, sir.

11        Q.    He didn't obtain a new

12   assistant?

13        A.    No, sir.

14        Q.    Didn't service the machines?

15        A.    Not -- not to my knowledge.

16   And I did personally observe the machines

17   from time to time.  They appeared to not

18   be serviced for a lengthy period of time.

19        Q.    All right.  February 14th,

20   you got a letter, Exhibit Number 5, in

21   which Mr. Scott requested an

22   administrative review.  Did you take any

23   action based upon his request for an

# FREEDOM COURT REPORTING

129

1    administrative review?

2         A.    Yes.

3         Q.    What did you do?

4         A.    I contacted individuals via

5    the general rules direction.  I contacted

6    a unit supervisor, a party that had not

7    been involved with any of the events

8    during this incident.

9         Q.    Who was that?

10         A.    Manny Russo.

11         Q.    And that's someone that works

12    for the Department?

13         A.    Yes, sir.  He's a unit

14    supervisor in Mobile.

15         Q.    In Mobile?

16         A.    Uh-huh.

17         Q.    Did not have any prior

18    dealings with Mr. Scott?

19         A.    No.

20         Q.    And to your knowledge, what

21    did Mr. Russo do?

22         A.    Mr. Russo contacted Mr. Scott

23    and scheduled an administrative review.

# FREEDOM COURT REPORTING

130

1      Q.     Now, at that administrative

2    review, employees who had not been

3    involved in any of the decisions to --

4    involving his facility to write him a

5    letter stating certain conditions that

6    would allow him to continue to operate his

7    business could have been presented

8    information at that administrative review

9    and made a decision as to the Department's

10   position; is that correct?

11     A.     Yes.

12     Q.     Did you correspond this

13   Exhibit 6, did you correspond to Mr. Scott

14   after he received -- you received his

15   letter asking for an administrative

16   review?

17     A.     I did correspond with

18   Mr. Scott around -- around February 22nd.

19     Q.     No.  It was before then.

20   Exhibit 6 is a letter dated February 14th.

21   I think it -- I think it's the way I asked

22   you the question.  It was on the same day

23   you received that letter that he requested

# FREEDOM COURT REPORTING

131

1   the administrative review and you wrote

2   Mr. Scott a letter; is that correct?

3        A.    Yes, sir.   That is correct.

4        Q.    And what was -- what was your

5   purpose in writing Mr. Scott a letter on

6   February 14th?  What were you trying to

7   do?

8        A.    What I was trying to do was

9   restore service to the building to the

10  eighteen hundred or so State servants that

11  work in that building.   They were without

12  snack service.

13       Q.    And was there any intent to

14  discriminate or violate Mr. Scott's

15  constitutional rights by writing him a

16  letter asking him to continue to service

17  his machines?

18       A.    Absolutely not.

19       Q.    Now, there was subsequent

20  correspondence you were about to tell me,

21  Ray, on February 22nd.  What was that

22  letter about?  It's Exhibit 8.

23       A.    On I believe February 22nd

# FREEDOM COURT REPORTING

132

1    was the letter where upon several

2    observations that product was not being

3    replenished in the building, approximately

4    twenty snack service areas.  I wrote

5    Mr. Scott and pleaded with him to restore

6    service and come back to work and said to

7    him, If you do not, if you do not resume

8    the provision of service, I will have no

9    other choice than to remove you from the

10   facility.

11          Q.    Right.  On February 22nd, you

12   wrote to him and set a removal date, an

13   inventory schedule?

14          A.    Yes, I did.

15          Q.    For the next day, the 23rd?

16          A.    The 24th I scheduled.

17   Thursday morning, the 24th.

18          Q.    At ten a.m.?

19          A.    Yes, sir.

20          Q.    Explaining to him that he was

21   going to be removed from that facility.

22   Now, why was he going to be removed from

23   that facility?

# FREEDOM COURT REPORTING

133

1    A.    For failure to meet the terms

2    of the agreement for operation of a

3    vending facility.

4    Q.    Exhibit 1?

5    A.    Yes.

6    Q.    The agreement he signed back

7    in 1998?

8    A.    Yes, sir.

9    Q.    He wasn't servicing the

10   machines from February 7th to

11   approximately February 22nd when you wrote

12   him?

13   A.    And as I recollect testimony

14   from earlier this morning, I thought I

15   heard March 2nd stated as the date that

16   service was resumed.

17   Q.    Did that inventory and that

18   removal that you scheduled for ten a.m. on

19   February 24th ever take place?

20   A.    Absolutely not.

21   Q.    Why didn't it?

22   A.    It did not take place in that

23   a dialogue with the Department of Finance

# FREEDOM COURT REPORTING

134

1    and Mr. Scott and BEP, considerable

2    dialogue with BEP, and then as I

3    understand it from Mr. Searcy Rushing at

4    Finance dialogue with Mr. and Ms. Scott

5    took place and they reached an agreement

6    on terms for his return to the building.

