# BEFORE THE ALABAMA DEPARTMENT
# OF REHABILITATION SERVICES

## IN RE:  THE MATTER OF CALVIN SCOTT

**A Full and Evidentiary Hearing Pursuant to the Randolph-**

**Sheppard Vending Act 20 U.S.C. 107, et seq.**

# VOLUME III

## [Pages 151 to 225]

# FREEDOM COURT REPORTING

151

1    Q.    At all of these locations,

2  are there different requirements to obtain

3  access?

4    A.    Yes.  That's -- that's really

5  up to the building manager about how they

6  enter and exit the building.

7    Q.    Have you ever worked with a

8  blind vendor assigned to a federal prison

9  location?

10    A.    Yes.  Yes.

11    Q.    Do those blind vendors have

12  certain restrictions as to how they can

13  arrive at those locations --

14    A.    Yes.

15    Q.    -- in order to comply with

16  them to operate their business on those

17  locations?

18    A.    Yes.

19    Q.    It's not unusual for building

20  management of any sort, private, State or

21  federal to place certain restrictions or

22  certain procedures for a blind vendor as

23  far as access to machines?

# FREEDOM COURT REPORTING

152

1      A.      Right.   I think I've still

2  got some that don't have any access except

3  for having the security guards open the

4  doors for them.

5      Q.      Have to be accompanied by a

6  security guard?

7      A.      In the prisons, yes, they

8  have to be accompanied, I think.  And in

9  many cases they do.  And in like the State

10  Judicial Building, I think they have to

11  have security open the doors for them.

12      Q.      Are you generally familiar

13  with the income monthly sales reports

14  filed on a monthly basis with --

15      A.      Yes.

16      Q.      -- in connection with Calvin

17  Scott's location?

18      A.      Yes.

19      Q.      Do you have any reason to

20  think that they were inaccurate in any

21  way?

22      A.      No.  They haven't changed

23  much over the years.

# FREEDOM COURT REPORTING

153

1    Q.    But it's your belief that

2    they accurately reflect the sales at a

3    building of that size and with the number

4    of employees situated buying from those

5    machines?

6         A.    Yes.

7         MR. SIMPSON:  That's all the

8    questions I have.

9         HEARING OFFICER:  Ms. Fleming,

10   do you have any questions?

11        MS. FLEMING:  No questions.

12        HEARING OFFICER:  Mr. Scott, do

13   you have any questions for Mr. Green?

14        MR. SCOTT:  Yes, I do.

15             CROSS-EXAMINATION

16   BY MR. SCOTT:

17        Q.    In February after getting

18   threatening letters from Ray Dennis --

19        HEARING OFFICER:  Would you

20   please, Ms. Scott, please refrain

21   from rattling your papers while

22   we're --

23        MS. SCOTT:  I'm sorry.

# FREEDOM COURT REPORTING

154

1      Q.    After getting those

2  threatening letters from Ray Dennis

3  threatening me out of the program, now,

4  how would you expect me to go down to that

5  building without my wife?  I cannot grasp

6  it and all, because, see, number one --

7          HEARING OFFICER:  Well, this is

8      the time to ask him a question now.

9          MS. SCOTT:  Yeah.  You have to

10     ask him a question, Calvin.

11     Q.    Well, anyway, we -- now, when

12  you gave us that key --

13         MS. SCOTT:  He didn't give it to

14     us.

15         HEARING OFFICER:  Ms. Scott --

16     Ms. Scott, I'm asking Mr. Scott if he

17     has any questions.  I'm not asking

18     you, Ms. Scott.

19         MS. SCOTT:  Ask him a question.

20     Q.    When you told us to pick up

21  that key, the swipe key in 2004, now, you

22  told us to keep the key and not -- you

23  know, and not lose that key.  And we did

# FREEDOM COURT REPORTING

155

1  not -- you did not tell us to return that

2  key to Buddy Swearengin every day we had

3  that key, did you?

4          A.    That's correct.

5              MS. SCOTT:  Ask him did he think

6      the key was permanent.

7          Q.    Did you think the key was

8  permanent that I had?

9          A.    The first key, yes, sir.

10 Yes, sir.

11             MS. SCOTT:  That's --

12             HEARING OFFICER:  Mr. Scott,

13     would you like to designate Ms. Scott

14     to be your representative and to ask

15     questions for you?

16             MR. SCOTT:  When it becomes

17     necessary, yes.

18             HEARING OFFICER:  Well, I mean,

19     it's hard for the court reporter to

20     take down what's happening when both

21     of you are taking at the same time,

22     and it is not appropriate in any

23     event.  So if you want to designate

# FREEDOM COURT REPORTING

156

1    Ms. Scott to be your representative

2    and to ask all your questions for you

3    and to make your opening statement,

4    your closing statement, that's fine.

5    But both of you cannot talk at the

6    same time.  That is disrespectful.

7         MR. SCOTT:  Well, yes, she can.

8         HEARING OFFICER:  All right.

9    Ms. Scott, I understand that

10   Mr. Scott has now designated you to

11   be his representative.

12        MS. SCOTT:  Yes.

13        HEARING OFFICER:  And you can

14   act as his representative, his

15   lawyer, and you can ask all the

16   questions you like.

17        MS. SCOTT:  Okay.  Well, he

18   stated that most of the machines was

19   full, so I know better and I've got

20   proof of that.

21        HEARING OFFICER:  You can ask

22   him questions, but this is not the

23   time to make speeches.

# FREEDOM COURT REPORTING

157

1      MS. SCOTT:  I won't ask him

2   that.  Calvin asked him questions

3   about that -- about the key.

4      HEARING OFFICER:  You don't have

5   any further questions?

6      MS. SCOTT:  No.  No.  I've got

7   other stuff to show proof of that

8   later on.

9      HEARING OFFICER:  Any further

10  questions?

11      REDIRECT EXAMINATION

12  BY MR. SIMPSON:

13      Q.    You've continued to work with

14  the Scotts as their representative and

15  with the Gordon Persons Building?

16      A.    Yes.  In the last -- since

17  these events that we're talking about,

18  very rarely do I get them on the phone

19  personally, you know, talking to them

20  actually.  I usually get their machine.

21  One -- for instance, one day probably

22  three o'clock --

23      Q.    You've answered my question.

# FREEDOM COURT REPORTING

158

1          A.     Okay.

2          Q.     And you will continue to

3     work.  That's your job?

4          A.     Oh, yes.  Yes.

5          Q.     You will continue to work

6     with them?

7          A.     Right.

8          Q.     And try to assist them.

9     Moving that snack machine, that's

10    something that you and technicians that

11    work underneath you effectuated for the

12    Scotts?

13         A.     Right.

14         Q.     If there is any other

15    problem, repairs, anything that has to be

16    done with those machines, it's your duty

17    to continue to do that?

18         A.     Yes.

19         Q.     And you are named as one of

20    the defendants in Mr. Scott's lawsuit

21    where he seeks a million dollars, to have

22    you incarcerated in a county jail for six

23    months and removed from your job?

# FREEDOM COURT REPORTING

159

1        A.    Yes.

2            MR. SIMPSON:  All right.  That's

3        all I have.

4            HEARING OFFICER:  Any additional

5        questions, Ms. Scott, of Mr. Green?

6            MS. SCOTT:  Well, yes.  I had

7        one I wanted to ask him, but it just

8        left my mind right now.  Let me see.

9            MS. SCOTT:  About the -- he said

10       that the machine was full.  I want to

11       ask him.

12            RECROSS-EXAMINATION

13    BY MS. SCOTT:

14       Q.    Just tell me what machines

15    was mostly full.

16       A.    They were full when you left.

17    So over the two week period as people

18    continued to buy, several of the machines

19    became empty but not all the machines.

20    The places where people go less frequently

21    and could be like behind the locked doors,

22    some of the machines never did go empty.

23    And that's why we took pictures to

# FREEDOM COURT REPORTING

160

1    document, you know, how the machines

2    looked.  And you can actually see how many

3    products are still in the machines.

