# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

RECEIVED

2008 JUN -2  A 11: 45

| | |
|---|---|
| Calvin Scott, Sr. | ) |
| (Blind Vendor) | ) |
| | ) |
| Plaintiff (s), | ) |
| | ) |
| v. | ) |
| | ) |
| James Buddy Swearengin | ) |
| State of Alabama Dept. of Finance | ) |
| | ) |
| Defendant(s) | ) |

CIVIL ACTION NO.  2:05cv651-T
(WO)

| | |
|---|---|
| Calvin Scott, Sr. | ) |
| (Blind Vendor) | ) |
| | ) |
| Plaintiff (s), | ) |
| | ) |
| v. | ) |
| | ) |
| Ray Dennis, Perry Hopper, Ken Green | ) |
| State of Alabama Dept. of Rehabilitation Services | ) |
| Business Enterprise Program | ) |
| Defendant(s) | ) |

CIVIL ACTION NO.  2:05cv652-F

Honorable Judge Charles S. Coody:

Enclosed is a copy of the decision from the Arbitration Panel that I received on February 4, 2008, as requested per your letter dated May 30, 2008.

Respectfully,

*Calvin Scott Sr.*

Calvin Scott Sr.
June 2, 2008

JAN 0 9 2008

BEFORE THE UNITED STATES
DEPARTMENT OF EDUCATION

|                                          |   |                                   |
|------------------------------------------|---|-----------------------------------|
|                                          | ) | An Arbitration Proceeding         |
|                                          | ) | Pursuant to the Randloph-         |
| In re:  The Matter of Calvin Scott,      | ) | Sheppard Vending Act              |
|         Licensed Blind Vendor            | ) |                                   |
|                                          | ) | Case No. R-S/06-8                 |

## OPINION AND AWARD

At Montgomery, Alabama, on May 23, 2007, the above styled matter came for hearing. After careful consideration of the testimony and evidence presented and the argument of the parties, the Arbitration Panel finds that the Alabama Department of Rehabilitation Services did not violate the Randolph-Sheppard Act and, accordingly, Denies the Grievance of Calvin Scott. The Arbitration Panel's reasoning follows.

### I – Procedural Posture

Calvin Scott (hereinafter "Vendor" or "Mr. Scott") is a long term Licensed Blind Vendor participating with the Randolph-Sheppard Vending Act (hereinafter "Act"). The Alabama Department of Rehabilitative Services (hereinafter "ADRS") is the designated State Licensing Agency responsible for administering the Act in Alabama.

On February 14, 2005, Vendor filed a demand for an Administrative Review hearing arising out of his dissatisfaction with ADRS's operation and administration pursuant to the Act. A hearing was scheduled for March 10, 2005. On March 8, 2005, Vendor indicated that he would not participate in the hearing and, accordingly, the hearing was cancelled.

1

On July 14, 2005, Vendor filed two civil lawsuits in the United States District Court for the Middle District of Alabama arising out of the same conduct he complained of in his initial request for an Administrative Review before ADRS. These cases are styled, respectively, *Scott v. Dennis, Hopper, Green, and State of Alabama Department of Rehabilitative Service Business Enterprise Program*, Civil Action No. 2005-CV-652, and *Scott v. Swearengin*, Civil Action No. 2005-CV-651. These cases have been jointly administered in the District Court.

On September 21, 2005, the Court ordered the Parties to submit to a Full Evidentiary Hearing pursuant to the Act. The Honorable Frank James was designated Hearing Officer, and, on October 6, 2005, conducted the required Full Evidentiary Hearing. Thereafter, James concluded that, having failed to participate in the Administrative Review or challenge any adverse determination to the Commissioner, the Vendor had failed to preserve any issue upon which he was entitled to relief.

Following the submission of the Decision by James, the Parties again returned to District Court where, once again, they were directed to return to the administrative process contemplated in the Act. On October 23, 2005, the Vendor filed a demand for Arbitration with the U.S. Secretary of Education. Said request was supplemented on June 15, 2006. Thereafter, this Panel was convened. Thomas Klinner was designated by ADRS as one Arbitrator. The Vendor declined to individually name an Arbitrator and requested that the Secretary of Education do so on his behalf. The Secretary did so and designated

Scott LaBarre as an Arbitrator. Jointly, LaBarre and Klinner designated Daniel Feinstein as the neutral chair of the Arbitration Panel.