7              HEARING OFFICER:  Who was that?

8              THE WITNESS:  Searcy Rushing.

9              HEARING OFFICER:  And who was

10        present?  I mean, who all reached

11        that agreement?

12             THE WITNESS:  The agreement

13        between Mr. Scott and Finance was

14        reached between those two,

15        Mr. Rushing and Mr. Scott, Ms. Scott.

16        Q.    Now, the Finance Department

17   owns or operates the Gordon Persons

18   Building, a State of Alabama office

19   building; is that correct?

20        A.    Yes, sir.

21        Q.    The Alabama Department of

22   Rehabilitation Services Business

23   Enterprise Program does not own that land

# FREEDOM COURT REPORTING

135

1    or building that's known as the Gordon

2    Persons Building?

3         A.    No.

4         Q.    Is there anything you can do

5    to Buddy Swearengin, the building manager

6    at the Gordon Persons Building, if he says

7    to you I don't want -- I'm not going to

8    allow a particular person to come and do

9    business at this building?  Is there

10   anything you can do to him?

11        A.    No.  I have absolutely no

12   organizational authority in regard to

13   individuals that work for the Department

14   of Finance.

15        Q.    Who had the authority, to

16   your knowledge, to make decisions about

17   access to the Gordon Persons Building?

18        A.    Buddy Swearengin.

19        Q.    When you learned that some

20   agreement had been reached between Searcy

21   Rushing with the Finance Department -- I

22   assume he's some sort of supervisor of

23   Mr. Swearengin -- that the Scotts were

# FREEDOM COURT REPORTING

136

1    going to return to the facility, did he

2    take any other action to remove them or

3    take any action against Mr. Scott's

4    license a blind vendor?

5         A.    Absolutely not.  I was quite

6    pleased that his return had been assured.

7         Q.    And you have been named as a

8    defendant, to your knowledge, in

9    Mr. Scott's lawsuit seeking a million

10   dollars, your incarceration for six months

11   and removal from your job, right, Ray?

12        A.    Yes.

13            MR. SIMPSON:  That's all the

14        questions I have for Mr. Dennis.

15            HEARING OFFICER:  Let's see.  I

16        guess we'll ask Ms. Fleming if she

17        has any questions.

18            MS. FLEMING:  No questions.

19            HEARING OFFICER:  Now we'll go

20        to Mr. Scott and see if Mr. Scott has

21        any questions.

22            MR. SCOTT:  I can make some

23        statements here?

# FREEDOM COURT REPORTING

137

1    HEARING OFFICER:  No.  No.  This

2    is not the time to make any

3    statements.  This is the time to ask

4    him questions about his testimony.

5    MR. SCOTT:  No questions.

6    HEARING OFFICER:  All right.

7    Next witness.

8    MR. SIMPSON:  Okay.

9    HEARING OFFICER:  Would you

10    raise your right hand and be sworn,

11    please.

12    KEN GREEN

13    The witness, having been first

14    duly sworn or affirmed to speak the truth,

15    the whole truth, and nothing but the

16    truth, testified as follows:

17    DIRECT EXAMINATION

18    BY MR. SIMPSON:

19    Q.    Tell us your name, please.

20    A.    Ken Green.

21    Q.    And what do you do for a

22    living, Mr. Green?

23    A.    I'm the Business Enterprise

# FREEDOM COURT REPORTING

138

1    Program rep for the Montgomery East area.

2         Q.    And what does a Business

3    Enterprise Program rep for the Montgomery

4    East area do?

5         A.    Basically, when -- when

6    someone who is legally blind becomes a

7    manager, they bid on locations.  Once they

8    get that location, it's the

9    representative's job to assist them in

10   figuring out all the different aspects of

11   the -- of the particular business that

12   they've bid on.  In this case, if Calvin

13   had never been there before, we would

14   bring him in and show him all the

15   different locations of the machines, start

16   him out with a beginning income which

17   would stock all of his machines plus a --

18   usually almost an extra set of snacks that

19   would go in all of those machines.  And

20   then from then on, you work with the blind

21   manager to make sure that everything runs

22   smoothly and you work with the different

23   building managers and what we call

# FREEDOM COURT REPORTING

139

1    customers of the building to ensure that

2    everyone stays happy and that it becomes a

3    profitable business.

4         Q.    Does your job also entail

5    keeping up with and producing and

6    obtaining signatures on a bunch of

7    different types of paperwork?

8         A.    Yes.

9         Q.    When Mr. Scott was initially

10   assigned to operate the -- his business at

11   the Gordon Persons Building, he signed an

12   agreement to operate a vending facility?