4           Q.    Okay.  How many machines are

5    behind locked doors?

6           A.    That's only one that is

7    totally locked in.

8           Q.    Okay.  Has that machine

9    always been totally locked in?

10          A.    That I can't answer.  I'm not

11   sure if it's always been that way.

12          Q.    Well, you've been down to the

13   building.  You've been up on that floor?

14          A.    Right.

15          Q.    And it wasn't locked then?

16          A.    The machine -- well, I have

17   no problem in knocking on a door and

18   saying -- showing them what I've got in my

19   hand, showing them my State ID and saying

20   would you let me walk to the other side,

21   especially when I can't find a machine.

22   In the last several years, we'll take our

23   inventory sheet and actually put which

# FREEDOM COURT REPORTING

161

1    column each one of the machines is beside,

2    because that building is known as the

3    Missing Persons Building because it's very

4    easy to get turned around and the machines

5    aren't in the exact place everywhere.

6          Q.    Well, I'm talking about this

7    one particular machine that we reported to

8    you in 2004 that had become under lock and

9    key as you get off the elevator floor on 4

10   Monroe and Ripley that started -- you had

11   to ask about the swipe key when we told

12   you we needed a permanent swipe key?

13         A.    Right.  And that's the one

14   that you still have to get in to get to,

15   right?  That's the one you're talking

16   about?

17         Q.    That's the one I'm talking

18   about.

19         A.    Yes.  Now, what's the

20   question?  Was it always locked up?

21         Q.    That's right.  Was that door

22   that you get off the elevator that leads

23   out in the hallway, because both the

# FREEDOM COURT REPORTING

162

1    hallway doors has always been secured.

2    And I learned our way through that we

3    didn't have to go through those other

4    doors.  I found a simpler way through

5    there.  But when that door became locked,

6    we couldn't get in to that --

7             HEARING OFFICER:  Well, you're

8         testifying now.  You need to ask him

9         questions.

10        A.    Yes.  I think it did at some

11   time become -- they actually locked the

12   elevator door.

13        Q.    When was it first reported to

14   you that that door was locked?

15        A.    I don't know the date.

16        Q.    You don't remember -- you

17   don't remember in 2004 we called and

18   reported to you that it was locked and we

19   could not get in?

20        A.    Well, I --

21        Q.    You were going to see about

22   getting us a key, a permanent key?

23        A.    Yes, ma'am.  Based on all

# FREEDOM COURT REPORTING

163

1    this information that we've talked about

2    today, I would guess that it was right

3    before we got the swipe key the first time

4    possibly.

5          Q.    Yeah.  But it was 2004 when

6    we reported that we couldn't get in?

7          A.    Okay.

8          Q.    And it was 2005, January 31st

9    when we came out and had a -- put in three

10   requests for you-all and told you about

11   the swipe key and what Swearengin had done

12   to us.

13         A.    Okay.

14         Q.    So I'll ask you again.  Has

15   that door always been locked that we could

16   get in on 4 Monroe and Ripley?

17              HEARING OFFICER:  Hold on a

18         minute.  How long have you been --

19         how old is that building, the Gordon

20         Persons Building?

21              THE WITNESS:  About 1990, I

22         believe, isn't it?

23              HEARING OFFICER:  How long have

# FREEDOM COURT REPORTING

164

1    you been working in the Gordon

2    Persons Building?

3         THE WITNESS:  Since I started

4    which was either '95, '96.

5         HEARING OFFICER:  He's not able

6    to ask -- he's not able to tell you

7    whether the door was always locked.

8         MS. SCOTT:  Well, we didn't

9    start there until 1995 either, March

10   31st, 1995.

11        HEARING OFFICER:  Well, your

12   question asked him has it always been

13   locked.  He didn't come there until

14   five years after the building opened.

15        MS. SCOTT:  Well, we didn't

16   either.  We didn't get there until

17   March 31st, 1995.

18        THE WITNESS:  The answer is at

19   one time I think the door coming out

20   of the elevator was unlocked at one

21   time.  But when they put the card key

22   lock on it, then you had to knock on

23   the door to get someone -- and if

# FREEDOM COURT REPORTING

165

1      someone would let you in, fine.  Or

2      you had to have a key.

3           HEARING OFFICER:  When did that

4      occur?

5           THE WITNESS:  And I don't have

6      that date, but I would guess shortly

7      before we got them the swipe key the

8      first time.

9           HEARING OFFICER:  Sometime in

10     2004?

11          THE WITNESS:  Yes, sir.  Yes,

12     sir.

13       Q.    Okay.  I've got another

14   question for you.  Now, when we came out

15   on January the 31st, you could not even go

16   to Calvin's folder.  We asked you what

17   date was that key issued, that it was your

18   place to go to his folder and tell us the

19   exact date.  Because you asked me whether

20   it was a week or two weeks and I said, No.

21   It's been longer than that.  It's been a

22   month.

23       A.    No.

# FREEDOM COURT REPORTING

166

1    HEARING OFFICER:  Try to ask him

2    one question at a time, now, and try

3    not to make speeches and try not to

4    testify.  Give him one question at a

5    time.

6    Q.    Okay.  Well, why wasn't you

7    able to tell us the date that that key was

8    issued?  That you had to go Swearengin's

9    office and pick up the key and --

10    HEARING OFFICER:  Now, let

11    him -- now that you've asked your

12    question, let him answer it.  Okay?

13    A.    I didn't record the date that

14    the key was issued because those kind of

15    things happen every day.  My main -- my

16    main responsibility is to make sure

17    everything keeps running smooth.  So if

18    you had called me and said we need a key

19    or if I had came by there and you said,

20    Look, we really need a key, I would just

21    automatically go to Swearengin, Buddy, and

22    say, Can you give me a key.  I need a key

23    for the Scotts, or the Scotts need a key

# FREEDOM COURT REPORTING

167

1      would probably be what I said.  And based

2      on all the information that we have talked

3      about today, it would seem reasonable that

4      you could have called me and then I could

5      have turned around and called Swearengin

6      and said, Look, the Scotts need a key.  So

7      instead of him actually placing the key in

8      my hand, he left it at the front desk of

9      his office and then y'all, I think, went

10     by and got it.

11            Q.     Did you not call and tell us

12     that you had worked it out and that we

13     have to go to Swearengin's office to pick

14     up the key?

15            A.     Yes.  I think that's what I

16     just said.  If I wasn't on site, then I

17     would have called Swearengin and said, Can

18     I get the Scotts a key.  You know, can

19     they have a key.  And then he said, Yes.

20     I'll leave it at the desk and they can

21     come by and get it.  That would save at

22     least several hours if I was in town by me

23     having to go by, pick up the key and then

# FREEDOM COURT REPORTING

168

1    bring it to y'all.  If y'all just walked

2    up a floor or wherever and went by and got

3    the key, it would save time.

4            MR. SCOTT:  Now I've got a

5        question.  May I speak?

6            HEARING OFFICER:  Why don't you

7        tell your wife the question that you

8        want her to ask.  Whisper it in her

9        ear.

10           Q.    The question he wants to ask

11   is the whole time from 1995, the latter

12   part or whenever you came there, because

13   we didn't go there until 1995, have we

14   ever taken you through any of those

15   security doors and knocked at the doors

16   when y'all were doing inventory with them

17   machines?  Have we ever carried you

18   through any doors and knocked at a door

19   through a security door for you to go in?

20   Because we usually go in and --

21           HEARING OFFICER:  I think you're

22       repeating your question now.  Just

23       let him answer it.

# FREEDOM COURT REPORTING

169

1    A.    Honestly, I can't say yes or

2    no.  I will say that you have a very --

3    Calvin and yourself have a very good route

4    of knowing how to go up and down the

5    elevators, go down the open access halls

6    in order to adequately and correctly

7    service your machines.  I on the other

8    hand have never been able to learn the

9    route successful, and so that's why I keep

10   all my equipment listed per columns in the

11   building.  I will work all the machines,

12   and then if I notice that I have missed a

13   machine, I'll know what column it's under

14   and I can -- then I can figure out which

15   elevator to go in to get to it.  So to

16   answer that question, most likely we have

17   never -- you have never knocked on a door

18   to get in.