On May 23, 2007, in Montgomery, Alabama, an arbitration hearing was held in a conference room of ADRS. During the course of the hearing both parties were afforded full opportunity for the presentation of evidence, examination and cross-examination of witnesses, as well as oral argument. In addition, the Arbitration Panel received into evidence, without objection by ADRS, certain written documents proffered by the Vendor after the evidentiary hearing.

A record and transcript of the arbitration hearing were prepared by or under the direction of Tracye Sadler, Certified Court Reporter.

The Parties elected to file post-hearing briefs. The Arbitration Panel received the written submission of the Vendor during the hearing and thereafter received the timely postmarked briefs of ADRS.

## II – Finding of Fact

The relevant facts of this case are largely undisputed and will be summarized briefly below. Additional facts necessary to the Panel's determination may also be noted in the subsequent analysis section of this Award.

Mr. Scott is a long term participant in the Randolph-Sheppard Act program for licensed blind vendors. During the time leading up to the instant matter, he has employed his spouse, Gladys Scott (hereinafter "Mrs. Scott") as his driver and assistant. Through his participation in the Act, for the previous nine years,

the Vendor was assigned certain vending machines located in a building owned and operated by the State of Alabama. This building is known as the Gordon Persons Building and is located in downtown Montgomery.

The Gordon Persons Building is a large, rambling office complex with many corridors, elevators and some locked areas. The building houses the Alabama Department of Finance and confidential tax records are maintained in secured areas near where the Vendor operates.

In order to service his snack machines, in 2004, the Vendor asked for and was given a "swipe key" which enabled him to more easily move throughout the building and not have to knock for entrance into locked areas. Around January 27, 2005, building management took this swipe key from the Vendor. The Vendor asked for the return of the swipe key from building management and, on January 31, 2005, asked Ken Green (hereinafter "Green") his representative at ADRS to seek to obtain the key.

In addition to the swipe key, the Vendor had two additional requests to simplify his tasks and increase his revenue. First, he requested that he be granted a designated parking space in the loading dock area rather than having to park in the publicly accessible spaces near or around the Gordon Persons building. Second, he requested that one of the snack machines be moved to a more desirable location.

Shortly before the time the swipe key was taken from the Vendor, Mrs. Scott had two conversations with James Swearengin, III, the son of James Swearengin, Jr., the building manager for the Gordon Persons building. On an

4

unspecified date, Mrs. Scott gave the younger Swearengin $6.00 and then loaned him an additional $20.00 while gambling at a local dog track. On a later date, when that individual won a bet at the dog track, Mrs. Scott mentioned the earlier loan and requested repayment. There followed a somewhat heated exchange about the funds. Among other things, the Vendor contends that Swearingen's subsequent actions were in retaliation for this verbal exchange between the spouse of the Vendor and the son of the building manager.

On February 7, 2005 ADRS received a letter from the elder Swearengin. In this correspondence, Swearengin "asked that the vendors supplying our snack machines be removed from our building." He went on to state that the reasons for this were,

> The Scotts are high tempered, as well as unreasonable. They don't attempt to work with Building Management, and have the attitude "it's their way, or no way at all." There have been incidents where the Scotts have threatened to bring a gun and shoot personnel, and I have continuous complaints with them not refunding money from the machines. ... The employees and visitors alike in the Gordon Persons Building deserve a safe and pleasant environment. I do not feel as if this can be accomplished with the Scotts servicing this building. I am asking that the Scotts be removed from this building within three (3) days of receipt of this letter.

The Vendor and his spouse vehemently deny the material allegations made in Swearengin's letter.[1]

Upon receipt of this letter, agents of ADRS immediately scheduled a meeting with Swearengin. ADRS employees credibly testified that they believed

---

[1] The Vendor has asserted a claim that appears to be one for slander or libel indicating that Swearengin lied about the described conduct and that ADRS agents acquiesced to those lies. As noted below, the Arbitration Panel has jurisdiction only over alleged violations of the Randolph-Sheppard Act and not over defamation tort claims. Accordingly, the Panel need not reach and thus makes no factual finding of the veracity of the described statements.

that Swearengin, as building manager, had the legal capacity to prohibit an individual, including a licensed blind vendor such as Mr. Scott, from entering the Gordon Persons building. Because of this, Ray Dennis (hereinafter "Dennis"), the Program Director, for ADRS's Business Enterprise Program ("BEP"), described the meeting as an urgent effort to protect the position and income of the Vendor.