13        A.    Yes.

14        Q.    Do you maintain those types

15   of documents in your files?

16        A.    Yes.

17        Q.    All right.  Back in 1998

18   after he'd been there for a few years, the

19   Department revised that agreement to

20   operate a vending facility.  Do you

21   recall --

22        A.    Yes.

23        Q.    -- obtaining -- giving --

# FREEDOM COURT REPORTING

140

1   giving a copy of the agreement to operate

2   a vending facility to Mr. Scott and

3   obtaining a copy signed by his wife?

4        A.    Yes.

5        Q.    And you've maintained that in

6   your files?

7        A.    Yes, sir.

8        Q.    All right.  So you've seen

9   Exhibit Number 1, the agreement to operate

10  a vending facility that was signed back in

11  1998?

12       A.    Yes.

13       Q.    That sets forth what

14  Mr. Scott is supposed to do, right?

15       A.    Right.

16       Q.    Now, a problem arose in early

17  January of 2005 in connection with access

18  to one of the areas of the Gordon Persons

19  Building.  Explain to the hearing officer

20  everything you know about that problem,

21  the card and what happened.

22       A.    Okay.  In all the building

23  there's one place at this time, I believe,

# FREEDOM COURT REPORTING

141

1    that is inaccessible through regular means

2    without a card.  All the other places you

3    can go up and down elevators to get to all

4    the vending machines.  But in one

5    particular spot, you have to have a card

6    to get in the door or knock on -- knock on

7    the door and have someone let you in.  The

8    Scotts requested a card because it will

9    make -- it does make it easier to go all

10   the way around each floor, you know, and

11   hit all the machines sometimes to stock

12   them and service them and so forth.

13            So I went to Swearengin and

14   requested a key, and he gave me the key.

15   And then I turned and gave it to the

16   Scotts.  Thereafter, I believe

17   Mr. Swearengin couldn't locate the key and

18   so he turned the key off.  He probably had

19   forgotten that he had given it to me and I

20   had given it to Calvin.

21        Q.    You don't know that for sure?

22        A.    I don't know, no.

23        Q.    But for some reason the key

# FREEDOM COURT REPORTING

142

1    that you had obtained and given to the

2    Scotts --

3          A.    Was turned off.

4          Q.    -- was used for several

5    months?

6          A.    Yes.  Yes.  Was turned off.

7          Q.    Now, Mr. and Ms. Scott had

8    been operating that facility, though --

9    Mr. Scott's been the blind vendor for

10   several years.  It was only several months

11   that they had a key?

12         A.    As far as I know.  Now, you

13   have to remember different -- different

14   agencies occupy the Gordon Persons

15   Building.  And so a hall one month may be

16   cut on and it may be cut off the next

17   month or vice versa due to different

18   agencies occupying, you know, needing

19   security and not needing security.

20         Q.    So the problem of access to

21   one particular machine might have arisen,

22   but there wasn't an access problem before

23   is what you're saying?

# FREEDOM COURT REPORTING

143

1      A.      Could be.  Could be.  And

2   really, having the key makes it easy on

3   many more machines because you can

4   therefore walk through let's say a wing of

5   the building to get to some more machines

6   rather than having to go down an elevator,

7   go across on another floor of that same

8   length and go back down the elevator and

9   coming out.  So it just makes it easier.

10      Q.      Okay.  For whatever reason --

11   you're not absolutely certain -- the key

12   was turned off?

13      A.      Right.  Right.

14      Q.      And what happened then?

15      A.      After the key was turned off,

16   I was requested to get a key.  And, you

17   know, to get the key back.  And when I

18   asked for the key back, I was told that it

19   would have to be checked out and checked

20   in.

21      Q.      Who did you ask?

22      A.      Mr. Swearengin.

23      Q.      And who told you it would

# FREEDOM COURT REPORTING

144

1    have to be checked out and checked in?

2         A.    Buddy.

3         Q.    Mr. Swearengin?

4         A.    Right.  Swearengin.

5         Q.    And did you relay that

6    information to the Scotts?

7         A.    I did.  I think so.

8         Q.    And what happened then?

9         A.    They requested the key on a

10   permanent basis.

11        Q.    And --

12        A.    It was denied.

13        Q.    Mr. Swearengin denied it?

14        A.    Right.

15        Q.    He wouldn't allow the key to

16   be issued on a permanent basis?

17        A.    Right.

18        Q.    He's the one that wanted it

19   to be checked out?

20        A.    Right.

21        Q.    Okay.

22        A.    And then --

23        Q.    And then what happened?

# FREEDOM COURT REPORTING

145

1     A.     And then after that through

2  different -- you know, we notified Calvin.