19        MS. SCOTT:  Thank you.

20        HEARING OFFICER:  Do you have

21        any further questions?

22        MS. SCOTT:  No.  Not that I can

23        think of right now.

# FREEDOM COURT REPORTING

170

1           HEARING OFFICER:  Let me ask

2       Mr. Simpson, do you have any

3       questions?

4       REDIRECT EXAMINATION (Continued)

5   BY MR. SIMPSON:

6           Q.    Even after having been served

7   with the lawsuit filed by the Scotts

8   naming you as a defendant, have you had

9   the opportunity to provide -- obtain

10  through your work new equipment for

11  Mr. Scott to utilize in his business?

12          A.    Repeat the question.

13          Q.    Have your bought them some

14  new equipment, a coin sorter?

15          A.    I would have to check.

16          Q.    Okay.  If a piece of

17  equipment failed and had to be replaced at

18  the Scotts' facility today, what would you

19  do?

20          A.    Just replace it.

21          Q.    Just replace it because

22  that's your job?

23          A.    Right.

# FREEDOM COURT REPORTING

171

1          Q.    All right.  You're not going

2     to treat them any differently now --

3          A.    No.

4          Q.    -- because they're asking

5     some federal court to pay -- have you pay

6     them a million dollars?

7          A.    No.

8          Q.    Or have you serve six months

9     in jail?

10         A.    No.

11            MR. SIMPSON:  All right.  That's

12        all, Your Honor.

13            HEARING OFFICER:  Ms. Fleming, I

14        believe you have some questions.

15            MS. FLEMING:  Yes.  Thank you.

16               CROSS-EXAMINATION

17    BY MS. FLEMING:

18         Q.    Mr. Green, do you have any

19    idea why the security procedures on the

20    fourth floor in the Gordon Persons

21    Building changed in or around January

22    2005?

23         A.    No, I don't.  I don't have

# FREEDOM COURT REPORTING

172

1    access to that kind of information.  I

2    could speculate, but --

3          Q.    Do you recall any

4    conversations that you might have had with

5    Buddy Swearengin having to do with a need

6    for security or greater security in the

7    Gordon Persons Building?

8          A.    Yes.  Whenever he -- whenever

9    he stated that they would have to check it

10   in and check it out, there were two

11   reasons.  I think one is for the greater

12   security and --

13         Q.    Around Revenue?

14         A.    Around Revenue.

15         Q.    And let me digress just a

16   moment.  The fourth floor of the Gordon

17   Persons Building is occupied by the

18   Alabama Department of Revenue; is that

19   correct?

20         A.    I don't know.  But you're --

21   yes, most likely.

22         Q.    And it was the fourth floor

23   of the Gordon Persons Building that was

# FREEDOM COURT REPORTING

173

1    secured and presenting a problem for

2    Mr. and Ms. Scott to access because they

3    had secured card keys for Revenue on the

4    fourth floor?

5         A.    Right.

6         Q.    All right.  Now, tell me what

7    conversations you can recall with Buddy

8    Swearengin about that security on the

9    fourth floor for Revenue.

10        A.    Only that they had tightened

11   the restrictions on who could have a key

12   and who could have continuous access to

13   those areas.

14        Q.    And when you say they had

15   tightened security, meaning the --

16        A.    I would guess the IRS or

17   the --

18        Q.    The Department of Revenue?

19        A.    Department of Revenue, yes.

20        Q.    Had requested tighter

21   security?

22        A.    Yes.

23        Q.    And it's your understanding

# FREEDOM COURT REPORTING

174

1    they only wanted people who were actually

2    permanent State employees, Revenue

3    Department employees to have access to

4    their revenue data --

5        A.    Right.

6        Q.    -- and areas?

7        A.    Right.

8        Q.    It's your understanding they

9    didn't want State employees from other

10   departments coming in to Revenue or having

11   access to Revenue?

12       A.    Right.

13       Q.    Only State Revenue employees

14   -- it was their request that only State

15   Revenue employees have access?

16       A.    Yes, ma'am.

17       MS. FLEMING:  Okay.  That's all

18   I have.

19       HEARING OFFICER:  Ms. Scott, do

20   you have any questions in light of

21   all of that?  Ms. Scott.

22       MR. SCOTT:  No questions.

23       MS. SCOTT:  No questions.

# FREEDOM COURT REPORTING

175

1          HEARING OFFICER:  Next witness.

2          MR. SIMPSON:  I'll get him.

3          HEARING OFFICER:  Raise your

4     right hand and be sworn.

5               PERRY HOPPER

6          The witness, having been first

7     duly sworn or affirmed to speak the truth,

8     the whole truth, and nothing but the

9     truth, testified as follows:

10              DIRECT EXAMINATION

11    BY MR. SIMPSON:

12         Q.    Tell us your name, please.

13         A.    My name is Perry Hopper.

14         Q.    What do you do for a living?

15         A.    I'm the assistant director of

16    the Business Enterprise Program for the

17    Blind.

18         Q.    How long have you been

19    assistant director?

20         A.    Twenty -- no.  Seven years.

21         Q.    And what does the assistant

22    director of the Business Enterprise

23    Program do?

# FREEDOM COURT REPORTING

176

1        A.    Well, job development,

2   marketing, promotion, also provide

3   assistance to our field reps in doing

4   their job.  I compile financial data, some

5   of which you submit to the federal

6   government.

7        Q.    In February of this year did

8   you become aware of a problem at the

9   Gordon Persons Building?

10       A.    Yes.  Ken delivered to Ray

11  and I a letter from a Mr. James Buddy

12  Swearengin that demanded the removal of

13  the Scotts from the building.

14       Q.    If he had been removed, if

15  Mr. Scott had been removed at the request

16  of the building management of that

17  building, would he upon his removal still

18  have a license to participate in the

19  Business Enterprise Program?

20       A.    Yes.

21       Q.    If there was available

22  another location that pursuant to our

23  rules would be assigned to Mr. Scott on

# FREEDOM COURT REPORTING

177

1    the day that he was removed from the --

2    and I'm conditioning this on if.  It's

3    hypothetical.  If there had been a removal

4    based upon that request from

5    Mr. Swearengin and if there had been

6    another facility that could be assigned in

7    accordance with our rules, could Mr. Scott

8    have continued to work in the program the

9    very next day?

10         A.    Yes, on a temporary basis.

11         Q.    All right.  And when you say

12   on a temporary basis, what do you mean?

13   What do you mean?

14         A.    We have to go through Alabama

15   Code Rules, our Business Enterprise

16   Program general rules.  We have to go

17   through certain procedures to select a

18   person for permanent placement in a job.

19         Q.    But he could have -- but

20   there are many facilities that are being

21   operated temporarily even as we speak?

22         A.    That's correct.  Probably a

23   dozen.

# FREEDOM COURT REPORTING

178

1          Q.    And so assignment to a

2    temporary facility and subsequent building

3    bidding for an assignment to a permanent

4    facility could have meant that Mr. Scott

5    could have continued operating a business

6    in the Business Enterprise Program with

7    no -- it's possible with no interruption

8    in his income?

9          A.    It's possible if the

10   circumstance permit it.

11         Q.    If the circumstances permit

12   it.  Now, that didn't happen?

13         A.    No.

14         Q.    That didn't happen.  You

15   received a letter asking for his removal

16   by the person that was assigned to manage

17   that building?

18         A.    Right.

19         Q.    And what did you do?

20         A.    Our liaison with the building

21   is Mr. Swearengin.  Ray and I, we went --

22   Ray Dennis, Mr. Dennis and I, we went to

23   see Mr. Swearengin immediately the first

# FREEDOM COURT REPORTING

179

1   working day he was back at work that

2   morning and to try and get him to rescind

3   his decision to put Calvin out of the

4   building.