During the meeting between ADRS employees and Swearengin, Swearengin indicated that his decision to have the Vendor and his assistant removed from the building was supported by his supervisor, Searcy Rushing (hereinafter "Rushing.") Despite this approval, Dennis and Assistant Program Director of BEP Perry Hopper, (hereinafter "Hopper") labored to convince Swearengin to allow Scott to continue. In the end, they were able to convince Swearengin to modify his demands. Rather than immediately terminate the Vendor's presence in the Gordon Persons building, Swearengin agreed to allow him to return on the conditions that (a) Mrs. Scott would no longer accompany him to the facility, (b) he obtain a different assistant approved by ADRS, and (c) he cooperate with building officials, particularly with regards to entrance into secured areas, and (d) he establish a more streamlined method for responding to customer complaints and requests for refunds. This information was conveyed to the Vendor by a letter from Dennis dated February 9, 2005.

The Vendor declined to accept Swearengin's terms as conveyed by ADRS. Upon receipt of the February 9th letter, the Vendor ceased going to the Gordon Persons building and ceased servicing the vending machines.[2]  The

---

[2] It is undisputed that while Vendor was not servicing the machines, product was purchased and supplies, except in on malfunctioning machine, were exhausted. All money deposited in these

Vendor began writing a series of letters to State and Federal officials seeking to be allowed to bring his spouse back as his assistant as well as certain other demands.

After exchange of letters between ADRS and the Vendor, on February 22, 2005, ADRS informed the Vendor that due to his abandonment of his facility he was to be removed from his position. An exit inventory was scheduled for February 24, 2005.

On February 25, 2005, Rushing announced that the Department of Finance was granting Vendor's requests to allow his spouse to again serve as his assistant, provide designated parking, relocate a certain snack machine, and provide a swipe key for access into secured areas. Shortly thereafter, Vendor returned to the facility and has remained there continuously since that time. The Vendor's license has not been suspended or terminated. Further, the Vendor was not "inventoried out" from his position in the Gordon Persons building.

The parties offered both testimony and documentary evidence of the amount of money lost by the Vendor as a result of the conduct described above. Mrs. Scott testified that her husband suffered a decrease in income of about $1000. The Vendor testified that his loss was approximately $2000. ADRS presented documents compiled by the Vendor in the ordinary course of business, known as BEP 1-E forms, which reflected net income from January 2005 through April 2005 of $3,478.59, $2,602.19, $4,132.48, and $6,394.10 respectively. At

---

machines was eventually received by Vendor. Vendor proffered testimony that Green, as his Representative from ADRS, should have had the malfunctioning machine fixed and product restocked. However, Vendor further made clear that he did not contend that the failure to do so was a violation of the Randolph-Sheppard Act.

the request of the Vendor, the Arbitration Panel held the matter open to allow the Vendor to supplement the record after the hearing. The Vendor did so, presenting daily logs which reflect income of $480.90 for the week of February 4, 2005, income of $686.30 for the week of February 11, 2005, and no income for the succeeding four weekly periods.[3]  As the Arbitration Panel does not reach any question of monetary damages, there is no finding of fact regarding these competing evidentiary proffers.

### III – Analysis of Applicable Law

#### A

In analyzing this unique case, it is important to first acknowledge what the Arbitration Panel is not deciding. First, this matter is before the panel in an unusual procedural posture. Ordinarily, a Randolph-Sheppard appeal proceeds through an Administrative Review to the Commissioner's determination to a Hearing Officer and only then to an Arbitration Hearing. Here, the Vendor chose not to participate in the Administrative Review and never submitted a challenge for a Commissioner's decision. While there was a Hearing Officer appointed, said Hearing Officer ruled that Scott had failed to preserve any issue for appeal and, accordingly, did not reach the merits of the case. Rather than proceed as a normal matter through the challenge process legislatively created for the Randolph-Sheppard program, the Vendor appears before this panel based on a