3  Well, no.  Let's see.  After that I guess

4  the next thing that happened was we ended

5  up getting a letter saying that Ms. Scott

6  couldn't work in the building.  Or no.

7  Yeah.  I think it was that Ms. Scott

8  couldn't work in the building any longer.

9     Q.     Do you need to look at your

10 exhibits?

11    A.     Okay.

12    Q.     It's Exhibit Number 2.

13    A.     You grabbed me so fast I left

14 it on my desk.  Okay.

15    Q.     See if you can refresh your

16 memory of that letter you received from

17 Mr. Swearengin by looking at Exhibit

18 Number 2.

19    A.     Okay.  Yeah.

20    Q.     Now, what was your

21 understanding?

22    A.     You're right.  You're

23 correct.

# FREEDOM COURT REPORTING

146

1      Q.     What was he requesting?

2      A.     We had several conversations,

3  you know, trying to fix this problem.  But

4  my main objective is just to fix the

5  problem and let everyone go on with

6  their -- with their, you know, work

7  environment.  So he sent me this letter,

8  and it basically said I've had problems

9  with the Scotts.  I want them out of my

10  building.  I don't think it's a safe

11  environment.  And that's when I took this

12  letter to Ray Perry, my supervisor.

13      Q.     Ray who?

14      A.     Ray Dennis and Perry Hopper.

15  And said how can we fix this, you know.

16      Q.     And did you have any further

17  involvement with meetings with

18  Mr. Swearengin or meetings with other

19  Finance Department officials --

20      A.     No, not --

21      Q.     -- or people from the

22  building?

23      A.     Not directly.  No.

# FREEDOM COURT REPORTING

147

1          Q.     Okay.  After you received the

2    letter, Exhibit Number 2, you turned the

3    problem over to Mr. Dennis and Mr. Hopper?

4          A.     Right.

5          Q.     Okay.  You're still the

6    Scott's representative?

7          A.     Yes.  Yes.

8          Q.     And to your understanding

9    now, do they have a card key that allows

10   them access?

11         A.     Yes.

12         Q.     That makes their job easier

13   in the building?

14         A.     Once -- once it was -- once,

15   I believe, Mr. Swearengin was told to give

16   them a key, he called me and gave me a

17   key.  I was -- I had to sign it out.  I

18   had to sign the key out in my name with

19   the understanding that it was going to the

20   Scotts permanently.  And so I did that.

21   And the other two items happened on the

22   same date.  They got their painted parking

23   place, and I was told they moved the

# FREEDOM COURT REPORTING

148

1    machine.

2            HEARING OFFICER:  What date was

3        this?

4            THE WITNESS:  That I'm not sure

5        of.  I could get a -- I could

6        probably get the date that was

7        signed.  It was all done shortly

8        there --

9        Q.    It wasn't a long period of

10   time?

11       A.    I don't think so.

12       Q.    Was there a lack of service

13   for about a two week period --

14       A.    Yes.

15       Q.    -- in February, late

16   February, the end of February and the

17   first few days of March?

18       A.    The Scotts keep their

19   machines pretty full.  So when they left,

20   it took a while for it to run out because

21   once -- once the favorites leave of what

22   you're buying, you're still going to buy

23   something.  And so eventually all the

# FREEDOM COURT REPORTING

149

1  stuff that people really didn't buy that

2  much went empty, and, you know, we've got

3  pictures.  Some machines never did go

4  empty.

5      Q.    You physically went to the

6  Gordon Persons Building to observe what

7  was happening with the machines during

8  this period after Mr. Scott had been

9  informed that he couldn't have his wife

10  accompany him to the Gordon Persons

11  Building?

12      A.    Right.  Repeatedly.  I had to

13  make sure that the machines -- you know,

14  that we didn't run out of product.  So

15  eventually I took my camera and took

16  pictures of every machine.

17      Q.    And there were -- there was

18  low volume of snacks in those machines,

19  but --

20      A.    Very few were empty.

21      Q.    Very few were empty.  So

22  items that were for sale were sold, and

23  like you said, some of the items that were

# FREEDOM COURT REPORTING

150

1    not favorites that sell out quickly were

2    sold?

3         A.    Right.

4         Q.    Did anybody else get access

5    to those machines during that period to

6    restock them?

7         A.    No.  I remember reading

8    somewhere I think in this paperwork that

9    we thought they had -- somebody was

10   working machines for them.  And they

11   notified us that no, nobody had access to

12   those machines.  So we figured out it was

13   just somebody had seen a dolly being

14   pushed around with boxes on it, which

15   could easily be a mail guy or somebody

16   just moving computers or something that

17   had been mistaken for the vendor.

18        Q.    You work with other blind

19   vendors that are assigned to State

20   buildings, private locations, federal

21   properties?

22        A.    (Witness nodding head in the

23   affirmative.)