5           Q.    Were you concerned at that

6   point?

7           A.    Yes.   I was very concerned.

8           Q.    Why?

9           A.    Because as far as I knew,

10  Calvin was out of a job.  Well, he was out

11  of his facility.  And Mr. Swearengin had

12  we -- had he not rescinded that, there

13  would be no way he could operate his

14  facility.  He wouldn't be allowed in the

15  building.  I suspect that he would have

16  been removed by the capital police had he

17  gone to the building after those three

18  days.  But we were fortunate enough and he

19  was a compassionate enough man that he

20  rescinded that decision.

21          Q.    And allowed Mr. Scott to

22  continue to operate with certain

23  conditions?

# FREEDOM COURT REPORTING

180

1      A.      With certain conditions,

2   correct.

3      Q.      Tell us about those

4   conditions and how they were arrived at.

5      A.      Well, it was through --

6   through negotiation with Mr. Swearengin,

7   Ray and I, and we relied on his compassion

8   for Calvin.  And we just asked him, you

9   know, what can we do so that Calvin can

10  continue his employment, self-employment

11  in this building.  And fortunately -- I

12  was very relieved.  Fortunately, we were

13  able to get a rescinding of that demand

14  that Calvin be removed from the building.

15     Q.      How did you feel after you

16  met with Mr. Swearengin?

17     A.      I was very -- I was very,

18  very happy that we had convinced him to

19  rescind his decision.

20     Q.      And do you know what happened

21  after Mr. Scott was informed of the fact

22  that he could go back to work just so long

23  as his wife was no longer accompanying

# FREEDOM COURT REPORTING

181

1    him?

2         A.    Well, there was a series of

3    communications which Calvin sent and there

4    was also some contacts with political

5    entities and -- but basically, he refused

6    to -- to go back to his job.  I mean his

7    facility.

8         Q.    How long have you known

9    Calvin Scott?

10        A.    Probably twenty-five,

11   twenty-seven years.

12        Q.    Have you served as his

13   Business Enterprise Program representative

14   during that period of time?

15        A.    Yes.  Yes, I have.

16        Q.    Before you were assistant

17   director?

18        A.    That's correct.  I have.

19        Q.    Known the man for a long

20   time?

21        A.    Yes.

22        Q.    You worked at obtaining

23   equipment for his facility?

# FREEDOM COURT REPORTING

182

1         A.    Yes.

2         Q.    Repair -- been present while

3    repairs were being made on this equipment?

4         A.    Yes.  Yes.

5         Q.    What do you consider Calvin

6    Scott to you?

7         A.    He's my friend.  He's been my

8    friend for years.

9         Q.    So you were trying to save a

10   friend's business --

11        A.    That's correct.

12        Q.    -- when you went to go back

13   to Mr. Swearengin?

14        A.    That is correct.  That is all

15   I was trying to do.

16        Q.    Were you trying to conspire

17   with Mr. Swearengin to somehow violate

18   Mr. Scott's constitutional rights?

19        A.    No, sir.

20        Q.    Now, when there was a series

21   of correspondence -- I believe you

22   testified there was a series of

23   correspondence, some of which you received

# FREEDOM COURT REPORTING

183

1    and then you are aware that some

2    politicians --

3         A.    I received --

4         Q.    -- and other governmental

5    officials received correspondence, did you

6    have to do anything in connection with all

7    of that correspondence?  Were you

8    requested to prepare something?

9         A.    Well, I prepared -- not only

10   did I respond to some -- a senator's

11   office -- I'm not sure exactly which one

12   it was -- through facsimile and by other

13   means, I also was met -- Ray and I met

14   with the commissioner because he had been

15   contacted by some local politicians or by

16   a local politician or politicians.  I know

17   of one.  And so I formulated a timeline of

18   the correspondence and the actions or

19   correspondence that had transpired between

20   February the 7th and February the 17th.

21        Q.    Those are documents you were

22   assigned to produce for the commissioner

23   to have an explanation of what had

# FREEDOM COURT REPORTING

184

1    happened?

2         A.    What was transpiring.

3         Q.    And you produced it on

4    February 17th for transmission to the

5    commissioner so he could understand what

6    had been happening?

7         A.    That's correct.

8         Q.    And in front of you, Exhibit

9    Number 13, is that an accurate copy of the

10   work that you performed to produce that

11   timeline of what had happened back on

12   February 17th?

13        A.    Yes.

14        Q.    Now, this is something that

15   the Scotts haven't seen until today, to

16   your knowledge?

17        A.    That's correct.

18        Q.    But this is a document that

19   you were assigned to produce in the

20   regular course of your business as

21   assistant director of the Business

22   Enterprise Program?

23        A.    That's correct.

# FREEDOM COURT REPORTING

185

1   Q.  Does it accurately reflect

2 what your knowledge of the events were

3 back on February 17th of what had

4 happened?

5   A.  To the best of my knowledge,

6 yes.

7   Q.  And did you record it for a

8 purpose?  I mean, did you write these

9 things down for a reason?

10   A.  Well, it was to advise the

11 commissioner on what the status was and

12 what had transpired.  He -- the

13 commissioner basically wanted to know what

14 is going on.

15   MR. SIMPSON:  We would move to

16  admit Exhibit Number 15.

17   HEARING OFFICER:  Is there any

18  objection?

19   MS. FLEMING:  No objection.

20   HEARING OFFICER:  It will be

21  admitted.

22   Q.  All right.  Subsequent to

23 that production of that document, Exhibit

# FREEDOM COURT REPORTING

186

1    Number 13, did I ask you to produce a

2    document that accurately reflects the

3    profits and sales that have over the years

4    been obtained by the operation of

5    Mr. Calvin Scott's facility at the Gordon

6    Persons Building?

7         A.    That's correct.

8         Q.    Now, I want you to look at

9    what's in that notebook identified as

10   Exhibit 14.  Is that the document you

11   produced for me?

12        A.    Yes.

13        Q.    How do you go about gathering

14   that information?

15        A.    Well, the -- each vendor

16   submits monthly a BEP-1E which is a --

17   it's a summary of financial data for his

18   or her facility.  That goes through

19   accounting which aggregates all the

20   information.  And each vendor is tracked

21   annually through the financial reports

22   that are produced in the accounting

23   department.  We receive a copy monthly of

# FREEDOM COURT REPORTING

187

1    those reports.

2          Q.    And those reports would

3    reflect the amounts of gross sales and net

4    profits along with some other information?

5          A.    Along with other information,

6    it would reflect the sales that was

7    reported by the vendor and the net

8    proceeds or net profit that accrue to the

9    blind vendor.

10         Q.    Does Exhibit Number 14

11   accurately reflect on a fiscal year basis

12   the reported amounts for gross sales and

13   net profits for Calvin Scott's facility at

14   the Gordon Persons Building?

15         A.    Yes.

16         Q.    You were his representative

17   for a period of time?

18         A.    Correct.

19         Q.    So the monthly sales reports,

20   to your knowledge, who prepared them for

21   Mr. Scott?

22         A.    I don't have any personal

23   knowledge, Steve, if it was a -- an

# FREEDOM COURT REPORTING

188

1     accountant, a bookkeeper or an assistant.

2     I don't -- I can't say.

3          Q.     But do you know whether or

4     not Mr. Scott was involved in the

5     preparation of those reports?

6          A.     I would only be speculating,

7     but Mr. -- Mr. Scott can't communicate.

8     As far as on paper, he can't communicate.

9     It would --

10          Q.     You know that from your

11     experience with him?

12          A.     I do.

13          Q.     So it had to be someone else

14     filing those reports?

15          A.     He -- it's -- it would be

16     someone else perhaps transcribing it,

17     perhaps someone else calculating them.

18     Perhaps he recorded into a recorder the

19     information.  Perhaps he kept it in

20     Braille and then it was transcribed by

21     another individual.  I've seen it done all

22     those ways over the years.