---

[3]In addition, there was testimony adduced regarding proceeds from certain soft drink machines located in the Gordon Persons building. These are supplied and operated by local Pepsi and Coke representatives; however, the Vendor receives an unspecified portion of the proceeds from these soft drink machines. While Vendor was absent from the facility, ADRS staff notified Pepsi and Coke who then placed holds on funds that otherwise would have been provided to him. Upon his eventual return, those funds were paid in full to Vendor. While receipt of some funds was delayed, there was no testimony that Vendor lost any revenue from these machines.

directive from a federal court. As an academic exercise, whether this panel has jurisdiction, either via the legislatively enacted Randolph-Sheppard Act or arising out of the directive of the United States District Court for the Middle District of Alabama, to reach the merits of the Vendor's claims is interesting; however, as set forth herein, assuming such jurisdiction exists, the Vendor is none-the-less not entitled to the relief requested. Accordingly, the panel need not reach and thus does not decide whether it has statutory authority to hear the merits of the case.

Second, Scott's Complaints state causes of action against certain individually named defendants. Scott seeks a monetary award from and the incarceration of Dennis, Hopper, Green, and Swearengin. The relevant duties owed to a licensed blind vendor under the Randolph-Sheppard Act are duties of the applicable State Licensing Agency. See gen'ly 20 U.S.C. §107a(b) ("The State licensing agency shall ... give preference to blind persons who are in need of employment. ...") They are not individual duties of that agency's employees taken outside and beyond the scope of their official assigned tasks. The proper party respondent to Scott's Randolph-Sheppard claims is the Alabama Department of Rehabilitative Services, not the individually named state employees.

Third, an Arbitration Panel empanelled pursuant to the Randolph-Sheppard Act is not a Court of general jurisdiction. Under Sections 107d-1 and 107d-2 of the Act, this Arbitration Panel may hear only claims of dissatisfaction with actions arising from the operation or administration of the vending facility. To

the degree that Scott's Complaint may be read to assert a claim for slander, defamation, violations of civil rights based on race or disability, or seek to impose criminal liability[4] such assertions lie outside the proper jurisdiction of this Panel. Nothing contained herein should be read as a finding of fact or law on such claims.

B

Having set forth what is not being decided, the panel now turns to what is: whether ADRS violated terms or provisions of the Randolph-Sheppard Act, including the Alabama administrative provisions adopted in accordance with said Act, and, if so, what shall be the appropriate remedy? After careful consideration of the relevant law, testimony offered, evidence admitted, and the argument advanced, the panel concludes that ADRS did not violate the Act.

The Vendor's express contention is that he "was terminated from the Blind Enterprise Program ... without being granted a full evidentiary hearing ..." In support of this position, the Vendor cites to §795-7-2.04 of the Alabama Administrative Code.[5]  Broadly stated, this provision sets out the reasons for

---

[4] In addition to the Federal Randolph-Sheppard claims arising under 20 U.S.C., 107, et seq. and the "mini Act" adopted by the State of Alabama, codified at §21-1-41 of the Code of Alabama, addressed subsequently in this Award, in his Brief to the Panel, the Vendor cited to the American's With Disability Act as well as certain provisions of the Alabama Code pertaining to handicapped persons generally, including §21-1-40 (general definitions), §21-7-2 (equal access for use of public buildings), § 21-7-5 (criminal misdemeanor for interference with enumerated rights), §21-9-1 (declaration of policy), §21-9-6 (oath and bond for Board of Rehabilitation Services), and §21-9-9 (duties of Board).

[5] This section provides as follows (emphasis in original):
**795-7-2.04 Removal From A BEP Facility, Suspension, Or Termination Of License.**
(1) The SLA shall issue licenses for an indefinite period. Licensees, temporary operators, and vendors are subject to removal, suspension, or termination. Suspension or termination of a license shall occur only after affording the vendor an opportunity for a full evidentiary hearing. If the vendor is dissatisfied with the full evidentiary hearing decision, he/she may request that a federal arbitration panel be convened by filing a complaint with the Secretary of the United States

which a vendor's status may be modified and the procedural mechanism required
for such change.