23               HEARING OFFICER:  We don't have

# FREEDOM COURT REPORTING

189

1       any dispute there.  Let's go on to

2       something else.

3             MS. SCOTT:  Can I ask a

4       question?

5             HEARING OFFICER:  Not yet.

6             MS. SCOTT:  Okay.

7       Q.    You've been named as one of

8  the defendants in Mr. Scott's lawsuit

9  where he seeks a million dollars and you

10 to be put in jail for six months --

11      A.    Yeah.

12      Q.    -- and be removed from your

13 job?

14      A.    Right.

15      Q.    And you still have to perform

16 services -- perform your job --

17      A.    Correct.

18      Q.    -- to see that Mr. Scott's

19 facility at the Gordon Persons Building is

20 a successful business operation?

21      A.    That's correct.

22      Q.    And you're still going to,

23 aren't you?

# FREEDOM COURT REPORTING

190

1        A.      You're right.

2        Q.      You're not going to treat him

3    any differently?

4        A.      No.  Absolutely -- absolutely

5    not.

6        Q.      Did you do anything, Perry,

7    to try to harm Mr. Scott --

8        A.      No.

9        Q.      -- in any way?

10       A.      No, sir.

11       Q.      What were you trying to do?

12       A.      Trying to keep him employed,

13   keep him -- I was trying to keep him from

14   losing his facility.

15           MR. SIMSON:  That's all.

16       A.      Trying to --

17           MR. SIMPSON:  That's all.  Thank

18       you.

19           HEARING OFFICER:  Ms. Fleming,

20       do you have any questions?

21           MS. FLEMING:  Yes, just a few.

22               CROSS-EXAMINATION

23   BY MS. FLEMING:

# FREEDOM COURT REPORTING

191

1     Q.    Looking, again, at Exhibit

2   14, Mr. Hopper, it indicates -- this

3   report that you've prepared indicates that

4   in fiscal years 1999, at least in FY '99,

5   Mr. Scott was servicing floors four

6   through six in the Gordon Persons

7   Building; is that correct?

8           A.    That's correct.

9           Q.    There's only one asterisk

10  there.  Was that also, though, the case in

11  fiscal year 2000 and 2001?

12          A.    I'm confident that is.

13          Q.    So in those three years,

14  Mr. Scott was only responsible for floors

15  four, five and six in the Gordon Persons

16  Building?

17          A.    That's correct.

18          Q.    Was there a different blind

19  vendor on floors one through three?

20          A.    Yes.

21          Q.    And then it appears beginning

22  in fiscal year 2002 Mr. Scott became

23  responsible for servicing the entire

# FREEDOM COURT REPORTING

192

1    Gordon Persons Building; is that correct?

2         A.    That's correct.  To date.

3         Q.    In 2002 and he's continued

4    that to the present day?

5         A.    Yes, ma'am.

6         Q.    Based on your figures, it

7    appears that the net profit that was made

8    in fiscal years 1999, 2000 and 2001 was in

9    the neighborhood of twenty-five thousand

10   dollars a year.  Twenty-six, twenty-five,

11   twenty-seven?

12        A.    Twenty-six thousand it looked

13   to me just without a calculator.

14        Q.    And then beginning in the

15   year 2002 when his space doubled to

16   include six floors instead of three

17   floors, his income apparently doubled to

18   the neighborhood of fifty-two thousand

19   dollars a year?

20        A.    Yes.

21        Q.    Net profit?

22        A.    Yes, ma'am.  In 2002, this is

23   the fiscal year because that's how we

# FREEDOM COURT REPORTING

193

1    report to the federal government.  Calvin

2    reported through his BEP-1E's fifty-two

3    thousand nine hundred and four dollars and

4    thirty-four cents in net proceeds, net

5    profits.

6           Q.    Is that what you would expect

7    when someone doubled the space, because

8    the Gordon Persons Building, I assume, has

9    approximately the same number of machines

10   on each floor?

11          A.    Yes, ma'am.  That's exactly

12   what we would expect.

13          Q.    That in 2002, net profits

14   would double from twenty-six to

15   fifty-two --

16          A.    Yes, ma'am.

17          Q.    -- thousand dollars a year?

18          A.    Yes, ma'am.

19       MS. FLEMING:  Thank you.

20       HEARING OFFICER:  Now,

21    Ms. Scott, do you have any questions

22    for him?

23       MS. SCOTT:  Yes, please, sir.

# FREEDOM COURT REPORTING

194

1          CROSS-EXAMINATION

2    BY MS. SCOTT:

3          Q.    I would like to ask Perry and

4    Ray and all, what has this income got to

5    do with this lawsuit?  What has this got

6    to do with this lawsuit?  Whatever the

7    income is, he worked and he earned it.

8    But what has this income, this ridiculous

9    income you've got down here --

10              HEARING OFFICER:  I think it

11         would be better, more appropriate for

12         you to object to the questions before

13         they were answered rather than to ask

14         him that question.  He's here to --

15         he's here to answer questions,

16         factual questions and not to talk

17         about the theory of the case.

18              THE WITNESS:  That's -- that's

19         correct.

20              MS. SCOTT:  What has this got to

21         do with this lawsuit?

22              HEARING OFFICER:  Well, the

23         thing to do, if you think something

# FREEDOM COURT REPORTING

195

1    is irrelevant is to object to it when

2    the question is asked.

3        MS. SCOTT: Okay. All right.

4    Okay.

5        HEARING OFFICER: Do you have

6    any questions for Mr. Hopper?

7        MS. SCOTT: That's -- that's --

8    that was the question I wanted to ask

9    him.

10        HEARING OFFICER: You don't have

11    any other questions for Mr. Hopper?

12        MS. SCOTT: No. No.

13        HEARING OFFICER: Okay. Seeing

14    as there were no other questions --

15    seeing as there were no questions --

16        MR. SIMPSON: Is Exhibit 14

17    admitted?

18        HEARING OFFICER: Do you want to

19    move to admit it?

20        MR. SIMPSON: Yes. Could I move

21    to admit Exhibit 14?

22        HEARING OFFICER: Any objection

23    to 14?

# FREEDOM COURT REPORTING

196

1    MS. SCOTT:  I object to it.  I

2  object to it.

3    HEARING OFFICER:  I will

4  overrule the objection and admit

5  Exhibit 14.

6    Mr. Hopper, you may be excused.

7  Thank you for your testimony.

8    THE WITNESS:  Thank you.

9    MR. SIMPSON:  That's all the

10  State has on behalf of the Department

11  and the departmental employees.  I

12  don't know if Ms. Fleming wants to

13  present anything on behalf of the

14  Finance Department.

15    HEARING OFFICER:  The Alabama

16  Department of Rehabilitation Services

17  is resting its case saying it has no

18  further evidence to present at this

19  time.  Y'all understand that?

20    MS. SCOTT:  Okay.

21    HEARING OFFICER:  Now I'll ask

22  if -- I guess that would be the

23  Finance Department.

# FREEDOM COURT REPORTING

197

1          MS. FLEMING:  I'm not sure if

2    it's appropriate for us to present a

3    case at this time, Your Honor.  So we

4    would not present one.

5          HEARING OFFICER:  You don't have

6    any?

7          MS. FLEMING:  We have no

8    evidence to offer.

9          HEARING OFFICER:  Okay.  Now, I

10   will go back to Ms. Scott on behalf

11   of Mr. Scott and ask if there's any

12   further evidence that you-all would

13   like to offer?  Evidence.

14         MS. SCOTT:  Yes.  These are the

15   2005 payout refunds.

16         HEARING OFFICER:  To be quite

17   frank, I really don't see that that

18   has anything to do with anything in

19   this case.

20         MS. SCOTT:  Well, this has all

21   come up.  We was accused of not

22   paying the personnel.

23         HEARING OFFICER:  I'm not going

# FREEDOM COURT REPORTING

198

1    to -- I'm not going to decide whether

2    or not that accusation was correct or

3    not correct.  It's irrelevant to

4    every issue in the case, if there are

5    any issues in the case.