There can be no dispute: under the applicable statutes, the suspension or
termination of an individual's status as a licensed vendor under the Randolph-
Sheppard Act must be preceded by full evidentiary hearing. If Scott's license had
been suspended or terminated without such hearing, he would be entitled to an
appropriate remedy from this Panel. However, while the Vendor makes a correct
statement of the law, the facts to do not support his subsequent conclusion. The
Vendor offered testimony that he was terminated and / or "inventoried out."

---

Department of Education. Removal, suspension, or termination may occur should the SLA find
that the vending facility of a licensee, temporary operator, or vendor is not operated in
accordance with:
(a) licensing requirements,
(b) the rules and regulations governing the program,
(c) federal regulations governing the program,
(d) the terms and conditions of the permit,
(e) the terms and conditions of the operating agreement,
(f) state law, the violation of which may result in physical harm to customers of the facility, the
department, or the vendor;
(g) regulations of other state of Alabama and federal agencies that have regulatory authority
directly related to the operation of a BEP facility; and
(h) rules prohibiting the use of alcoholic beverages or illegal drugs while on duty.
(2) The suspension or termination of a license may be brought about by deterioration of the
relationship between the grantor and the vendor that results in the grantor requesting removal of
the vendor in order for the facility to remain a part of BEP.
(3) The termination or suspension may result from failure of a vendor to fully disclose a felony
conviction(s) that occurs during the time he or she is assigned a facility. Licensees shall disclose
any present or past felony conviction(s) to the SLA. The SLA will not disclose this information
unless it is a condition of placement involving a security clearance or grantor requirement.[21]
(4) The SLA may take action to remove vendors from their facility who become seriously
delinquent in the submission of BEP 1E monthly financial reports and corresponding setaside
assessments due the setaside fund, and escrow funds due the SLA escrow account for initial
stocks, supplies or petty cash as defined by 79576.03 and the commissioner of ADRS.
(5) Licensees, temporary operators and vendors whose license has been suspended or
terminated shall return said license to the SLA within 15 days of suspension or termination.
(6) Additionally, the SLA may suspend or terminate a license after affording the vendor an
opportunity for a full evidentiary hearing for:
(a) Improvement of vision such that the vendor no longer meets the definition of blind person as
defined by applicable federal regulations. In order to ensure compliance, vendors may be
required to undergo an ophthalmologic examination. The SLA shall approve the exam provider
and costs for such an exam shall be the responsibility of the SLA.
(b) Voluntary withdrawal of the vendor from the program upon written notification.

11

However, from the totality of the evidence presented, the Panel finds that these allegations have not been substantiated. *We reject letter for weight*

The evidence presented in the instant case establishes that on February 7, 2005, Swearengin requested that the Vendor be removed from the facility. One of the statutory bases for termination of a license is the "deterioration of the relationship" between a vendor and a facility. See §795-7-2.04(2) However, despite this statutory authority, ADRS did not initiate the process to suspend or terminate Scott's license. Likewise, ADRS did not immediately remove Scott from the facility. Instead, the evidence reflects that ADRS agents promptly made good faith efforts to maintain and repair this deteriorating relationship and save the Vendor's position. *We did not offer any assistance* After discussions between ADRS and Swearengin, Swearengin retracted his demand that the Vendor be removed from the facility.

Swearengin did continue to insist that Mrs. Scott, the Vendor's assistant, be removed from the facility; however, this is not sufficient to amount to a constructive termination. The Vendor was expressly informed that he would be allowed to continue to operate the vending machines in the Gordon Persons Building. He was further informed that this continuance was conditioned upon certain factors, most significantly including replacing Mrs. Scott as his assistant. At that time, the Vendor unilaterally decided that he would not participate under these conditions. A refusal to participate by the Vendor does not amount to a termination or suspension by the ADRS.

Following his receipt of the February 9, 2005 letter, the Vendor stopped going to the Gordon Persons Building and halted servicing his vending machines.

12

Thereafter, based on his failure to perform, on February 22, 2005, ADRS officials notified him that he was to be removed from this facility. This decision, however, was never implemented. Prior to its effective date, this decision was retracted and the Vendor, together with his spouse, was allowed to return to the facility.