6         MS. SCOTT:  We have payouts.

7         HEARING OFFICER:  Now, if you

8    want to offer that, that's fine.

9         MS. SCOTT:  I'd like to offer

10   it.

11        HEARING OFFICER:  All right.

12        MS. SCOTT:  And, also, even

13   where we called these people, I've

14   got checks in red of the State office

15   building.  Every one of these numbers

16   is the personnel.

17        HEARING OFFICER:  Let's take

18   them one at a time now.  You want to

19   offer your 2005 snack refunds as

20   Exhibit 23.

21        MS. SCOTT:  Whatever exhibit

22   that go on.

23        HEARING OFFICER:  And do you

# FREEDOM COURT REPORTING

199

1    have copies of these?

2        MS. SCOTT:  Yeah.  I have copies

3    of those.

4        HEARING OFFICER:  So that you

5    won't be prejudiced in preparing your

6    2005 tax returns?

7        MS. SCOTT:  No.  I ran them off.

8        HEARING OFFICER:  All right.

9    Any objection?

10        MR. SIMPSON:  I have no

11    objection.

12        MS. FLEMING:  No objection.

13        HEARING OFFICER:  All right.

14    This will be admitted as Exhibit 23.

15    Now, the next thing that you'd like

16    to offer would be -- what is that?

17        MS. SCOTT:  This is the cell

18    phone calls.  I've got them all

19    checked there for State for the

20    Gordon Persons Building where we

21    called personnel to come out and

22    collect the refunds.  I have those.

23        HEARING OFFICER:  All right.

# FREEDOM COURT REPORTING

200

1    You want to offer that as Exhibit

2    Number 24?

3        MS. SCOTT:  Yes.  And we do pay

4    refunds.  Don't nobody have no

5    problem with us down there.  None

6    whatsoever.

7        HEARING OFFICER:  All right.

8    And is there any objection to 24?

9        MR. SIMPSON:  No, sir.

10       MS. FLEMING:  No.

11       HEARING OFFICER:  Then they'll

12   be admitted.  All right.  Any

13   additional testimony or evidence or

14   documents?

15       MS. SCOTT:  Well, I would like

16   to go back and talk about those

17   machines that was empty.  They had

18   nineteen.  They got on here twenty,

19   but it's only nineteen snack

20   machines.  And when we got back to

21   work --

22       HEARING OFFICER:  All right.

23   You're testifying now; am I correct?

# FREEDOM COURT REPORTING

201

1        MS. SCOTT:  Yes.

2        HEARING OFFICER:  And you're

3    testifying in response to something

4    that you heard?

5        MS. SCOTT:  Them say.

6        HEARING OFFICER:  All right.

7    Now, you're still under oath.

8        MS. SCOTT:  Okay.  All nineteen

9    of those machines, my old camera gave

10   out.  All nineteen -- all eighteen of

11   those machines was empty when we got

12   back.  My camera messed up.  I tried

13   to take all eighteen of them.  I

14   tried to take them all.

15       HEARING OFFICER:  Do you want to

16   offer that?

17       MS. SCOTT:  I don't mind.

18       HEARING OFFICER:  Do you want to

19   offer that to show that --

20       MR. SCOTT:  Yes.  Yes, sir.  To

21   how hard a time we had when we got

22   back to work.  Yes.  I sure would.

23   Now, on this here, only one machine

# FREEDOM COURT REPORTING

202

1    that was full when we got back, and

2    that is because somebody -- it's been

3    reported to Ken Green several times.

4    Somebody down in that building on 2

5    Monroe and Jackson is putting tape,

6    paper clips, letter openers,

7    rubberbands, even twisted bread

8    things in the coin machine where you

9    put your coins and it jams up the

10    machine.  That's how the machine was

11    when we got back.  This has been

12    reported to Ken Green several times.

13    Several times.  And it was full.

14    This is the only machine that was

15    full when we got back.  It's the only

16    one that was full.  I tried to stand

17    back far enough.  And this machine

18    has a note on it.  I've got the note

19    somewhere.  It reads this machine is

20    jammed.  Ken Green saw this.  Neither

21    did he call the technician -- and

22    he's got keys to these machines -- to

23    unjam that machine, to open it up.

# FREEDOM COURT REPORTING

203

1    So the precedent is, Well, he had at

2    least one machine they could have

3    used after all this trouble they was

4    putting us through was going on.  He

5    done nothing about that.  We didn't

6    get any support, none whatsoever.

7    But this is the -- that was full when

8    we got back located on 2 Monroe and

9    Jackson.  I've got a copy of that

10   note somewhere telling that the

11   machine was jammed.  Ken saw that

12   because they went to every machine.

13        HEARING OFFICER:  What period of

14   time -- what period of time was

15   Mr. Scott absent from the building?

16        MS. SCOTT:  From February the

17   11th until we returned March the 2nd.

18   He was gone two weeks.

19        HEARING OFFICER:  That sounds

20   like more than two weeks, the 11th of

21   February to the 2nd of March.

22        MS. SCOTT:  Whatever it was.

23   Whatever amount it was, because I had

# FREEDOM COURT REPORTING

204

1    reports here that we -- the 11th of

2    February was the last day.

3        HEARING OFFICER:  Let me ask you

4    this.  Was there any reason why

5    Mr. Scott could not return to the

6    building between the 11th of February

7    and the 2nd of March?

8        MS. SCOTT:  Well, he didn't have

9    anybody to bring him to work.

10        HEARING OFFICER:  That's not my

11    question.  Was there any reason why

12    Mr. Scott could not return to the

13    building between the 11th of

14    February -- was anybody preventing

15    him from returning to the building?

16        MR. SCOTT:  Can I answer that?

17        HEARING OFFICER:  Yes, sir.

18    You're still under oath.

19        MR. SCOTT:  Yes, sir.  Yes, sir.

20    They did.  I -- number one, as I

21    stated earlier, when we were -- when

22    we first got here, see, the whole

23    thing was that I could not use my

# FREEDOM COURT REPORTING

205

1    wife in helping me who has been with

2    me --

3        HEARING OFFICER:  I understand.

4        MR. SCOTT:  -- these forty

5    years.

6        HEARING OFFICER:  I understand.

7    Other than that, was there anything

8    to prevent you from returning to the

9    facility from the 11th of February

10   and the 2nd of March?

11       MR. SCOTT:  As far as somebody

12   helping me, how do you mean that?

13       MS. SCOTT:  I wasn't allowed to

14   drive.

15       MR. SCOTT:  That's right.

16       MS. SCOTT:  I couldn't even

17   drive him down there.

18       HEARING OFFICER:  Other than

19   that, was there anything to prevent

20   you from returning to the building

21   between the 11th of February and the

22   2nd of March?

23       MS. SCOTT:  He had no

# FREEDOM COURT REPORTING

206

1       assistance.

2               MR. SCOTT:  Number one, I did

3       not have no assistance.

4               HEARING OFFICER:  Was there

5       anything else?

6               MR. SCOTT:  That's it.

7               HEARING OFFICER:  Okay.

8               MR. SCOTT:  Number one, I wasn't

9       going to hire nobody to help me with

10      my work.

11              HEARING OFFICER:  Okay.

12              MS. SCOTT:  And why should I get

13      rid of my wife for helping me for no

14      reason?  I'd be a fool.

15              MS. SCOTT:  And, also --

16              HEARING OFFICER:  Now, let me

17      ask you this.  Is there anything in

18      the program that requires anyone to

19      allow you to bring your wife to your

20      facility to assist you?

21              MR. SCOTT:  I have never heard

22      of it.  I have never heard that it

23      was not.

# FREEDOM COURT REPORTING

207

1    HEARING OFFICER:  No.  No.  I

2    think you misunderstood my question.

3        MR. SCOTT:  Okay.  Ask it again.

4        HEARING OFFICER:  I'm asking if

5    there's anything in law or regulation

6    that requires the Alabama Department

7    of Rehabilitation Services or the

8    State of Alabama Finance Department

9    to allow you to bring your wife to

10   the building, to the Gordon Persons

11   Building, that requires them to allow

12   you to bring your wife?  That's my

13   question.