Even assuming arguendo that the limitations placed on the Vendor, including replacing his assistant, amounted to a constructive removal, doing so without prior hearing does not rise to the level of a violation of the Randolph-Sheppard Act. The provision of the Alabama Administrative Code cited by Scott clearly distinguishes between suspension and termination on the one hand versus removal on the other. Suspensions and terminations must be preceded by a full evidentiary hearing. However, the statute does not similarly require such a hearing prior to a removal. In relevant part, the enactment states, "vendors are subject to removal, suspension, or termination. Suspension or termination of a license shall occur only after affording the vendor an opportunity for a full evidentiary hearing." The Panel must give effect to the statutory omission of "removal" from the second sentence above.

Similarly, the Randolph-Sheppard Act provides that a state licensing agency shall, "provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and to agree to submit the grievance … to arbitration." 20 U.S.C. §107b(6). This statute requires a fair hearing. It does not require that fair hearing to occur prior to any action with which a vendor may be or become dissatisfied.

In addition to the express contention of the Vendor addressed above, the Vendor also makes the implied argument[6] that the ADRS breached an implicit duty to serve as his advocate.

ADRS, as the designated state licensing agent, has numerous express duties owed to people in this Vendor's position. Those duties include providing an "adequate initial stock of suitable articles to be vended therefrom" 20 U.S.C. §107b(2), "provide initial starting capital ..." §795-7-6-.03(6), and "provide post-licensing training ..." §795-7-5-.01(2). More broadly stated, ADRS is required to provide some degree of support and assistance to the licensed blend vendors and applicants. Assuming – without deciding – that these requirements mandate an implicit duty to serve as an advocate for a vendor in discussions and negotiations between the vendor and the facility management, ADRS did not breach such duty.

The Vendor contends that ADRS and its employees failed to adequately challenge Swearengin's decision to initially have the Vendor removed and subsequent modification that Mrs. Scott be terminated as her husband's assistant. It is undisputed that ADRS's advocacy was able to obtain the benefit of retaining the Vendor's position at the Gordon Persons Building. It is likewise undisputed that the Vendor's own advocacy was successful in having his wife reinstated as his assistant, as well as obtaining a swipe key and the relocation of a snack machine. The Vendor's own advocacy was more successful in achieving his personal goals than was that of ADRS.

---

[6] As the Vendor is proceeding without the benefit of legal counsel, the Panel shall construe his arguments liberally.

14

While the Vendor's advocacy was more successful, that does not establish that the ADRS's actions were not sufficient to comply with the implicit and explicit statutory requirements of the Randolph-Sheppard Act. If the arbitration panel determines that the Agency's conduct was beyond the bounds of reasonableness, it must conclude that the Agency exceeded its discretion and award an appropriate remedy for this breach. However, the panel's discretion to substitute its judgment for that of the ADRS is limited. If the arbitrators are persuaded that the actions in complying with its duties were within the bounds of reasonableness, they may not demand more. This is true even if the panel would likely have taken different actions in the first instance. That is, as expansively as this Panel can view the implicit duty of ADRS, in its role as an advocate for the vendors, ADRS is charged with undertaking good faith and zealous representation. It shall not be found liable for a mere error in tactical judgment.

Here, the Vendor's actions were more successful. But those of ADRS were not unreasonable. The Vendor is assigned to one of if not the most profitable duty assignments available within Alabama. ADRS agents, when notified of Swearengin's determination, immediately took steps to reverse that decision. Their paramount consideration was to protect the Vendor's position. It is not unreasonable for them to have concluded that the position itself was a higher priority than the Vendor's choice of assistant. The panel can not conclude that ADRS's immediate and sincere efforts that resulted in the allowance of the Vendor remaining at his assigned duty station while not succeeding in retaining

Mrs. Scott as his assistant breaches an implied duty to serve as the Vendor's advocate.[7]

## IV - Conclusion

At issue herein is whether the Alabama Department of Rehabilitative Services violated the Randolph-Sheppard Act in its dealings with Licensed Vendor Calvin Scott arising out of the actions and correspondence of February 2005. After careful consideration of the relevant statutory provisions, evidence presented, and argument advanced by the parties, the Arbitration Panel concludes that the agency did not violate this Act. For the foregoing reasons, the Appeal of Calvin Scott is DENIED.

Dated at Montgomery, Alabama on this the 5th day of December 2007.