14       MR. SCOTT:  There is no law as

15   far as who -- whoever I use to bring

16   me to that building.

17       HEARING OFFICER:  Okay.

18       MR. SCOTT:  Not only her.

19       MS. SCOTT:  We never saw a

20   policy that a wife couldn't work with

21   or assist my husband because we've

22   got plenty of wives that does assist

23   their husbands that are --

# FREEDOM COURT REPORTING

208

1    MR. SCOTT: Most of them that
2    are totally blind like myself. I'm
3    sorry. I'm sorry.

4    MS. SCOTT: Most of them help do
5    it. But if I may get back to talk
6    about these machines. We had
7    eighteen of them empty. I talked
8    about the one that was full.

9    HEARING OFFICER: All right.

10   MS. SCOTT: And the monies we
11   took up, we wasn't able to keep the
12   stock up because we wasn't allowed to
13   be there at work.

14   HEARING OFFICER: Well, nothing
15   prevented Mr. Scott from returning to
16   the building, isn't that his
17   testimony, other than that he wanted
18   you to be there with him?

19   MS. SCOTT: He have to have
20   assistance, and he didn't have no
21   assistance. He didn't have anybody
22   to bring him.

23   HEARING OFFICER: All right. I

# FREEDOM COURT REPORTING

209

1    understand.

2        MS. SCOTT:  That's why.  And

3    they only gave him three days.

4        HEARING OFFICER:  Okay.

5        MS. SCOTT:  Along with the

6    harassment letters and the calls.

7    But anyway, all the money that we

8    took up out of the machines, out of

9    the eighteen machines, that one was

10   full.  And I had pastries.  I forgot

11   how many I had in that machine.  So

12   we lost on pastries there.  But all

13   the money that we took up, we had to

14   take it and fill up those machines.

15       HEARING OFFICER:  Let me ask you

16   this.  Is there anything in the law

17   in the regulation that requires the

18   Alabama Department of Rehabilitation

19   Services to do Mr. Scott's job for

20   him when he didn't do it?

21       MS. SCOTT:  No.  But most of the

22   time, a lot of times I have known of

23   some representatives that have been

# FREEDOM COURT REPORTING

210

1    pretty nice to some people.  Like we

2    had stock down there that --

3         HEARING OFFICER:  That's not

4    what I'm asking.  I think you've

5    answered my question.

6         MS. SCOTT:  No.

7         HEARING OFFICER:  It seems to me

8    that you're saying that Mr. Green had

9    some duty to do Mr. Scott's job in

10   his absence, and I want to know where

11   that duty comes from.

12        MS. SCOTT:  No.  I didn't say he

13   had a duty.  I just said some of them

14   are pretty nice at helping their

15   vendors.

16        HEARING OFFICER:  Well, what's

17   the point of these photographs that

18   you're putting out here?

19        MS. SCOTT:  To tell that they

20   was empty when we got back, and all

21   the money that we took up, we had to

22   put it back inside.

23        HEARING OFFICER:  That's what

# FREEDOM COURT REPORTING

211

1    I'm asking.

2         MS. SCOTT:  We had to put them

3    back in the machines when we went

4    back to work.

5         HEARING OFFICER:  I'm trying to

6    understand -- I'm trying to

7    understand and I'm trying to help,

8    too.

9         MS. SCOTT:  Okay.

10        HEARING OFFICER:  I do not

11   understand why you're offering these

12   photographs.  I don't see what

13   they're relevant to unless they're

14   relevant to your theory that the

15   Department or Mr. Green had some

16   obligation to service these machines

17   in Mr. Scott's absence.

18        MS. SCOTT:  Ken Green stated

19   that the machines was full.  He

20   stated that, and that's why I come up

21   with these pictures, to show that

22   those machines was not full.

23        HEARING OFFICER:  Okay.  That's

# FREEDOM COURT REPORTING

212

1       your only reason.

2           MS. SCOTT:  He said before we

3       left --

4           HEARING OFFICER:  That's the

5       only reason you're offering those?

6           MS. SCOTT:  That's the only

7       reason why.  Uh-huh.  He said they

8       were full when we left.  I was just

9       showing that they did empty up, and

10      this one here that was jammed, the

11      reason why it was still full.

12          HEARING OFFICER:  Okay.

13          MS. SCOTT:  And then he didn't

14      call the technician when he knew the

15      problem with that machine.

16          HEARING OFFICER:  Was that his

17      job?

18          MS. SCOTT:  Uh-huh.

19          MR. SCOTT:  Yes.  That's his

20      job.

21          MS. SCOTT:  He had keys.  He

22      could have unlocked it.  He could

23      have unlocked the machine and got all

# FREEDOM COURT REPORTING

213

1    of this stuff out of here, got the

2    tape and all of this stuff, paper

3    clips or whatever it is and cleaned

4    it out.  So the customers could have

5    used that one machine.

6            HEARING OFFICER:  Where can I

7    verify that that's his job?  Is there

8    something in --

9            MS. SCOTT:  Oh, I'm not -- the

10   reason we had a problem is we

11   reported it to Ken Green.  And Ken

12   Green know about this problem.  When

13   he got there and saw this machine, he

14   knew what was wrong with the machine

15   and he done nothing about it.

16           HEARING OFFICER:  Well, what I'm

17   trying to find out is where does it

18   say in the law or the regulations

19   that it's his job to deal with that

20   problem?  That's what I'm getting at.

21           MS. SCOTT:  Well, I don't know

22   where it is in there, but as he said,

23   he reports whatever problems we

# FREEDOM COURT REPORTING

214

1    report to him.

2    MR. SCOTT:  To the technicians.

3    MS. SCOTT:  To the technicians.

4    And he saw it was a problem because

5    he knew of this problem.  We had told

6    him long ago and kept telling him

7    about this problem and tried to talk

8    to them about putting a camera up for

9    the people been messing with that

10   machine.  But he knew of that problem

11   and he didn't call the technicians

12   in.

13   HEARING OFFICER:  Do you want to

14   offer these photographs?

15   MS. SCOTT:  Yeah.  Uh-huh.

16   HEARING OFFICER:  Which ones do

17   you want to offer?

18   MS. SCOTT:  That's the machines

19   that were -- I don't care if you take

20   them all.  It will be all right with

21   me.

22   HEARING OFFICER:  Well, I'm

23   going to leave that to you.  I'm not

# FREEDOM COURT REPORTING

215

1    going to make that decision.

2         MS. SCOTT:  I'm showing where

3    the machines was empty.  Like I said,

4    my camera hung up on me.

5         HEARING OFFICER:  Well, just

6    show me which exhibits you want to

7    offer, which photographs you want to

8    offer.

9         MS. SCOTT:  All of these down

10   here.  It will be all right.

11        HEARING OFFICER:  Do you want to

12   hand them to me?

13        MS. SCOTT:  Sure.  That's where

14   that machine, the one that's got the

15   note on it.  And they done nothing

16   about it.

17        HEARING OFFICER:  You want to

18   offer all of these photographs as

19   Exhibit Number 25?

20        MS. SCOTT:  Whatever exhibit it

21   is.

22        HEARING OFFICER:  All right.

23   Any objection over here?

# FREEDOM COURT REPORTING

216

1        MR. SIMPSON:  None whatsoever.

2        HEARING OFFICER:  All right.

3    These photographs will come in as

4    Exhibit Number 25.  Anything further?

5    Is there anything further, Ms. Scott?

6        MS. SCOTT:  Oh, no.  Not that I

7    can think of right now.

8        HEARING OFFICER:  You don't have

9    any other evidence you want to offer

10    on behalf of Mr. Scott?

11        MS. SCOTT:  Not right now.  I

12    think I've given you all the facts.

13        HEARING OFFICER:  You've covered

14    everything that you want to cover?