_____
Daniel L. Feinstein
Montgomery, Alabama

_____
Thomas B. Klinner
Montgomery, Alabama
Concurring

_____
Scott C. LaBarre
Denver, Colorado
Concurring in part and Dissenting in part

---

[7] The Dissenting Opinion couches a similar duty to advocate upon the statutory mandate of Section 107d-4 of the Act to ensure upward mobility and follow-along services for trainees. Neither party raised a claim or defense under this provision. Whether based implicitly on §107d-4 or on the broad penumbra of benefits under the Act, the duty to act on the behalf of a vendor remains the same: a duty to exercise good faith judgment to maximize available benefits under the Act. A mere error in tactics chosen while zealously representing does not rise to the level of a breach. Assuming that this code provision is properly before the Panel, we can not conclude that even a minor infraction occurred.

CONCURRING AND DISSENTING OPINION

OF SCOTT C. LaBarre

> "The Commissioner shall insure, through promulgation of appropriate regulations, that uniform and effective training programs, including on-the-job training, are provided for blind individuals, through services under the Rehabilitation Act of 1973. He shall further insure that State agencies provide programs for upward mobility (including further education and additional training or retraining for improved work opportunities) for all trainees under this chapter, and that follow-along services are provided to such trainees to assure that their maximum vocational potential is achieved." See 20 U.S.C. §107d-4.  See also 34 C.F.R. § 395.4 and 395.11.

To this Member of the Panel, the above-quote represents, perhaps, the single most important provision of the Randolph-Sheppard Act.  This provision calls upon the state licensing agency, here the Alabama Department of Rehabilitation Services, to do more than simply administer a government program.  This provision calls upon such an agency to be proactive and work actively to secure upward mobility for the blind participants working in the Program.  In my view, ADRS did not meet this higher standard in its interaction with Calvin Scott in February of 2005.  I concur with my fellow panel members in that a great deal of the claims asserted by Mr. Scott are not justiciable by this Panel.  However, with respect to whether the ADRS violated the Randolph-Sheppard Act, I do believe a minor infraction thereof occurred.

From the testimony of Ray Dennis and Parry Hopper, it is clear that very little, if any, investigation  occurred to determine whether the claims brought by Mr. Swearengin against the Scott's had any validity.  In fact, Mr. Hopper testified that he did not believe that the agency had any duty to conduct an investigation.

Mr. Dennis testified that ADRS had no real choice but to remove Mr. Scott from the location because of the expressed wishes of the state property manager. In my view, ADRS's inability and/or unwillingness to advocate forcefully for its blind vendor violates the Randolph-Sheppard Act.

I indicated above that this constitutes a minor infraction of the Act. I make such a finding for two reasons. First, although ADRS should have done more to protect its blind vendor and should not have been so willing to place such restrictive terms on Mr. Scott, ADRS at least made some effort to advocate for Mr. Scott. Perhaps, agency administrators did not feel confident in the Act's ability to protect Mr. Scott's right to operate the facility when pitted against a state property manager on state property as opposed to one on federal property.

Secondly, it is clear from the evidence that ADRS's actions caused Mr. Scott very little in the way of real harm. Although the figures proffered contrast sharply, it is doubtful that Mr. Scott lost more than $700.00 or $800.00 in real income. He was only out of the location for a period less than a month, and a number of his machines were maintained by outside vendors in any event.

For these reasons, I would have found ADRS in violation of the Act. Even so, the relief owing to Mr. Scott would be minimal. Perhaps the agency should have been ordered to pay him $800.00 in lost income or forgive set-a-side in a similar amount. The evidence suggests that ADRS BEP managers probably did the best they could in the situation as it developed. However, in the future, ADRS should advocate more forcefully for its blind vendors and, in a situation like this, investigate whether the property manager's allegations against the blind

18

vendor are warranted.  In my view, that is part of the meaning contained in the Act's mandate that "follow-along services are provided to such trainees to assure that their maximum vocational potential is achieved."

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
_____DIVISION

**CERTIFICATE OF SERVICE**

I, _Calvin Scott Sr_____, do hereby Certify that a true and correct copy of the foregoing has been furnished by _Deppartment Educatio_ (manner of service, i.e., U.S. Mail, electronic mail, etc.) on this _2_ day of _June_____ 200_8_ to:

_____

_____

_____

_____

_June 2, 2008_____
Date

_Calvin Scott Sr._
Signature