15        MS. SCOTT:  I believe so.  All

16    except I can't find the date that

17    Calvin got inventoried out, because

18    Searcy Rushing had given us a copy

19    where he said he -- Calvin's letter

20    said he -- Calvin was being thrown

21    out on the 24th.

22        HEARING OFFICER:  Was he

23    actually inventoried out?

# FREEDOM COURT REPORTING

217

1    MS. SCOTT: Yes. Uh-huh. I

2    have a sheet of it. But that's what

3    they gave Searcy. And when Searcy

4    called us after all of these people

5    had called him and all that,

6    contacted him about this situation,

7    he rescind his letter. Not

8    Swearengin. Swearengin hasn't

9    rescinded nothing. If it was up to

10   Swearengin, we would have been out of

11   there. All the calls that had come

12   from Rushing and government calls is

13   written in here.

14   HEARING OFFICER: Why did

15   you-all come back to work? Why did

16   Mr. Scott come back to work on March

17   2nd?

18   MS. SCOTT: Well, Searcy had

19   phoned us after we got a letter from

20   Jim Maine's assistant. He wanted us

21   to come down to tell him the

22   problems. I didn't want to go down

23   because he had the letter that

# FREEDOM COURT REPORTING

218

1    Swearengin had written to push us

2    out.  But I went and we had a talk.

3    Those letters are over there.  And

4    he -- I showed him all of this stuff.

5    I went down the letter and I told him

6    about him agreeing with such things

7    that -- you know, to answer a matter

8    before you hear both sides of it.

9    And he didn't look to our side and

10   try to find out who we were.  They

11   got together and they tried to push

12   us out.  And I didn't want to go talk

13   to him.  The reason why I went was

14   because a friend of ours,

15   Representative McClammy, because I

16   was busy trying to get a lawyer to

17   sue these people, you know.  So to be

18   sure Calvin kept his building, I had

19   written all these people.  Because I

20   know once they got him out,

21   regardless of what the Court turn out

22   to be, these people not going to do a

23   wrong to make a right that put

# FREEDOM COURT REPORTING

219

1    another vendor out of that building

2    and give Calvin his business back.

3    So that's why I went to Rushing.  He

4    rescinded his letter and said we

5    could go back to work.  And that's

6    how we got back to work.

7         HEARING OFFICER:  Okay.

8         MS. SCOTT:  And he went down --

9    I wrote -- there's a letter and

10   saying he gave us a letter when he

11   first got there and wanted us to sign

12   the letter.  No.  We're not signing

13   anything.  He claim he read the

14   letter, but he didn't read it to us,

15   because if he had, me and Calvin

16   would have got up and walked out on

17   him.  He was like accusing us of

18   violating rules at the Gordon Persons

19   Building.  And I wrote him a letter

20   back pertaining to that letter of how

21   he accused us and, you know, that he

22   was accusing us.  But anyway, on the

23   28th he had called and he says to me

# FREEDOM COURT REPORTING

220

1     -- because we -- on the 25th is when

2     we had that conference with him.  And

3     he said, Well, I'll see y'all Monday.

4     So in telling us that, I mean, the

5     package he gave me for us, it didn't

6     have a letter telling us we could go

7     back to work.  So naturally we wasn't

8     showing up.  We didn't show up

9     Monday.  So he called me sometime

10    Monday.  Ms. Scott, do you ever get

11    tired?  Do your battery ever run

12    down?  All of these meetings and you

13    didn't show up at work today.  I

14    said, You didn't -- them letters you

15    gave us was for Swearengin.  You

16    accused us of breaking laws.  I

17    haven't seen a letter where you're

18    telling us to go back to work down in

19    the building.  Until we get that

20    letter, we're not going.  Well,

21    Ms. Scott, I come out to your house

22    to bring that letter trying to get

23    your coins back in your pocket.

# FREEDOM COURT REPORTING

221

1    That's how he talked to me.  But I

2    went to pick up the letter to get

3    back to work because they was all

4    hollering about the building.

5        HEARING OFFICER:  I think you've

6    answered my question.  You went back

7    to work after you got a letter?

8        MS. SCOTT:  From Searcy.  Okay.

9    We got the letter from Searcy.

10   Now --

11       HEARING OFFICER:  I think you've

12   answered my question.

13       MS. SCOTT:  Okay.  I want to say

14   something else.  We got a letter from

15   Searcy that was for the building.  It

16   wasn't from Ray Dennis telling him

17   that.  Because we got the letter that

18   I could not work with Calvin anymore.

19   So I had to wait then to get the

20   letter from Ray Dennis.  I went and

21   picked up the letter, I think, from

22   Searcy on the 28th of February.  So

23   on March the 2nd, I met Ken Green

# FREEDOM COURT REPORTING

222

1         down at the building with the letter

2         telling us we could go back to work.

3         We wasn't going back to work until we

4         got a letter from these people saying

5         we could go back to work.

6               HEARING OFFICER:  I understand.

7               MS. SCOTT:  There was no reason

8         we were --

9               HEARING OFFICER:  You've

10        answered my question.  All right.  I

11        understand from everyone that there's

12        no further evidence to be offered.

13              MS. FLEMING:  I have a couple of

14        questions I would like to ask

15        Ms. Scott.

16              HEARING OFFICER:  Go ahead.

17              MS. FLEMING:  Thank you.

18              GLADYS SCOTT

19         having been previously duly

20   sworn or affirmed, testified as follows:

21           RECROSS-EXAMINATION

22  BY MS. FLEMING:

23         Q.   I just want to clarify for

# FREEDOM COURT REPORTING

223

1    the record, Ms. Scott, you previously

2    stated in your opening statement about the

3    incident at the dog track with Buddy

4    Swearengin's son, James Swearengin, III.

5         A.    Uh-huh.

6         Q.    And I believe that your

7    testimony has been that Exhibit 2, the

8    letter that James Buddy Swearengin wrote

9    to Ken Green on -- that was received on

10   February 7th, you've previously stated you

11   think that letter was written because of

12   the incident that happened between you and

13   James Swearengin, III; is that correct?

14        A.    No.    That letter was written

15   because of the three requests that we gave

16   Ray to take back.  He had to take it to

17   the building manager.  That letter was

18   written because of that.  Now, my swipe

19   key was keyed out because of the incident.

20   Remember me telling you.  I told you on

21   September the 20th.  I explained all that

22   to you.

23        Q.    I remember that.

# FREEDOM COURT REPORTING

224

1      A.     We had a long conference

2   after the hearing.   I explained it to you

3   that day.

4      Q.     And it's your belief that

5   Buddy Swearengin disabled your swipe

6   key --

7      A.     Yes.   That's my belief.

8      Q.     -- because of the incident

9   that happened between you and his son?

10     A.     His son must have went back

11  and told him a pack of lies, but he should

12  have told him how I was and how he

13  responded to me about the twenty dollars,

14  which he could have the twenty dollars.

15  Twenty dollars wouldn't keep me from

16  paying a bill.   I gave him the six

17  dollars.

18          HEARING OFFICER:   I think you've

19      answered her question.

20     Q.     Now, what evidence do you

21  have that James Buddy Swearengin

22  discriminated against your husband, Calvin

23  Scott, on the basis of his race or his

# FREEDOM COURT REPORTING

225

1  disability?

2      A.    Well, he discriminated on him

3  when he took the swipe key and he didn't

4  want us to have the swipe key.  Anytime

5  anybody don't --

6          HEARING OFFICER:  You've

7      answered the question.  You've

8      answered the question.

9      Q.    Okay.  Is that the only way

10  you feel he was discriminated against?

11     A.    He was discriminated on

12  because of him being black.  He never

13  liked us since we've been there.  At first

14  it was two white vendors in that building.

15  From day one we went to him the way Fred

16  Morris was treating us and giving me

17  problems about me loading up and with my

18  blind husband and moving that -- moving

19  the van from the loading dock.  And I had

20  to push all that stock up the long ramp.

21  They discriminated on us then, I mean,

22  when I first went to him.

23     Q.    When was that?